UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| ACORN SEMI, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) CASE NO. |
| | ) 2:19-cv-000347-JRG |
| SAMSUNG ELECTRONICS CO., LTD., | ) |
| SAMSUNG ELECTRONICS AMERICA, | ) |
| INC., SAMSUNG SEMICONDUCTOR, | ) |
| INC., and SAMSUNG AUSTIN | ) |
| SEMICONDUCTOR, LLC, | ) |
| | ) |
| Defendants. | ) |

REPORTER'S RECORD

TRANSCRIPT OF JURY TRIAL (VOLUME 1)

BEFORE THE HONORABLE JAMES RODNEY GILSTRAP

May 13, 2021; 8:44 a.m.

MARSHALL, TEXAS

Proceedings recorded in realtime via machine shorthand.
_____

**Dana Hayden, CCR, RMR, CRR, CRC**
**Deputy Official Court Reporter**
**Dana@ArkansasRealtimeReporting.com**

1                     **APPEARANCES**

2    **FOR THE PLAINTIFF:**

3         Douglas James Dixon and John Charles Hueston

4         Christina Rayburn

5         Hueston Henningan, LLP

6         620 Newport Center Drive, Suite 1300

7         Newport Beach, CA 92660

8         (949) 226-6741

9         DDixon@hueston.com

10        JHueston@hueston.com

11        Crayburn@hueston.com

12

13        Robert William Weber

14        Smith Weber LLP

15        5505 Plaza Drive

16        P O Box 6167

17        Texarkana, Texas 75505

18        (903) 223-5656

19        Bweber@smithweber.com

20

21

22

23

24

25

1              APPEARANCES (cont'd)

2    FOR DEFENDANTS:

3         Mark D. Fowler and Carrie L. Williamson

4         Erik Fuehrer

5         DLA Piper US LLP

6         2000 University Avenue

7         Palo Alto, CA 94303

8         650-833-2000

9         Mark.fowler@us.dlapiper.com

10        Carrie.williamson@dlapiper.com

11        Erik.fuehrer@dlapiper.com

12

13        David R. Knudson

14        DLA Piper US LLP

15        401 B Street, Suite 1700

16        San Diego, CA 92101

17        619-699-2700

18        David.knudson@dlapiper.com

19

20        Melissa Richards Smith

21        Gillam & Smith, LLP

22        303 South Washington Avenue

23        Marshall, Texas 75670

24        903-934-8450

25        Melissa@gillamsmithlaw.com



```
 1                    APPEARANCES (cont'd)
 2   FOR DEFENDANTS:
 3        Michael J. McKeon and Ruffin B. Cordell
 4        Michael J. Ballanco and Daniel Aaron Tishman
 5        Lauren A. Degnan
 6        Fish & Richardson PC
 7        1000 Maine Ave., SW, Suite 1000
 8        Washington, DC 20024
 9        202-783-5070
10        Mckeon@fr.com
11        Ballanco@fr.com
12        LAD@fr.com
13
14        Timothy John Rawson
15        Fish & Richardson PC
16        12860 El Camino Real, Suite 400
17        San Diego, CA 92128
18        858-678-5070
19        Rawson@fr.com
20
21
22
23
24
25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

I N D E X

(JURY TRIAL - VOLUME 1)

May 13, 2021

SESSIONS/OPEN COURT

PAGE:

Preliminary Instructions                          8

Plaintiff's Opening Statement                    39

Defendants' Opening Statement                    58

WITNESSES IN CHRONOLOGICAL ORDER:

PAGE:

DANIEL GRUPP

    Direct Examination By Mr. Hueston:           85

    Cross-Examination By Mr. Cordell            125

    Redirect Examination By Mr. Hueston         157

TOM HORGAN

    Direct Examination By Mr. Hueston           165

    Cross-Examination By Mr. Fowler:            190

    Redirect Examination By Mr. Hueston         213

    Recross-Examination By Mr. Fowler           218

    Redirect Examination By Mr. Hueston:        219

KIN-SANG LAM (via deposition testimony)         221

DAVID MOREAU (via deposition testimony)         225

MOON-YOUNG JEONG (via deposition testimony)     232

KYUNG-EUN BYUN (via deposition testimony)       236

JOON-IL LEE (via deposition testimony)          241

1   MIN-HYUN LEE (via deposition testimony)          250

2   STEPHEN DELL

3       Direct Examination By Dixon                  262

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           ***** PROCEEDINGS *****

2           THE COURT:  All right.  Counsel, are the

3    parties prepared to present their opening statements

4    after Court gives its preliminary instructions?

08:44AM   5           MR. HUESTON:  Yes, your Honor.  John Hueston on

6    behalf of Plaintiff.

7           THE COURT:  Defendants.

8           MR. McKEON:  On behalf of Samsung, we are, your

9    Honor.  We're ready to proceed.

08:44AM  10           THE COURT:  Please proceed.

11           (Whereupon, jurors enter the courtroom.)

12               PRELIMINARY INSTRUCTIONS

13           THE COURT:  Good morning, ladies and gentlemen.

14    Welcome back.  Please have a seat.

08:45AM  15           Thank you, ladies and gentlemen, for being here

16    promptly.  I had some matters I had to take up of

17    counsel.  We're getting a little bit of late start, but

18    at this point, I have some preliminary instructions I

19    need to give you, and I need to give these to you on the

08:45AM  20    record before the lawyers proceed to present their

21    opening statements.

22           You've now been sworn as the jury in this case,

23    and as the jury, you are the sole judges of the facts,

24    and it is you that will decide what all the facts are in

08:45AM  25    this case.  As the judge, I'll give you instructions on

1  the law.  I'll decide questions of law, evidence, or

2  procedures that arise during the trial.  I'm responsible

3  for maintaining an efficient flow of the evidence

4  throughout the trial process and for maintaining the

08:45AM  5  proper decorum of the courtroom.

6          At the end of the evidence, I'll give you

7  detailed instructions about the law to apply in deciding

8  this case, and I'll give you a list of questions that

9  you are then to answer.  This list of questions, ladies

08:46AM  10  and gentlemen, is called the verdict form, and your

11  answers to those questions will need to be unanimous.

12  Those unanimous answers to those questions will

13  constitute the jury's verdict in this case.

14          Now, I want to briefly tell you what this case

08:46AM  15  is about.  This case involves a dispute regarding four

16  certain United States patents.  Now, I know that each of

17  you saw the patent video film prepared by the Federal

18  Judicial Center as a part of the jury selection, but I

19  need to give you some instructions now, and on the

08:46AM  20  record, about a patent and how one is obtained.

21          Patents are granted or denied by the

22  United States Patent and Trademark Office, an agency of

23  the United States government, which is sometimes called,

24  and you'll hear it referred to throughout the trial,

08:46AM  25  either as the "patent office" or the "PTO."  A valid

United States Patent gives the holder of the patent the

right for up to 20 years from the date the patent

application is filed to prevent others from making,

using, offering to sell or selling the patented

08:47AM   invention within the United States or from importing it

into the United States without the patent holder's

permission.

A patent is a form of property called

intellectual property, and like other forms of property,

08:47AM   a patent can be bought or sold.  A violation of the

patent holder's rights is called infringement.  A patent

holder may try to enforce a patent against persons it

believes to be infringers by filing a lawsuit in a

United States district court, and that's what we have

08:47AM   before us in this case.

The process of obtaining a patent is called

patent prosecution.  To obtain a patent, one must first

file an application with the United States Patent and

Trademark Office, the PTO.  As I mentioned, the PTO is

08:48AM   an agency of the United States government, and it

employs trained examiners who review applications for

patents.  The application includes within it something

called a specification.  The specification contains a

written description of the claimed invention, telling

08:48AM   what the invention is, how it works, how to make it, and

1   how to use it.  The specification concludes or ends with

2   one or more numbered sentences.  These numbered

3   sentences are the patent claims.

4         When a patent is granted by the PTO, it is the

08:48AM   5   claims, ladies and gentlemen, that define the boundaries

6   of its protection and give notice to the public of those

7   boundaries.  Patent claims may exist in two forms

8   referred to as independent claims and dependent claims.

9         An independent claim in a patent does not refer

08:49AM   10   to any other claim; it's independent.  It's not

11   necessary to look at any other claim within a patent to

12   determine what an independent patent claim covers.

13   However, a dependent claim refers to at least one other

14   claim in the patent.  A dependent claim includes each of

08:49AM   15   the elements or limitations of that other claim or

16   claims to which it refers, or as we sometimes say, from

17   which it depends, as well as the additional elements or

18   limitations recited within the dependent claim itself.

19         Accordingly, to determine what a dependent

08:49AM   20   claim covers, it's necessary to look at both the

21   dependent claim itself and the independent claim or

22   claims to which it refers or, as we say, from which it

23   depends.

24         The claims of the patents ensued in this case

08:49AM   25   use the word "comprising."  "Comprising" means including

1    or containing.  A claim that includes the word

2    "comprising" is not limited to the methods or devices

3    having only the elements that are recited in the claim

4    but also covers methods or devices that add additional

08:50AM   5    elements.

6            Let me give you a simple example.  If you

7    consider a claim that covers a table, if the claim

8    recites a table comprising a tabletop, legs, and glue,

9    then the claim will cover any table that contains these

08:50AM   10   structures, even if the table also contains other

11   structures, such as a leaf to expand the size of the

12   tabletop or wheels to go on the ends of the legs.

13           Now, that's a very simple example using the

14   word "comprising" and what it means.  In other words,

08:50AM   15   ladies and gentlemen, it can have other features in

16   addition to those covered by the patent.

17           Now, after an applicant files his or her

18   application with the PTO, an examiner is assigned who

19   reviews the application to determine whether or not the

08:51AM   20   claims are patentable; that is to say, appropriate for

21   patent protection, and whether or not the specification

22   adequately describes the invention that's claimed.

23           In examining a patent application, the examiner

24   reviews certain information about the state of the

08:51AM   25   technology at the time the application was filed.  The

1   PTO searches for and reviews this type of information

2   that is publicly available or that was submitted by the

3   applicant.  This type of information is called, "prior

4   art."

08:51AM   5           The examiner reviews this prior art to

6   determine whether or not the invention claimed is truly

7   an advance over the state of the art at the time.  Prior

8   art is defined by -- and I'll give you specific

9   instructions later as to what constitutes prior art;

08:52AM   10   however, in general, prior art includes information that

11   demonstrates the state of the technology that existed

12   before the claimed invention was made or before the

13   application for the patent was filed.

14           A patent also contains a certain list of prior

08:52AM   15   art that the examiner has considered.  The items on this

16   list are called the cited references.  Now, after the

17   prior art search and examination of the application, the

18   examiner informs the applicant in writing of what the

19   examiner has found and whether the examiner considers

08:52AM   20   any claim to be patentable, in which case it would be

21   allowed.

22           Now, this writing from the examiner to the

23   applicant is called an office action.  Now, if the

24   examiner rejects the claims, the applicant has an

08:52AM   25   opportunity to respond to the examiner, to try to

1    persuade the examiner to allow the claims.  The

2    applicant also has the opportunity to change or amend

3    the claims or to submit new claims, and the papers

4    generated during these communications back and forth

08:53AM    5    between the examiner and the applicant are called the

6    prosecution history.

7           This process may go back and forth between the

8    examiner and the applicant for some time until the

9    examiner is ultimately satisfied that the application

08:53AM   10    meets the requirements for a patent, and in that case,

11    the application issues as a United States Patent.

12          Or in the alternative, if the examiner

13    ultimately concludes that the application should be

14    rejected, then no patent is issued.  Sometimes patents

08:53AM   15    are issued after appeals within the PTO or to a court.

16           Now, to help you follow the evidence in this

17    case, I want to give you a brief summary of the

18    positions of the two parties.  As you know, the party

19    who brings a lawsuit is called the Plaintiff.  The

08:54AM   20    Plaintiff in this case is Acorn Semi, LLC, which you are

21    going to hear referred to throughout the trial simply

22    either as "the Plaintiff" or as "Acorn."

23           And, as you know, the party or parties against

24    whom a lawsuit is brought are called "the Defendants,"

08:54AM   25    and in this case, the Defendants are Samsung Electronics

Company Limited; Samsung Electronics America, Inc.;

Samsung Semiconductor, Inc.; and Samsung Austin

Semiconductor, LLC, which, you are going to hear these

four entities referred to collectively throughout the

trial as either "the Defendants" or simply as "Samsung."

Now, as I told you during jury selection, this

is a case of alleged patent infringement.  And as I may

have already mentioned, there are four separate

United States patents that have been asserted in this

case.

The first of these patents is United States

Patent Number 8,766,336.  And as you have heard, patents

are commonly referred to by their last three digits.  So

in this case, Patent Number 8,766,336 is going to be

referred to, and you'll hear it referred to throughout

the trial simply as the "'336 Patent" or the "'336

Patent."

The second U.S. patent at issue in this case is

United States Patent Number 9,461,167, which you'll hear

referred to as the "'167 Patent" or the "'167 Patent."

The third United States Patent at issue is

United States Patent 9,905 ,691, which you'll hear

called the "'691 Patent" or the "'691 Patent."

And the fourth and final United States Patent

at issue in this case is United States Patent Number

1,090,395, which you'll hear referred to throughout the
trial as the "'395 Patent" or the "'395 Patent."

Now, these four patents, ladies and gentlemen,
are going to be collectively referred to, at various
times throughout the trial, as the patents in suit.  You
may also hear them referred to collectively throughout
the trial as the asserted patents.  These patents
generally relate to semiconductors and their
manufacturer.

The Plaintiff in this case, Acorn, contends
that the Samsung defendants are infringing certain
claims of these four patents-in-suit by making, selling,
or offering for sale in the United States or importing
into the United States products that include its
patented technology.

Acorn contends that it's entitled to money
damages as a result of that infringement.  Acorn also
contends that Samsung has willfully infringed the
asserted patents.

Samsung denies that it infringes any of the
claims of Acorn's asserted patents, and Samsung denies
that any infringement has been willful.  Samsung also
contends that Acorn is not entitled to any money
damages.

Now, I want you to know, and I'm aware, that

there are many new words and concepts that have been
thrown at you.  I'm going to define a lot of these words
and explain these concepts to you as we go through these
instructions.  The attorneys are going to discuss them

08:57AM  during their opening statements.  The witnesses, over
the course of the trial, are going to help you
understand this through their testimony.

So, ladies and gentlemen, please do not feel
overwhelmed at this stage.  I promise you, it will all
08:57AM  come together as we go forward.  Now, one of your jobs
in this case is to decide whether or not the asserted
claims of the four asserted patents have been infringed.
If you decide that any claim of the patents-in-suit has
been infringed by the Defendants, then you'll need to
08:58AM  decide whether or not that infringement has been
willful.

You will then also need to decide what amount
of money damages should be awarded to the Plaintiff as
compensation for that infringement.

08:58AM  Now, as I mentioned, my job in this case is to
tell you what the law is, to handle rulings on evidence
and procedure, and to oversee the conduct of the trial
and to maintain a proper decorum in the courtroom.  In
determining the law, it's specifically my job to
08:58AM  determine the meanings of any of the claim language from

the claims that have been asserted that needs to be interpreted.  I've already determined the meanings of this claim language for the patents-in-suit, and you must accept the meanings or definitions, sometimes called constructions, that I am going to give you, and you must apply those meanings to the particular claims throughout the course of the trial.

        You are going to be given a document in a few minutes that reflects those meanings that the Court is providing to you.  For any claim language for which I have not provided you with a meaning or a definition, you should apply the plain and ordinary meaning of that language, as understood by a person of ordinary skill in the art.

        If, however, I have provided you with a specific meaning, definition, or, as I say, they are sometimes called constructions, then you are to apply my definition or construction of that language to those terms throughout the case.  However, ladies and gentlemen, my interpretation of any language from the asserted claims should not be taken by you as an indication that I have a personal opinion or any opinion at all regarding the issue of infringement, because the issue of infringement is for the jury to decide and only for the jury to decide in the course of this trial.

1    I'm going to provide you with more detailed

2    instructions on the meaning of the claims before you

3    retire to deliberate on your verdict.  In deciding the

4    issues that are before you, you will also be -- you will

09:00AM  5    also be asked to consider specific legal rules, and I'm

6    going to give you an overview of those rules now.  And

7    at the conclusion of the case, I'll give you more

8    detailed instructions.

9    First, I'll remind you that the burden of proof

09:00AM  10   in this case is what is known as the preponderance of

11   the evidence.  This burden of proof may sometimes be

12   talked about and called out to be the greater weight and

13   degree of credible testimony.  The burden of proof,

14   known as the preponderance of the evidence, means that

09:00AM  15   the jury must be persuaded by the credible and

16   believable evidence that the claim asserted is more

17   probably true than not true, more probably true than not

18   true.

19   Let me remind you of the example I gave you

09:01AM  20   during jury selection.  If you look at the statue in the

21   courtroom in front of the court reporter, the Lady of

22   Justice, she holds in her left hand, raised above her,

23   the scales of justice.  Those scales start off at the

24   beginning of this trial, where we are now, exactly

09:01AM  25   balanced and equal.

1        Over the course of the trial, the Plaintiff

2   will put on their testimony.  Consider that the

3   Plaintiff's testimony goes on one side of those scales,

4   and the Defendant will put its testimony in evidence on

09:01AM   5   the other scale, the other side of the scales; and when

6   all the evidence has been produced and presented during

7   this trial, if the party has the burden of proof by a

8   preponderance of the evidence and you consider those

9   scales, if those scales tip in favor of the party who

09:01AM  10   has that burden of proof by a preponderance of the

11   evidence, even if they tip ever so slightly, then that

12   party has met its burden of proof by a preponderance of

13   the evidence; again, the greater weight and degree of

14   credible testimony, more probably true than not true.

09:02AM  15        Now, at the time the jury was selected in this

16   case, back on April the 30th, I talked to you about

17   another burden of proof called clear and convincing

18   evidence.  Since that time, it's become clear to the

19   Court that in this particular case, that burden of proof

09:02AM  20   is not going to be applied, and you will not be called

21   upon to apply a second burden of proof called clear and

22   convincing evidence.

23        The burden of proof that you are going to apply

24   to all the evidence in this case is the preponderance of

09:02AM  25   the evidence standard.  Also, ladies and gentlemen, I

1  want to remind you that at no time in this trial will

2  you ever apply a third and different burden of proof

3  called beyond a reasonable doubt.  That's the burden of

4  proof that applies in a criminal case, and it has

09:03AM  5  absolutely no application in a civil case like this.

6        Now, the first issue that you are going to be

7  asked to decide is whether or not the Samsung defendants

8  have infringed any of the asserted claims of the

9  patents-in-suit.  Let me remind you:  Infringement is

09:03AM  10  determined and assessed on a claim-by-claim basis, and

11  Acorn, the Plaintiff, must show you by a preponderance

12  of the evidence that a claim has been infringed.

13        Accordingly, there can be infringement of one

14  claim within a patent but no infringement as to another

09:03AM  15  claim within the patent.  In general, a defendant may

16  infringe the asserted patent by making, using, selling,

17  or offering for sale in the United States or importing

18  into the United States a product meeting all of the

19  requirements of a claim of an asserted patent or a

09:04AM  20  method that practices all required steps of a claim

21  without the permission of the patent holder.

22        I'll provide you with more detailed

23  instructions about the requirements for infringement at

24  the end of the case.

09:04AM  25        Now, if you decide that any claim of the

patents-in-suit has been infringed, you'll then need to decide whether that infringement has been willful.  The Plaintiff has the burden of proof to prove willful infringement by a preponderance of the evidence.

09:04AM

        Further, if you decide that any of the asserted claims of the patents-in-suit has been infringed, then you will also need to decide what amount of money damages should be awarded to the Plaintiff in this case, Acorn, to compensate it for that infringement

09:04AM

        A damages award, ladies and gentlemen, must be adequate to compensate the patent holder for the infringement, but in -- and in no event may a damage award be less than what the patent holder would have received if it had been paid a reasonable royalty for

09:05AM

the use of its patent.

        However, any damages that you award are meant to compensate the patent holder and they are not meant to punish the Defendant.  And you may not include in the damages award any additional amount as a fine or a

09:05AM

penalty above what is necessary to fully compensate the patent holder for any infringement that you have found.

        Moreover, damages in a case like this cannot be speculative, and the Plaintiff, Acorn, must prove the amount of its damages for the alleged infringement by a

09:05AM

preponderance of the evidence.

1      I'll give you more detailed instructions on the

2  calculation of damages for the alleged infringement of

3  the patents-in-suit at the conclusion of the trial,

4  including by giving you specific instructions with

09:05AM    5  regard to the calculation of a reasonable royalty.

6  However, let me remind you, the fact that I am

7  instructing you on damages now does not mean that Acorn

8  is or is not entitled to recover damages.

9      Now, ladies and gentlemen, over the course of

09:06AM   10  the trial, you are going to be hearing from a number of

11  witnesses in this case, and I want you to keep an open

12  mind while you are listening to the evidence and not

13  decide any of the facts until you've heard all the

14  evidence.  This is important.

09:06AM   15      While the witnesses are testifying, remember

16  that you, the jury, will have to decide and determine

17  the degree of credibility and believability to allocate

18  to each of the witnesses and all of the evidence that's

19  presented over the course of the trial.

09:06AM   20      So while the witnesses are testifying, you

21  should be asking yourselves things like this:  Does the

22  witness impress you as being truthful?  Did he or she

23  have a reason not to tell the truth?  Does he or she

24  have any personal interest in the outcome of the case?

09:07AM   25  Does the witness seem to have a good memory?  Did he or

1   she have the opportunity and ability to observe

2   accurately the things that they testified about?  Did

3   the witness appear to understand the questions clearly

4   and answer them directly?  And, of course, does the

09:07AM   5   witness's testimony differ from the testimony of any

6   other witness; and if it does differ, how does it

7   differ?

8           These are some of the kinds of things you

9   should be thinking about while you are listening to each

09:07AM   10   witness that will testify over the course of this trial.

11          Also, I want to talk to you briefly about

12   expert witnesses.  When knowledge of a technical subject

13   may be helpful to the jury, a person who has special

14   training or experience in that particular technical

09:07AM   15   field -- we call them an expert witness -- is permitted

16   to testify to the jury about his or her opinions on

17   those technical matters.  However, ladies and gentlemen,

18   you are not required to accept an expert witness's, or

19   any witness's, opinions at all.  It's up to you to

09:08AM   20   decide whether you believe an expert witness or any

21   witness and whether you believe what they tell you is

22   correct or incorrect, or whether you want to give it any

23   weight at all or a considerable amount of weight.  Those

24   decisions are yours and yours alone.

09:08AM   25          Now, I anticipate that there will be expert

witnesses testifying in support of each side in this
case, but it will be up to you to listen to their
qualifications when they testify; and when they offer
you an opinion and explain the basis for that opinion,
you will have to evaluate what they say and whether you
believe it or not and to what degree, if any, that you
want to give that opinion weight.

Remember, ladies and gentlemen, judging and
evaluating the credibility and the believability of each
and every witness is an important part of your job as
jurors.

Now, during the trial, it's possible that some
testimony from one or more witnesses is going to be
presented to you through what we call a deposition.  In
trials like this, it's very difficult, if not impossible
sometimes, to get every witness in the same place at the
same time to offer their testimony live and in person
from the witness stand.

So before the trials begin, the lawyers for
each side take the depositions of all the witnesses.  In
a deposition, a court reporter is present, the witness
is sworn and placed under oath, and then they are asked
questions by both sides in the case, through their
lawyers, and the questions and the witnesses' answers
are taken down and recorded; and in most cases, those

1    depositions are video-recorded.

2          Now, it's important for you to understand,

3    ladies and gentlemen, that over the course of the trial,

4    when you see these witnesses testify by deposition; in

09:10AM   5    other words, when portions of those video-recorded

6    depositions are played back to you, you are going to see

7    and notice places where there are sections that are

8    spliced together.  There may be little jumps involved.

9    You may hear different people's voices asking the

09:10AM   10   questions of the witnesses.  Let me explain to you why

11   that happens.

12         In most depositions, most witnesses are

13   questioned for up to seven hours.  There may be 15

14   minutes, 5 minutes, 30 minutes of that seven-hour

09:10AM   15   deposition that the lawyers in this case think is

16   important for you to hear and that they intend to

17   present to you through that deposition witness.  You

18   don't have to listen to all seven hours to get that 15

19   minutes or 20 minutes or whatever it is that's relevant;

09:10AM   20   and so those video-recorded depositions will be spliced,

21   and only the relevant portions that each side in the

22   case wants to present to you will be played to you.

23   That's why you may notice little breaks or splices or

24   you may hear different voices asking the witnesses

09:11AM   25   questions, but I want you to understand that keeps you

1  from having to listen to all seven hours' testimony of

2  these witnesses, and it's going to save you and the

3  Court a lot of time.

4          Don't focus on any jumps or skips or changes in

09:11AM  5  voices.  Focus on the questions that are asked and focus

6  that are -- on the answers that are given.  That, as I

7  mentioned, is going to save everybody a lot of time.

8          But deposition testimony, ladies and gentlemen,

9  is entitled to the same consideration, insofar as

09:11AM 10  possible, and is to be judged by you as to the

11  credibility, weight, and otherwise considered by the

12  jury in the same way as if the witness had appeared in

13  person and testified live from the witness stand.

14          Also, ladies and gentlemen, over the course of

09:11AM 15  the trial, you are going to be shown certain documents

16  that have been admitted by the Court as exhibits, and in

17  some of these documents, portions are going to be

18  blacked out or redacted.  Those redactions are going to

19  be there because the Court ordered them to be redacted.

09:12AM 20          When you see a document over the course of the

21  trial that has portions like that or redacted, do not

22  focus on what's been redacted.  Do not speculate or

23  guess about what's been blacked out.  You should focus

24  your attention on the remaining portions of the document

09:12AM 25  that are there for you to see and not be confused or

1   distracted by any redactions that are in there.  Again,

2   if there are redactions, it's because I have ordered

3   them prior to the trial.

4          Also, during the course of the trial, it's

09:12AM   5   possible that the lawyers are going to raise objections,

6   and when they do, I will issue and give rulings on those

7   objections.  Remember, it's the duty of an attorney to

8   object when the other side purports or attempts to offer

9   evidence that the attorney believes is not proper under

09:12AM   10   the rules of the Court.  However, upon allowing the

11   testimony or other evidence to be introduced over the

12   objection of attorney, the Court does not, unless

13   expressly stated, indicate any opinion as to the weight

14   or effect of that evidence.

09:13AM   15          As I've told you, you, the jury, are the sole

16   judges of the credibility and believability of all the

17   witnesses and the weight and effect to give to all the

18   evidence.

19          Now, I'd like to compliment the lawyers and the

09:13AM   20   parties on both sides of this case because prior to

21   today, in pretrial -- in pretrial procedures before the

22   Court, we have gone through many, many, many documents

23   that would be potential exhibits for you to see over the

24   course of the trial, and where there have been disputes

09:13AM   25   over the proper admissibility of those documents, the

1    Court has heard arguments from both sides, and I have

2    already ruled on the admissibility of those documents;

3    and by preadmitting those documents, we have all saved

4    you the obligation to sit here and listen to that over

09:14AM    5    the course of the trial, and that has saved you a lot of

6    time.

7            That means that when a document is presented to

8    you as an exhibit in this trial, the Court has already

9    ruled on its admissibility, so the lawyers can simply

09:14AM    10   present it, put it in a proper context, and use it with

11   the witness.  They don't have to go through the formal

12   presentation process, objection process, argument over

13   the admissibility of it, and then have the Court

14   ultimately rule on it.  All of that's already been done

09:14AM    15   in advance.

16           And whether you understand it or not, ladies

17   and gentlemen, that saved you many hours of having to

18   listen to that process, that you won't have to listen to

19   in this trial, because, as I say, because of the

09:14AM    20   cooperation and work of both sides and their lawyers

21   with the Court in advance, that's already been done.

22           So when the parties show you an exhibit, it

23   means I've already ruled on its admissibility, and they

24   will ask such questions and put it in a proper context

09:14AM    25   as they feel is appropriate.

1          However, it's still possible that objections

2     are going to arise during the course of the trial.  If I

3     should sustain an objection to a question addressed to a

4     witness, then you must disregard the question entirely,

09:15AM     5     and you must not draw any inference from its wording or

6     speculate about what the witness would have said if the

7     I had allowed them to answer the question.

8          On the other hand, if I overrule an objection

9     to a question addressed to a witness, then you should

09:15AM    10     consider the question and the answer just as if no

11     objection had been made in the first place.

12          You should understand, ladies and gentlemen,

13     that the law of the United States permits a judge to

14     comment to the jury regarding the evidence in the case,

09:15AM    15     but those comments from the judge are only an expression

16     of his or her opinion as to the evidence, and the jury

17     is free to disregard those comments because, as I've

18     told you several times, you, the jury, are the sole

19     judges of the facts in this case and the credibility and

09:16AM    20     believability of each of the witnesses and all the

21     evidence.

22          I want you to understand, even though the law

23     may permit me to comment on the evidence during the

24     course of the trial, I'm going to work very hard not to

09:16AM    25     do that.  Also, you should understand that our court

1    reporter takes down everything that's said in the

2    courtroom.

3          There may be times when two people try to talk

4    at the same time, and I will stop them.  That's because

09:16AM    5    you cannot write down what two people are saying at the

6    same time.  But the transcription, the written version

7    of everything that's said over the course of a trial, is

8    not going to be available for you to consider during

9    your deliberations after you've heard all the evidence.

09:16AM   10    The transcript is prepared in case there is an appeal of

11    this case to an appellate court.

12          That means, ladies and gentlemen, you are going

13    to have to rely on your memories of the evidence and the

14    testimony that's presented over the course of the trial.

09:17AM   15          Now, in a moment, each of you are going to be

16    given a juror notebook.  In that notebook, you will have

17    an opportunity, and you'll have a legal pad in there on

18    which you can take notes during the course of trial, if

19    you determine you want to take notes.

09:17AM   20          If you take notes about the testimony of the

21    witnesses and what's presented over the course of a

22    trial, those notes are for your own personal use.  You

23    still have to rely on your memory of the evidence, which

24    is why you should pay close attention to the testimony

09:17AM   25    of each and every witness.

1          A juror should not abandon his or her own

2     recollection of the evidence because some of the jurors'

3     notes indicate something differently.  Notes, if you

4     take them, are to refresh your recollection, and that's

09:17AM    5     the only reason you should be keeping them.

6          All right.  I'm now going to ask our court

7     security officer to distribute these juror notebooks to

8     each member of the jury.

9          You'll notice in these notebooks, when you get

09:18AM   10     them, ladies and gentlemen, that you each have a copy of

11     the four asserted patents that are at issue in this

12     case.

13          Also you'll find in there a ledger indicating

14     certain language from the asserted claims that the Court

09:18AM   15     has construed or defined for you.  You'll see the claim

16     language on the left-hand column and the actual

17     definition or construction that the Court has provided

18     you on the right-hand side.

19          Also, you are going to find a section in there

09:18AM   20     for witness pages.  Those should be tabbed with a single

21     page for each person that may testify over the course of

22     trial, and you'll find a picture of the witness on each

23     page, with their name underneath, and ruled lines for

24     note-taking there, if you wish to take notes there.

09:19AM   25          You'll also find, in the back of those

notebooks, a new legal pad that you can also use for additional note-taking, and you should find a pen in the front of the notebooks in case you don't have one with you.

09:19AM    These notebooks, ladies and gentlemen, should be with you at all times.  You should not leave them laying around.  When you are in the courtroom, they should be in your possession.  When you go to the jury room, you should take them with you.  When you leave

09:19AM each evening at the end of that day's portion of trial, the notebooks should be closed on the table in the jury room so they will be there for you the next morning.

    Now, having said that, there may be times -- there probably will be times over the course of the

09:20AM trial when we will take a short recess and you are not going to be out of the courtroom very long, and in those cases, I may say to you, "Ladies and gentlemen, you can simply close your notebooks and leave them in your chairs," in which case you can do that, and you don't

09:20AM have to carry them back to the jury room with you.  But they are not to be left lying around.  They are to be in your possession and under your control at all times.

    All right.  In a moment, we're going to proceed to hear the lawyers' opening statements for each side in

09:20AM the case.  Opening statements, ladies and gentlemen, are

09:20AM

designed to give you a roadmap of what each side expects
to offer by way of evidence, and you should remember,
throughout the course of this trial, that what the
lawyers tell you is not evidence and what the lawyers
tell you is not -- or are not instructions on the law.
Any instructions on the law will come from the Court and
only from the Court.

        The sworn testimony of the witnesses given
under oath and subject to cross-examination from the
witness stand and the exhibits that the Court has
already reviewed and found admissible that are presented
to you, that is the evidence in this case.

        What the lawyers are going to tell you is their
impression of what they hope the evidence will show you,
and they have a duty to point out to you what they
believe the evidence will be; but remember, what they
tell you is not evidence.

        Now, after the lawyers for both sides have
given their opening statements, then we'll proceed with
the evidence in this case.  The Plaintiff will present
its evidence case.  The Plaintiff will call each of its
witnesses.  That's called the Plaintiff's case-in-chief,
and when the Plaintiff has called and presented all its
witnesses, the Plaintiff will rest its case-in-chief.

        At that point, the Defendants will come forward

with their case-in-chief, and they will call their

witnesses and present their evidence; and when the

Defendants have called all their witnesses and presented

their evidence, the Defendants will rest their

09:22AM   case-in-chief.

At that point, the Plaintiff has an

opportunity, if it chooses, to call additional witnesses

that are called rebuttal witnesses.  If the Plaintiff

presents rebuttal witnesses, then those will be called

09:22AM   to testify; and when any rebuttal witnesses have

completed their testimony, then you will have heard all

of the evidence, and at that time, I will give you

written instructions on the law, and I will present you

with a copy of those instructions for you to take with

09:22AM   you to the jury room during your deliberations.

I will also send back to you, in the jury room,

a verdict form with the questions that I have mentioned

already that you are going to be asked to answer.  These

final instructions that I will give you after all the

09:22AM   evidence is presented are called the Court's final

instructions to the jury.  They are also commonly called

the Court's charge to the jury.

After I present my charge to the jury, the

Court's final instructions to the jury, the lawyers will

09:23AM   present their closing arguments; and after you've heard

closing arguments from counsel for the Plaintiff and counsel for the Defendants, then I will instruct you to retire to the jury room and to consider the answers to those questions and return your verdict in this case.

Let me repeat my earlier instruction to you: You are not to discuss or communicate about this case with anyone and you are not to discuss or communicate in any way about this case with each other.

Only when you've heard all the evidence, when I have given you my final instructions, when the lawyers have presented their closing arguments, and when I specifically instruct you to retire to the jury room and consider and deliberate upon your verdict, at that point, ladies and gentlemen, it's like a light switch flips and you go from not being permitted to talk about the evidence to being required to talk about the evidence among the eight of you, in an effort to reach a unanimous decision as to the questions that are included in the verdict form.

But until that time, until I specifically instruct you to retire and deliberate upon your verdict, you must not discuss or communicate in any way, among each other, anything about the trial or the evidence, and you must not at any time discuss or communicate in any way with anyone else about the trial or the evidence

1    in this case.

2           Also, I want to remind you of something I

3    mentioned during jury selection, and that is over the

4    course of this trial, it's going to be nearly impossible

09:24AM   5    that you won't at some point come in close contact with

6    one of the lawyers, one of the witnesses, one of the

7    support staff for each side in this case, either coming

8    in the entrance, on the sidewalk out front, where you

9    parked; that's probably going to happen, and when it

09:24AM   10    does, whoever that is, if they are associated in any way

11    with either side of this case, they are not going to

12    speak.

13           They are not going to be friendly.  They are

14    not going to have a conversation.  They are not going to

09:25AM   15    say, "Good morning.  How are you," because I've

16    instructed them not to.

17           Again, it is critical that when you retire to

18    the jury room to deliberate on your verdict and to

19    consider and answer those questions, the only

09:25AM   20    information that you have before you to draw upon for

21    that process is the information that you received over

22    the course of this trial from the witnesses that have

23    testified under oath and subject to cross-examination

24    and the documents and exhibits that the Court has

09:25AM   25    admitted into evidence.  That must be the only

1  information that you draw upon when you answer the

2  questions in the verdict form, and that's why I've

3  instructed the parties and their counsel and their

4  witnesses not to have any communication with any member

09:25AM  5  of the jury.

6          So if that happens and somebody associated with

7  one side or the other walks right by you, doesn't look

8  you in the eye, doesn't smile, doesn't ask you how

9  you're doing this morning, don't hold that against them.

09:26AM  10  Don't think they are being rude or unfriendly.  Just

11  remember they are simply following the Court's

12  instructions to you.

13          All right.  With that, we will now proceed with

14  your opening statements from counsel for the competing

09:26AM  15  parties.

16          Plaintiff, you may present your opening

17  statement to the jury.

18          MR. HUESTON:  Thank you, your Honor.

19          THE COURT:  Would you like a warning on your

09:26AM  20  time, Mr. Hueston?

21          MR. HUESTON:  Yes, your Honor.  Two minutes.

22          THE COURT:  I'll warn you when you have two

23  minutes remaining.  You may proceed with Plaintiff's

24  opening statement.

25          ///

PLAINTIFF'S OPENING STATEMENT

MR. HUESTON:  May it please the Court.

Good morning, ladies and gentlemen.  This case is about a special company that invents things and it's about two inventors who worked at that company who came up with a brilliant idea, a breakthrough invention that helps the cell phone in your pocket run faster and use less battery power.

Samsung has been using this invention in its electric devices for years without paying.  You have the power today to say that this special company that's dedicated to inventing needs to get paid what it's owed.

Now, the story of this invention starts with the inventors and the special company that helped them, and that's called Acorn Technologies.  Acorn was founded right here in the United States in 1998, about 20 years ago, and it had a special vision.  It wanted to try to solve the world's most important technical problems, and its mission is just like its name.

Acorn was trying to find the great ideas, the acorns, and then by investing time, money, and bringing in inventors, it tried to grow those ideas into real and practical inventions, the oak trees.  It would take many years to do that.

The CEO of Acorn is Mr. Tom Horgan, and

1  Mr. Horgan, if you can stand up, please.

2          Mr. Horgan will testify a little later today,

3  and he's going to tell you that he invested in research

4  and development, he hired brilliant inventors, and when

09:28AM  5  they came up with a great idea, he protected them with

6  patents.  And when they found that 1-in-1,000

7  breakthrough idea, they worked to bring it to market.

8          Now, you are going to hear this is a tough

9  business.  A lot of ideas fail.  Other ones take years.

09:28AM  10  They think ahead of the technology years ahead of

11  industry, and it takes years for industry to catch up

12  and appreciate what they've done, and that's true in

13  this case.  It takes time, patience, and the investment

14  of a lot of money before you might ever eventually see a

09:29AM  15  return.

16          Last and finally, hiring the two brilliant

17  inventors in this case who created the invention, and

18  they are Dr. Daniel Grupp and Dr. Daniel Connelly.  A

19  little later this morning, you are going to hear from

09:29AM  20  Dr. Connelly, and you are going to find him, I think, to

21  be a very interesting person.  He has been an inventor

22  his whole life.

23          You'll hear that he invented a way to take

24  blood clots out of a body.  He invented a way to bring

09:29AM  25  portable malaria kits that are now being used in

1   different parts of the world, and you will hear that

2   when he was at Acorn, he was focused on semiconductors,

3   trying to find a breakthrough, and his partner there was

4   Daniel Connelly, and you'll hear he was equally as smart

09:29AM   5   and knew everything about physics, and the two of them

6   worked together to create the breakthrough invention in

7   this case.

8           Now, before I tell you about the invention,

9   we're going to be going inside the phone here, and I've

09:30AM   10   got to talk to you about a couple of things that are

11   going to come up inside the phone.

12          First of all, inside your phone is something

13   called the processor.  That's the brain of the phone,

14   and it's a computer chip; and inside that computer chip

09:30AM   15   are all these tiny little transistors.  Those are little

16   electrical switches.  There are actually billions of

17   them inside your phone, and if you look over there to

18   the call-out on the right, it says, "Metal, silicon, and

19   metal"; that's inside one of those transistor chips.

09:30AM   20   Those transistors are connected together with bits of

21   metal, and electricity has to run from the metal to the

22   silicon to the metal.

23          Now, you're going to hear it's hard for the

24   electricity to jump from the metal to the silicon and

09:30AM   25   back again.  I'm going to show you an illustration right

now.  See how the electricity kind of gets stuck a
little bit as it goes from the metal to the silicon and
then silicon to the metal.  It's kind of slowing down.
It's like it's running uphill.  That's called contact
09:31AM  resistance.  And see what happened to the battery?  The
more contact resistance, the harder it is for that
electron to jump from metal to silicon and back around
again, the faster your battery runs down.

The semiconductor industry knows this is a big
09:31AM  problem, and they all tried to reduce contact
resistance.  If you can reduce contact resistance, the
electrons will move through faster and your phone won't
run down.  That's exactly the problem that Drs. Grupp
and Connelly solved; they figured out a way to reduce
09:31AM  that contact resistance.

Now, you'll hear at the time everybody was
trying to work on this -- and you see that metal and
silicon?  What everybody thought at the time was if you
just push that metal and silicon together and get it
09:32AM  together as smooth as you can, that will be the way to
reduce contact resistance.  Those electrons will move
fast.  But it wasn't working.

So Dr. Grupp and Connelly worked day and night,
blackboards, thinking, "How can we overcome this
09:32AM  problem," and they came up with a solution that no one

09:32AM

else was thinking about.  Instead of trying to push it
together, they thought, "What if we make a separation
between the metal and silicon, pull them apart, and put
an insulating layer in between.  That will make -- in
the world of quantum physics, that will make it easier
for those electrons to move."

So here's what they thought of.  Look at that
metal and silicon.  They made a gap, they put in that
insulating layer that you see in color there, and look,
the electrons are moving quickly and the cell phone is
not running down on its battery.  That was the
invention.

Now, ladies and gentlemen, they didn't just
think of this idea; they tested it.  And when they did
their initial tests, it really worked.  They reduced
contact resistance more than 20 times lower than the
industry's highest standard at the time.  It was a true
breakthrough moment.

Now, those inventors in Acorn knew they had a
great invention, and so what they did is they then
applied for a patent to protect it.  They filed, and
you'll see they got their first patent in 2006.  And you
will see, ladies and gentlemen, that in the
United States Constitution, our Founding Fathers have
protected the ideas of patents for over 200 years.  They

1  knew how important it was, how necessary it was, the

2  patent system, for innovation and invention, how

3  necessary the patent system is to protect inventors like

4  Drs. Grupp and Connelly and Acorn and reward them for

09:34AM  5  their inventions; and that reward is you can't use the

6  patented invention without permission, without paying

7  for it.

8          And, by the way, it doesn't matter that the

9  inventor can't manufacture something, doesn't have the

09:34AM  10  money or ability to do that.  It protects the small

11  ones, too, who can invent and come up with great ideas.

12          Now, Acorn, in fact, received other patents

13  related to this invention.  You'll see them here.  And

14  these patents, ladies and gentlemen, are strong patents.

09:34AM  15  You heard in that video that you saw about patents that

16  the Defendant can actually challenge the patents.  They

17  can say, "You know what?  The U.S. Patent Office got it

18  wrong; these are not valid patents."

19          Well, at this trial, these patents are so

09:35AM  20  strong that Samsung hasn't challenged any one of them

21  here at trial.  These patents, in fact, and this

22  invention was so powerful, Samsung was paying attention

23  and knew how strong it was for years, and I'll show that

24  to you.

09:35AM  25          After Acorn began putting out patents relating

1  to this invention, Samsung, you'll hear, was talking

2  about these patents in its own patents.  "Prior art,"

3  you heard that.  That's kind of a fancy term for, "It's

4  a building block of their own invention."  They were

09:35AM  5  acknowledging the importance early on.  And not only

6  that, Acorn, on top of these patents, they were

7  publishing scientific papers talking about the

8  invention.

9         And you'll hear that everybody was looking at

09:35AM  10  this.  Drs. Grupp and Connelly published two papers, and

11  scientists and engineers around the world continue to

12  look at these papers, talk about the invention, and

13  write about it.  There have been over 300 papers being

14  written about Grupp and Connelly's invention, and you

09:36AM  15  know who's in those 300 people?  Samsung engineers.

16  They have been writing about it, too, and you'll see it.

17  I'll show you evidence in this trial.  2013 is one

18  instance where Samsung was talking about, in writing,

19  about this invention.

09:36AM  20         Now, I mentioned earlier this was a

21  breakthrough invention; it was way ahead of its time.

22  Let me give you a little history reminder.  I often

23  forget.  You know, Apple didn't release its first iPhone

24  until 2007, six years after this invention, and Samsung

09:36AM  25  took another three years to get out their first phone,

1    in 2010.

2           It wasn't for another few years that the

3    industry would really have a need for this invention,

4    because those transistors I showed you earlier were

09:37AM    5    getting smaller and smaller and smaller, and those

6    electrons were having trouble getting through; they had

7    contact resistance.

8           It's kind of like this picture here.  You've

9    probably all gone through one of those big toll ways

09:37AM   10    like this.  This one's got twelve lanes, and then you

11    come out of it, and you're kind of getting squashed

12    going into two or three lanes.  What happens when you're

13    driving your car, then?  You're kind of slowing down and

14    it's getting crowded.

09:37AM   15           Well, that's what was happening as these

16    transistors were getting smaller and smaller and

17    smaller.  The electrons were having trouble getting

18    through.  Contact resistance was the big problem people

19    were trying to solve.

09:37AM   20           And we'll show you Samsung's internal documents

21    which they talk about it as the biggest problem.  Here's

22    an example:  In 2014 they are saying, inside Samsung,

23    "Contact resistance dominates device performance."  What

24    that means is contact resistance is our biggest problem.

09:38AM   25           But somehow, a year later, when they release

their new, tiny transistor, they have solved the problem

and they brag to the world, like in this document:

"This newest process enables up to 20 percent faster

speed, 35 percent less power."

09:38AM

Well, ladies and gentlemen, guess how they did

that.  One of the ways they did it was using Grupp and

Connelly's invention.  And how do we know that?  We cut

open one of their chips inside their phone and found it.

Now, to do that, we had to get a specialist in,

09:38AM

with the right kind of equipment, and you are going to

hear at this trial from Dr. Edward Piner.  He's a

professor of physics at Texas State.  He has more than

ten years' experience in the area, and he's published

papers about semiconductors, and he himself has invented

09:38AM

over 30 inventions.

You'll see, and it will be kind of fun, he'll

talk to you about how he cut open the phone, went

inside, and tried to -- and did find the chip to look

at, to try to examine it, to see if he could find the

09:39AM

invention.  And to do that, he had to use that gigantic,

big microscope there on the right to look inside.

Now, to figure out if he was finding the Grupp

and Connelly invention, he needed a roadmap, and the

roadmap comes from the patent.

09:39AM

So here's one of the patents, and it has a lot

1  of words and jargon on it, but as you can see from those

2  green checks, Samsung, we think, is not even going to

3  argue that they were doing all those things.  They are

4  going to focus on the last point there, and that last

09:39AM  5  point looks like a lot of jargon, too.

6       But the judge is going to give you a specific

7  definition of that.  He's going to say what you need to

8  look for is a layer of oxide titanium -- that's oxygen

9  connected to titanium -- and a distinct layer of

09:40AM  10  silicon.  Look for the layers.

11       So Dr. Piner went and looked for it, and he

12  looked through that gigantic microscope, and guess what

13  he found.  Here we are inside the transistor, ladies and

14  gentlemen.  Remember I showed you that diagram earlier?

09:40AM  15  There's the metal at the top, there's the silicon at the

16  bottom, and look between; there's the gap that Grupp and

17  Connelly talked about, and there are the layers:  a

18  layer of titanium silicon oxide and a layer of silicon

19  oxide.

09:40AM  20       Let me take the colors off.  Take a look at it

21  again.  The colors help direct your eyes.  There it is

22  without the colors; there it is with it.  Let's do a

23  close-up.  Dr. Piner will do this to you.  Look to the

24  left.  There I put the colors on in blue and then in

09:40AM  25  green.  Take a look at that.  Do you see the layers when

1   I take the colors off?  Let me put it back again.  Your

2   eyes won't deceive you.  You are seeing Grupp and

3   Connelly's invention right there.

4           In fact, Dr. Piner made sure that it was

09:41AM  5   titanium oxide and silicon oxide.  He did what's called

6   an elemental analysis, and he confirmed in that chart on

7   the right, those two double bumps, that's oxygen.

8   There's silicon oxide in one layer, titanium oxide in

9   the other.

09:41AM 10           Ladies and gentlemen, you're staring at Grupp

11   and Connelly's invention right inside the Samsung phone.

12   This isn't the only picture you are going to see with

13   Samsung caught with its hand in the cookie jar.  You are

14   going to see a picture of it from their own expert,

09:41AM 15   Jeffrey Bokor.  Take a look at this one.

16           There you can see the silicon on the bottom,

17   dark.  You can see the metal on the top, and look at

18   those layers in between.  It's like that layer cake.

19   Let me help you there with the colors again.  Focus your

09:42AM 20   eyes on that.  You see the blue and green?  Now I'll

21   take it off.  And ask yourself, are you seeing the

22   layers?  Your eyes won't deceive you.

23           They are going to wave their arms around and

24   Dr. Bokor's going to say, "Well, these layers really

09:42AM 25   aren't there."  Trust your eyes; trust the documents.

1        Now, as you can see, Samsung has been caught

2   red-handed with the Grupp and Connelly invention, but

3   they don't want to pay any money, so they are going to

4   give you a series of excuses to try to convince you to

09:42AM   5   let them off the hook.  I'm going to review a few of

6   them with you now.

7        Believe it or not, the first thing you are

8   going to hear is there actually isn't any oxygen in

9   there.  Now, this is like the kid who caught his hand in

09:42AM   10   the cookie jar, and you're like, "Hey, you got your hand

11   in the cookie jar," and the kid goes, "No, I don't."

12        Yeah, that's kind of cute when you talk to your

13   kid, but it's not funny in business.  And what you are

14   going to see is this person, David Moreau from Samsung.

09:43AM   15   He's going to tell you, "My hand's not in the cookie

16   jar.  There's no oxide there at the interface," at the

17   level we just showed you.  But his documents, their own

18   documents show the opposite.

19        We'll show you documents from Samsung like this

09:43AM   20   one, where they are finding oxygen in those layers.

21   It's right there in front of them:  Titanium oxide,

22   silicon oxide.  They will say it's not there, but their

23   own documents will show it's a lie.

24        Next excuse:  "Well, maybe there's oxygen, but

09:43AM   25   there's not enough to be oxide layers."  Now, this is

1  like the kid who is caught with his hand in the cookie

2  jar that says, "No, I'm not grabbing a cookie; I'm just

3  grabbing a crumb."  This also is not true, and you'll

4  see it from their own documents.

09:44AM  5        Here's an example.  Talk about caught

6  red-handed, oxygen in a -- see the "IL"?  That means,

7  "Interface layer."  Oxygen in the layer.  There it is

8  again and again, oxygen in the layer.  And at the

9  bottom, the interface layer top is the silicon oxide

09:44AM  10  that has been oxidized, their own documents showing it's

11  there.

12        Next excuse, "Well, we know there are oxide

13  layers, but we took them out starting in 2017, and they

14  are not there anymore."  Now, that's like the kid caught

09:44AM  15  with his hand in the cookie jar, and he says, "Okay.

16  Look, you know, I haven't gone back in that cookie jar

17  for a couple weeks.  Don't worry; I'm not going there."

18  And then you walk into his bedroom and you see some

19  cookies.  That's exactly what happened here with

09:44AM  20  Samsung.

21        You are going to hear from the expert.  He's

22  going to say, "Hey, once we took this special step out

23  of our complicated processes, those oxide particles were

24  no longer there."  Well, that's wrong.  Their own

09:45AM  25  documents are going to show they're still there.  They

did their own tests afterwards.  When they took out the
special test, you'll see it here, a year later, after
2017; here we are, January 2018.  Their tests are going
to show, boom, oxide, oxygen, there on the left; boom,
and there on the right, oxygen.  The documents will show
the truth.

        Next excuse, "Well, actually, we really don't
want this here."  You may hear them say something like,
"This is like rust.  We don't really want this in our
process.  We'd like to just -- we don't want it.  We've
been trying to get rid of it."

        Now, this is like the kid caught with his hand
in the cookie jar that says, "Yeah, I don't even really
like those cookies, Mom and Dad.  I promise you, I won't
be eating those again," and then two weeks later, caught
with his hand in the cookie jar again.  That's exactly
what's happened here, ladies and gentlemen.

        You are going to see, from their internal
documents, their engineers figured out a way to take the
oxygen out.  They said, "Here's how you can do it."  And
you know what Samsung chose to do?  Keep the oxygen
there.  They decided not to take it out because they
knew the invention worked.  You'll see it.  They will
also tell you, "Hey, we had this task force in 2014.  It
looked into oxygen, and they decided in the task force

1  they didn't want the oxygen in there."  But you'll learn
2  that task force was looking at another chip, not the one
3  related to our invention.

4         And more importantly, after they said that, we
09:46AM  5  caught them with oxygen in their chips again and again,
6  in 2015, in 2017.  They still haven't gotten rid of it
7  because they know it works.

8         Now, ladies and gentlemen, they will have one
9  more excuse for you.  They will say, "Well, people
09:46AM  10  aren't really interested in this invention.  Nobody else
11  has taken a license to it."  Now, this is like the kid
12  who was caught with his hand in the cookie jar, and he
13  says, "You know, Mom, Dad, brothers and sisters, they
14  don't like the cookies, so I did everybody a favor and
09:47AM  15  ate them all."  That's what Samsung's doing here, ladies
16  and gentlemen.

17         You are going to hear that the industry was
18  very interested, but this invention was ahead of its
19  time.  Some of those companies didn't have the right
09:47AM  20  technology.  It didn't fit.  Other companies are still
21  talking to Acorn today.  But the company that's most
22  interested in this invention is sitting right here; it's
23  Samsung.  How do you know that?  We'll show you.

24         Samsung actually will tell you here in trial,
09:47AM  25  "We had no knowledge of Acorn's patents until the

1  lawsuit was filed in 2019." That's also false, over and

2  over again.  Samsung was talking about patents in the

3  same family of the invention in 2009 and 2010.

4          Samsung actually, as I talked to you earlier,

09:48AM  5  in their papers, they are called the Samsung Advanced

6  Institute of Technology.  They were talking about this

7  invention, and there it is, Connelly and Grupp, in their

8  papers.  They knew about the invention, and they knew

9  about it earlier.

09:48AM  10          And they will tell you they even studied the

11  invention in 2014, when they came up with that task

12  force, and they will say, "Well, that's when we said we

13  didn't want the oxygen," but then, as I just showed you,

14  we found the oxygen afterwards, over and over again.

09:48AM  15          And that's not all.  Even after that,

16  Samsung's still talking about the invention in papers

17  they published in 2017 and 2018.  Again and again, we'll

18  show you example after example where they are talking

19  about this invention.

09:48AM  20          Now, after they kept talking about that

21  invention again, we'll show you internal documents, the

22  oxygen's still there.  What are they trying to do with

23  their chips?  They are trying to make them as fast as

24  possible.  If they really thought the oxygen was

09:49AM  25  dragging it down, rust they wanted to get rid of, and

1  they had the ability to get rid of it, they would have

2  done so.  When they leave it in, it's because they know

3  it's best for their chip.  They have been working for

4  years on it.

09:49AM  5          Ladies and gentlemen, they not only cite this

6  in those -- in those articles, they cite the patent

7  family in their own patents.  They know it's a building

8  block for their own invention.  2009, 2010, 2017, 2018,

9  and again in 2018, they talk about the invention, again

09:49AM  10  and again.  Boy, did they know about the invention.

11          They are going to have paid experts and other

12  people up here trying to convince you otherwise today.

13  Just keep your eyes on the evidence.

14          Now, Samsung has been caught with its hand in

09:50AM  15  the cookie jar.  Your eyes don't lie.  They are showing

16  you the inventions there.  Make sure you keep focusing,

17  ladies and gentlemen, on the documents and things that

18  happened before the lawsuit, not what the paid experts

19  say to you here at trial.

09:50AM  20          So since they have been caught red-handed and

21  they haven't paid a cent, the question for you is going

22  to be, well, what's fair?  What should Acorn have been

23  paid?  Now, you'll see the United States law says the

24  minimum that should be paid, the absolute minimum, is

09:50AM  25  something called a reasonable royalty.

1          So what is a reasonable royalty?  That's kind

2    of a fancy term for a rent payment.  So if you wanted to

3    live in this building here and you had to pay rent,

4    well, you pay rent for every month you're there.  The

09:50AM   5    longer you're there, the more rent you're paying.

6          Well, same thing when you use somebody's

7    invention.  You call it the license agreement, and you

8    pay as you use it.  The more you use it, the longer you

9    use it, the more you owe.

09:51AM   10          Now, how do we figure out how much they ought

11    to pay?  We had to bring in an expert to take a look to

12    try to figure out, well, what would a reasonable royalty

13    have been if Samsung had done the right thing and sat

14    down and tried to pay what was right?  And you're going

09:51AM   15    to hear from Stephen Dell.  He's a professor at the

16    University of Texas, and he's going to tell you he

17    really looked at this.  He's got lots of experience, 19

18    years in consulting, he's a certified valuation expert,

19    and he's going to tell you that Samsung has sold over

09:51AM   20    $9 billion of wafers.  That's just a fancy -- I think,

21    like, a cookie when I hear a wafer.  It's like these big

22    sheets with chips on them, and every chip has the Grupp

23    and Connelly invention.  They have sold over $9 billion

24    worth.

09:51AM   25          And he will tell you when he looked at all the

factors, he thought 3 1/2 cents on the dollar would be

the minimum reasonable royalty for the contribution of

the Grupp/Connelly invention for the success of Samsung

with this.  And when you apply 3 1/2 percent, 3 1/2

09:52AM   cents on the dollar to 9 billion, you come up with

$326 million.

Ladies and gentlemen, what has happened here is

very serious.  You have the power to do what's right by

a company whose invention was stolen and used by Samsung

09:52AM   to help make their phones and electronic devices run

faster with less battery power.  You have the power to

say, "It's time for the excuses to end.  It's time to

make things right."

Thank you for your time and attention.

09:53AM   THE COURT:  Defendants may now present their

opening statement to the jury.  Mr. Cordell, would you

like a warning on your time?

MR. CORDELL:  I would, your Honor.  Could I

have five minutes?

09:53AM   THE COURT:  I'll warn you when you have five

minutes remaining.

MR. CORDELL:  Thank you.

THE COURT:  Please proceed when you're ready.

MR. CORDELL:  Thank you, your Honor.

///

1                    DEFENDANTS' OPENING STATEMENT

2              MR. CORDELL:  Ladies and gentlemen, good

3    morning.  My name is Ruffin Cordell, and along with my

4    colleagues, Ms. Smith and Michael McKeon and Mark

09:53AM    5    Fowler, we are proud to stand before you and represent

6    Samsung.  And like Ms. Smith and his Honor did during

7    the jury selection, the first thing I want to do is to

8    thank you for your service.

9              Jury service -- I echo what Judge Gilstrap

09:53AM   10    said -- is the highest form of civic duty that we have

11    in this country.  We're lucky to have it.  It's what

12    makes us unique.  It's what allows us to settle disputes

13    in a straightforward manner.  And we know you have busy

14    lives and you have other things you could be doing this

09:54AM   15    week, but on behalf of Samsung, we really appreciate it.

16              And, you know, one of the things Ms. Smith said

17    at jury selection that struck me is that, you know, when

18    your kids come running to you and there are two of them

19    there, they -- you know, the first one that starts

09:54AM   20    talking tells the story -- and I should tell you, I have

21    three children of my own.  My wife and I have been

22    married for 32 years, so I've been through this.  And,

23    you know, it's important to get both sides of the story.

24    And you heard his Honor this morning instruct you that

09:54AM   25    you are to keep an open mind, and that's what we're

1    going to ask.

2         Because we heard a lot from Mr. Hueston on

3    behalf of Acorn, and I'm going to respond to that; but

4    importantly, you are going to hear the evidence.  You

09:55AM    5    are going to hear the evidence from Acorn first and then

6    you are going to hear the evidence from Samsung.

7         So we're going to ask you to keep an open mind.

8    And my job for the next half-hour is to preview that

9    evidence for you a little bit to kind of show you where

09:55AM    10    it all fits into this overall dispute.  So I'm going to

11    try to do that.

12         Now, you heard a lot about different claims and

13    whatnot, and I'm going to take you through it, you know,

14    one piece at a time, but let me cut to the chase, ladies

09:55AM    15    and gentlemen.  Samsung doesn't use Acorn's patents.

16    There's just no infringement in this case, and the

17    evidence is going to show you, over the next few days,

18    that Samsung just does this contact resistance that

19    Mr. Hueston talked about in a different way.

09:55AM    20         And there are 11 million patents out there.

21    They just issued the 11 millionth, and each one is very

22    particular as to what it covers.  So we're going to look

23    at that patent claim that's at issue in this case, those

24    claims, and I'm going to show you Samsung 's technology,

09:56AM    25    and I hope, at the end of this, you'll agree with me

1    that there's just not.

2           Now, we heard a lot about Acorn from

3    Mr. Hueston, but I'd like to tell you a little bit about

4    Samsung.  So many of you know Samsung.  You've got some

09:56AM    5    of their great products, their phones, their

6    televisions, their appliances, and they make great

7    stuff.  But they started out very humbly back in 1938,

8    when Byung-chul Lee started the company as a small

9    trading company, and it took decades of work,

09:56AM    10    innovation, and investment to build it into the company

11    that gives us these great products.

12           Now, you know, South Korea is a lot like the

13    U.S., and Mr. Lee was lucky enough to have been born

14    there in a country where you can worship as you choose

09:56AM    15    and you can work as you choose and you can enjoy the

16    same freedoms that we have in the U.S.  South Korea is

17    actually patterned after the U.S. in a lot of respects,

18    and it was that freedom that allowed Mr. Lee to build

19    Samsung into the company we know today.  And it's been

09:57AM    20    successful.  You know, there's no question about that.

21    We heard some of that from Mr. Hueston.  They have got

22    100,000 patents of their own, Samsung does.

23           But you might ask yourself, why are we here?

24    How did this get to Texas?  And the answer's pretty

09:57AM    25    simple, and it has to do with this factory.  So what

1    I've got up on Slide 2 is Samsung's Austin Semiconductor

2    factory.  We call it a "fab," which is short for

3    "fabrication facility," a factory.  And this Samsung

4    Austin fab is just to the west of here, has about 3,000

09:57AM   5    employees, and they make 90 percent of all the products

6    that you are going to hear about in this case.  They are

7    made right here in America.

8           And, you know, Samsung's a little different.

9    In the last few years, we heard a lot about offshoring

09:57AM   10    jobs and companies, big companies sending our jobs

11    overseas.  Well, Samsung did just the opposite, ladies

12    and gentlemen.  They took those jobs and they moved them

13    to the States, and so we're lucky enough to have

14    Dr. Jason Reifsnider here with us who is the director of

09:58AM   15    engineering manufacturing at the Samsung Texas facility,

16    and you are going to hear from him a little later.

17           But what they do at this factory is really, in

18    my experience, it's nothing short amazing.  It is the

19    most technologically advanced place, I think, in human

09:58AM   20    history.  This facility, which covers eight football

21    fields, is where they manufacture all of the chips you

22    are going to hear about in this case.

23           So what do these chips look like?  So we'll

24    start with the wafers.  So the way these things are made

09:58AM   25    -- and it is a fascinating process; you are going to

1   hear about it from the witnesses -- is they take pure

2   silicon.  They actually melt it and draw it up so it's

3   just one crystal.  And Mr. Raifsnider is actually going

4   to show you one of these wafers, and it shines like a

09:59AM   5   mirror, it's so pure.  And then after using a series of

6   steps, layer upon layer, they take some material off,

7   they put some material on, and they build up the layers

8   that make the circuits that end up creating the chip you

9   see on the right.

09:59AM   10          And Mr. Hueston said, "Well, these things are

11   very complicated," and he's right.  That one chip has,

12   you know, 100,000 times the processing power of the

13   computers that we put into Apollo that put people on the

14   moon, just in that one little chip.  There are billions

09:59AM   15   and billions of transistors, and they can switch on and

16   off billions of times a second.  It's a remarkable,

17   remarkable process.

18          If, when they are making these chips, if they

19   are off by just a few atoms, the whole chip won't work.

09:59AM   20   The whole wafer has to be thrown away.  It takes three

21   months to make one of these wafers.  So we're going to

22   talk about that process some today.

23          But now let's focus in on the transistor

24   itself.  And, you know, most of us don't ever even have

10:00AM   25   to think about what a transistor is.  Well, a transistor

1  is nothing but a switch.  It's just like a light switch

2  on the Court's wall right there.  What it does is it

3  allows you to turn electricity on or turn it off.  The

4  difference is this thing is really, really tiny.

10:00AM  5  So we have -- we call it a 14-nanometer, which is just a

6  word for a very small distance -- FinFET transistor, and

7  14 nanometers, ladies and gentlemen, just to give you

8  some perspective, is about a half of a millionth of an

9  inch.  So obviously, it's really, really tiny.  And as

10:00AM  10  they have gotten tiny, it's become challenging to do

11  things like, "How do we wire up the switch?  How do we

12  get electricity to the switch so it can turn on and off

13  as it's supposed to?"  And we're going to focus on that

14  a lot in this case.

10:00AM  15       And basically what we're going to focus on is a

16  very particularized part of this, and it has to do with

17  where that wire comes into the switch.  And so in the

18  drawing that I have up on the slide, you can see that

19  there are these two metal cylinders, these two

10:01AM  20  silver-colored cylinders.  Those are basically the

21  wires.  They are called plugs; the engineers call them

22  plugs, but they are just metal cylinders, is what they

23  are.  And those metal cylinders go down and they meet

24  the transistor at a place that the engineers call the

10:01AM  25  source/drain, and they do that on both sides.  You can

1  see there are two cylinders.  One's a source and one's a

2  drain.

3  Source/drain, to me, is hard to follow, but the

4  shape that they go into kind of looks like a mushroom,

10:01AM   5  so I call it a mushroom cap, just to make it easy.  And

6  so what we're going to be talking about in this case

7  over and over and over again is this region right here,

8  where that metal cylinder, where that wire comes into

9  the switch, sort of like when you would screw the wire

10:01AM   10  into the wall switch on the Court's wall.  We're going

11  to be looking at where that cylinder comes into the

12  semiconductor, where it comes into that mushroom, and

13  that contact point is going to be the entire focus of

14  this case.  So we're not going to have to talk about all

10:02AM   15  of the amazing other parts of this, because there are

16  quite a few, and that's going to help us.  So we're

17  going to have a much more focused discussion in this

18  case.

19  So looking at that -- and I apologize because

10:02AM   20  this is kind of vertical, right?  I got the metal

21  cylinder coming in, the wire coming in, and the

22  semiconductor that's upside down, and then for some

23  reason, we turn it to the side, I think because it makes

24  it a little easier to talk about.

10:02AM   25  But what the Acorn patents are all about

1    is that meeting between the metal and the semiconductor.

2    And Mr. Hueston was right that the inventor has said,

3    "Well, let's separate it apart," but he kind of left

4    something out, because they don't just separate them.

10:02AM  5    They don't just put a little space between the metal and

6    the semiconductor.  They fill it with two very, very

7    important things, and you are going to hear about this

8    over and over again, because the Acorn patents, in order

9    to infringe the Acorn patents, you've got to find two

10:03AM  10    things.  You've got to find a layer of metal oxide, and

11    they often talk about titanium oxide.  Titanium's a

12    metal.  So a layer of metal oxide and a layer of

13    semiconductor oxide.  You've got to have both layers

14    between the metal and the semiconductors.  Not just any

10:03AM  15    layers.  It's not just oxygen.  I heard Mr. Hueston say,

16    "Oh, there's oxygen here or there."  No, ladies and

17    gentlemen, oxygen is not what the claim talks about.

18    The claim talks about an oxide, and you absolutely have

19    to find it, if we're going to find infringement in this

10:03AM  20    case.

21            Now, this is all going to be very technical,

22    and I apologize about that.  I've learned a lot in this

23    case.  That's probably the coolest part of my job is I

24    get to learn new things all the time.  And you are going

10:03AM  25    to learn a lot about semiconductor processing.  But some

1  of this you already know.

2       So what we're talking about, when we're putting

3  these oxides right in the pathway of the electricity,

4  is, at least when I first encountered it, it didn't make

10:04AM  5  a lot of sense to me.  What do I know?  I know that when

6  my battery goes bad and I go take it to the store to

7  look at it, the first thing they do is they take the

8  cable off and they take a scrub brush and this round

9  thing and they clean the terminal off.  Why?  Because

10:04AM  10  oxide may have built up between the cable and the

11  battery terminal, and that's what's making my battery

12  dead because we know that oxide's not good for

13  electricity; it doesn't like to flow through an oxide.

14  It's an insulator, we hear, and it stops the flow of

10:04AM  15  electricity.

16       But, ladies and gentlemen, that's what these

17  claims talk about.  These claims require two different

18  kinds of oxide:  that metal oxide and that semiconductor

19  oxide in layers.  They have to completely separate the

10:04AM  20  semiconductor and the metal.  And that was the invention

21  that Acorn came up with.

22       And, look, they have their patents.  That's

23  great.  You know, we have patents, too.  We all believe

24  in patents.  But they decided to patent something that,

10:05AM  25  frankly, just doesn't work for Samsung.

1          So what does Samsung do?  Samsung says, "We

2     don't think oxides are a good idea.  We don't think

3     putting two layers of oxide in the path of our

4     electrical current is going to help.  We think it makes

10:05AM  5     it worse.  It's going to be like your car battery.

6     You're going to have to go clean that out of there."

7          So Samsung does something different, and they

8     use a term -- and you are going to hear this just all

9     through this case -- called silicide.  And I have to

10:05AM  10    admit, when I first heard that term, I thought roach

11    spray, right?  I mean, silicide would be a good name for

12    it, but it's not.

13         What silicide is, again, it's complicated, but

14    in another way, it's actually very simple.  So when that

10:05AM  15    metal bar comes up against the semiconductor, it turns

16    out that the metal in that bar, titanium, will react

17    with the semiconductor, the silicon.  Actually, it's

18    like a little chemical reaction, and it forms this thing

19    called silicide.

10:06AM  20         And so what you end up with is, instead of

21    having the separation that Mr. Hueston talked about, you

22    bring them absolutely together.  You bring them together

23    at a molecular level.  You can't bring them any closer.

24    And that's what Samsung does; it uses this metal

10:06AM  25    silicide in that contact between the metal and the

semiconductor, and it doesn't want oxide.  In fact, if there's oxide there, the silicide won't form.  So Samsung makes sure there's no oxide at that interface.

So what we really have here is a tale of two companies, a tale of two cities.  We have Acorn saying, "Oxide's a good thing.  "You should put oxide in your products"; and we have Samsung saying, "Don't use oxide; it's bad; and, instead, we're going to use silicide."

And you are going to hear the inventors, you heard -- you're actually going to hear from Dr. Grupp today, not Dr. Connelly, but you are going to hear from these inventors that their patents don't cover silicide. We think that's going to be very important.

So let's talk a little bit about patent infringement.  So, you know, most of us have never encountered patent infringement in our regular lives, right?  Doesn't come up every day.  And his Honor gave you some instructions about what it means to infringe a patent, but I just want to illustrate that a little bit.

So every one of these patents has claims in it, and the claims are what matter.  His Honor told you about that, but that's the actual property that people have.  It's not the written part of the patent in the front; it's not the drawings.  The claims are what matter.

1        And my patent here is on a soccer ball, and

2    it's -- my claim says, "Made of leather and stitched

3    together and filled with compressed air, and it's

4    round."  And, you know, you might think of an old

10:08AM  5    Pete Maravich-style basketball.  It may even fit this,

6    right?  It's made of leather, it's stitched together,

7    it's filled with compressed air, and it's round, made

8    with leather.  But what if Mr. Hueston comes up with a

9    different ball and he has a football?  While it's made

10:08AM  10   of leather, it's stitched together, it's filled with

11   compressed air -- outside of Tom Brady, it's filled with

12   compressed air, but it's not round.  It's not round,

13   ladies and gentlemen.

14        So if there's a difference, if there's a

10:08AM  15   missing element, then there's no infringement.  And

16   that's the way it works.  That's the way the law works.

17   So your task is going to be to look at these patent

18   claims and decide whether there is a missing element or

19   not.

10:08AM  20        And I'm not going to try to minimize that

21   because it's complicated, and here's the claim, the '167

22   Patent claim.  And there were a lot of it technical

23   terms in here, but we're going to take you through it

24   and the witnesses are going help you through it, but the

10:08AM  25   reality is, it really comes down to this.

1          And Mr. Hueston said, "Well, we're not

2    really disputing some of these other elements."  I don't

3    know if that's quite true, but the point is we're going

4    to focus on the things that we can most directly point

10:09AM   5    out to you are missing, and that is a layer of metal

6    oxide and a distinct layer of oxide in the

7    semiconductor.  That "distinct" came from his Honor's

8    construction of that patent.

9          So before I move on, let me make one more

10:09AM  10    point.  What the evidence is going to tell you about

11    these products -- remember, they are made in a wafer,

12    and there are billions and billions of these transistors

13    on one little chip, and then there's hundreds of, or

14    maybe even thousands of chips on a wafer.  And these

10:09AM  15    transistors are right next to each other; they are

16    separated by just a few, you know, millionths of an

17    inch, less than a millionth of an inch.  And what do we

18    know about electrical devices?

19          Well, you know, when you go to plug in your

10:09AM  20    toaster in the morning, if that cord isn't encased in

21    plastic, that's a bad morning, right?  You want that

22    plastic to keep you protected from that electricity.

23    The same is true with these devices.

24          An oxide, silicon oxide in particular, is the

10:10AM  25    one that they use to isolate, to separate these so that

1    the electricity doesn't flow between devices, which you

2    don't want to have happen.

3         So you are going to see other parts of the

4    device that have silicon oxide in it.  They put it in

10:10AM  5    there on purpose; they can tell you all about it.

6    Importantly, thought, it's not where we're going to

7    focus, which is this interface, right where that metal

8    bar meets the semiconductor, the contact between the

9    metal and the semiconductor.

10:10AM  10         And what the evidence is going to show here,

11   ladies and gentlemen, is there are no layers.

12   Mr. Hueston showed you a bunch of photographs, and then

13   they had some color that they put in there.  That wasn't

14   in the photographs, because the reality is, what you are

10:10AM  15   going to see is that that interface, that place where

16   the metal meets the semiconductor is made of that

17   silicide, not of an oxide.

18         So now let's talk a little bit about how these

19   products are made, because these -- as I said, these are

10:11AM  20   some of the most sophisticated things in human history.

21   What I've got on Slide 14 is a photograph of the actual

22   production line at the semiconductor Austin facility,

23   the Texas facility.  And you can see the guys in little

24   bunny suits in there.  It's an absolute clean

10:11AM  25   environment.  They've got to control vibrations.  They

1    have got to do all kinds of things in order to make

2    these things.

3              But these machines you see in front of you take

4    these wafers that start out as just plain silicon and

10:11AM  5    they end up as the most advanced and sophisticated

6    microprocessors that we have, and they do them step by

7    step.  It takes three full months to make a lot of these

8    products, and they go from machine to machine to machine

9    and process after process after process.

10:11AM  10             So as you would expect, this is not some

11   random.  You can't just, "Oh, you know, Joe didn't show

12   up this morning, so let's just have somebody else fill

13   in for him," because these are the most sophisticated

14   processes you will ever see.  Everything has to be

10:11AM  15   absolutely precise or it just doesn't work.

16             So what I've got up on Slide 15 is one of what

17   we call the process flows, or some people call them

18   recipe cards, but they are really process flows, because

19   in each of these steps, there are sometimes further

10:12AM  20   recipes.  And what it does is it tells the technicians

21   and the engineers exactly what they have to do in every

22   step along the process, and there are 2,169 of them in

23   this particular product.

24             And, ladies and gentlemen, those are not

10:12AM  25   random.  Those can't be the kind of thing that you just

1  do -- you just do differently on a Tuesday and on a

2  Thursday.  Everything is preordained.  It absolutely has

3  to be done precisely, and then they double-check it to

4  make sure that it was.

10:12AM   5  And I apologize.  I had to kind of gray these

6  out because these are super, super secret, and we don't

7  want to close the courtroom.  We'll show them to you

8  without the graying when the witnesses -- when

9  Dr. Raifsnider takes the stand, for example, you'll see

10:12AM  10  them -- you'll see them in all their glory.

11  Now, remember, we're only focused on one little

12  part of the chip, right where that metal meets the

13  semiconductor.  So those are the steps we're going to

14  spend most of our time on, but I don't want to leave the

10:13AM  15  point that there are over 2,000 of these.  And of the

16  steps that are required to make these chips, we're going

17  to focus on about 20 of them, because that's where we

18  get the metal meeting the contact.

19  And Dr. Raifsnider and then later our expert,

10:13AM  20  Dr. Bokor who I'll introduce to you in a few minutes,

21  are going to take you through every single one of those

22  steps and show you how they build this mushroom cap,

23  this epi S/D thing that's labeled on the slide.  That's

24  the silicon part.  They build it up and they make it

10:13AM  25  bigger.  They make it bigger because they want the

1    contact resistance to be better.  They want the current

2    to flow more easily, so they make that bigger, that

3    mushroom cap, epi S/D, short for epitaxial; but

4    basically, it's just a mushroom cap.  It's made out of

10:13AM   5    silicon, and they make it bigger.  You are going to get

6    specific steps on what they do in order to create that

7    in just the right place.

8              But I also want to describe for you step

9    1,169, and I kind of unmask a little bit of that,

10:14AM   10   because that's going to be a really important step.

11   What happens in that step?

12             Well, after they make this mushroom cap, and

13   that -- just to orient everybody, the space above it is

14   empty, right?  That white space is just empty, and the

10:14AM   15   sides are some of that isolation that I talked about

16   earlier.  Above that epi S/D is just open space, and the

17   surface of that epi S/D, that mushroom cap, is exposed.

18             So what does Samsung do?  Well, Samsung knows

19   that anytime you have an exposed surface like that,

10:14AM   20   oxygen from the air might get in there and might cause a

21   reaction, might create a little bit of oxide.  Not much,

22   but a little bit.  But Samsung says, "We're not going to

23   have that."

24             And so in this Step 1,169, what they do

10:14AM   25   is they take the wafer and they put it in this thing

called a cluster tool, which is about the size of the

well between me and all of you, and they close the

chamber up and then they use these really, really strong

pumps to take all of the air out, all of it.  It's like

10:15AM   being out in outer space.  So the wafers are in a pure

vacuum.  And they take these wafers and then they put in

this cleaner, which is called the SiConi cleaning

process you are going to hear about.  It's an

ammonia-based cleaner, and its job is to go in, and if

10:15AM   there's any oxide on the surface of this mushroom cap,

it eats it and it vaporizes it and it's pumped out of

there.

So they make sure that it is pristine,

absolutely clean and precise, in this vacuum chamber.

10:15AM   And then while it's still in this vacuum chamber, ladies

and gentlemen, they put down a layer of titanium, a

layer of metal, and then they put down a layer of

titanium nitride.  And I apologize about the chemistry,

but titanium is the pure metal that they use to make the

10:15AM   silicide.  Remember, it combines with the semiconductor.

And then the titanium nitride is like a sealant.  It

seals that entire surface.

So what you end up with is the yellow, which is

the titanium nitride and over the titanium silicide.  So

10:16AM   there's no way any oxide can grow back.  And then they

1    take it out of the vacuum chamber.  So only after it's

2    completely sealed do they take it out of the vacuum

3    chamber.

4        And what I show here on the right is they

10:16AM    5    actually put a piece of tungsten.  Tungsten plug goes in

6    on top.  That's that metal bar ultimately that creates

7    the contact.  But the yellow is that titanium nitride,

8    which is also a metal, and that titanium silicide is

9    actually also a metal.

10:16AM   10        The point here is that there's no oxide.  There

11    certainly aren't two layers of oxide, which is what

12    these patents require.

13        So let me set this up, if I can.  Remember what

14    Samsung does is this epi process, and this epi process

10:17AM   15    creates a bigger mushroom cap.  They make sure that it's

16    really conductive.  They dope it and they make that

17    mushroom cap, and then they put a silicide layer on top

18    of it, and that is known in the business as, "Epi plus

19    silicide."  People talk about that.

10:17AM   20        What I've got up on Slide 18 is an e-mail from

21    one of the Acorn executives, a fellow by the name of

22    Mr. Clifton.  And you are going to see his testimony.

23    His Honor talked about seeing some testimony by

24    deposition.  You are going to see Mr. Clifton's

10:17AM   25    deposition.

1           And what Mr. Clifton did is he was having a

2      meeting with a guy who was sort of like the Snap-On

3      salesman for this business, or the Craftsman salesman.

4      If you buy tools to make all those tools we saw in

10:17AM   5      Mr. Raifsnider's production line, most of them come from

6      a company called Applied Materials.  He's working all

7      the businesses, and he knows all the big players, and

8      Mr. Clifton had a meeting with him, and he was very

9      disappointed coming out of that meeting.

10:18AM  10           Mr. Clifton said, "You know, it doesn't look

11      like our invention is going to go anywhere."  He calls

12      it the MIS contact, and that stands for

13      metal-insulator-semiconductor, the thing that

14      Mr. Hueston described.

10:18AM  15           He said, "You know, our invention's probably

16      not going to go anywhere because epi and silicide is

17      being used by everybody else, and it works too well.

18      It's too successful," he says.  And he talks about the

19      idea that it's been so advanced and so successfully

10:18AM  20      applied that, "We just can't compete anymore."  And

21      that's right, because there were two different pathways.

22      The pathway was the Acorn way, which was to use this

23      metal-insulator-semiconductor, or MIS, or the way people

24      like Samsung did it, which was metal silicide and then

10:18AM  25      epi.

1          THE COURT:  Five minutes remaining.

2          MR. CORDELL:  Thank you.

3          You're going to hear a lot about that.  And

4     then the CEO, Mr. Horgan, writes back and says, "You

10:19AM   5     know, let's not put anything else in writing about

6     this," and we think you can probably understand why.

7          So let me move along here, because I am running

8     short on time, but we could stop right here, ladies and

9     gentlemen.  We could stop with these process flows

10:19AM  10     because they tell you exactly how the product is made.

11     We don't have to guess.  We don't have to think.  We

12     don't have to go off and deduce anything.  We can look

13     under the hood.  We built the engine.  We know how big

14     the pistons are.  We don't need to second-guess it, and

10:19AM  15     that's the primary evidence that everybody should be

16     pointing to.

17          But in this case, both sides, both experts,

18     have taken the parts and sliced them up and given them

19     to a company called EAG, Evans Analytical Group, who are

10:19AM  20     the gold standard in this business, and they have done

21     analysis using that microscope that Mr. Hueston showed

22     you.  Both sides did it.  Both sides' experts did it.

23          And what I've got on Slide 30 is important

24     because it shows you kind of the way the elements lay

10:20AM  25     out in the chip.  And just to put a fine point on it,

1    I've drawn a "50 percent" stripe across the middle of

2    this.  Why did I do that?

3            Well, turns out, in nature, oxygen, it floats

4    around.  We find it all over the place; but if it's

10:20AM    5    going to form an oxide, that means you need at least one

6    oxygen for every silicon, for example.  If you're

7    familiar with H2O, that's two hydrogens for one oxygen.

8    Well, silicon oxide is one silicon, and one oxygen,

9    which means if we're looking at the percentages here, we

10:20AM    10    should see 50 percent oxygen.

11           And Dr. Bokor is going to take you through

12    this, so I'm not going to belabor it.  But, ladies and

13    gentlemen, they're going to show you all these plots.

14    They're going to show you squiggly line after squiggly

10:20AM    15    line, and you're never going to see where the oxygen

16    gets up to 50 percent.  You'll see some down in the

17    bottom, because there's oxygen everywhere and there's

18    always a little bit of it hanging around, but you are

19    never going to see it enough to make an oxide.

10:21AM    20           And I'm going to -- Dr. Bokor is going to take

21    you through this a step at a time, and he's going to

22    show you how they scan through the part and you can

23    report out exactly what levels of each of the elements

24    there are, and you can see them listed on the right in

10:21AM    25    the different colors, but he's going to take you through

1    that.

2         The important thing is this oxygen curve, this

3    pink part at the bottom never comes close to 50 percent,

4    which is what you need for an oxide.

5         Now, EAG's expert, Dr. Piner, who you were

6    introduced to, he also -- I said, "EAG's expert."  I

7    meant Acorn's expert.  Dr. Piner went to EAG as well.

8    They both used the same lab, and this is one of his

9    curves.  And you can see the oxygen, ladies and

10   gentlemen, is way down at the bottom.  It's in green.

11   You can barely see it.  It's just sort of background

12   oxygen at that level.

13        But, ladies and gentlemen, he also did

14   something else.  One of the charts that Mr. Hueston

15   showed you showed that, you know, the data had sort of

16   been manipulated.  I don't know what word to use for

17   this.  Because Dr. Piner got this chart, and apparently

18   he wasn't happy with it; so what he did is he changed

19   that oxygen by multiplying it by 15.  And, look, these

20   are very complicated cases.  We have to trust these

21   experts.  We really put a lot of faith in what they do,

22   and I'm going to look forward to his explanation as to

23   why he felt like he should do that, because what it did

24   is it made this oxygen curve, this red or orange curve,

25   look bigger and come up close to where the silicon is,

1    so it almost looked like it was 50/50.

2         But I'm going to leave it to them to explain

3    why they felt like that was appropriate.  And, again,

4    ladies and gentlemen, the process flow is the real

10:22AM    5    evidence.  That's what we should be focused on, and they

6    are not going to show you a single step, not one, where

7    a layer of oxide was created or a semiconductor oxide

8    and a layer of metal oxide.  They can't show it because

9    it's not there, and that should be the real focus of

10:23AM    10   this case.

11        So quickly, let me go through just a little bit

12   of the timeline.  We heard a lot from Mr. Hueston about

13   papers and citations, and you heard from your Honor

14   that -- his Honor that people prosecute patents and they

10:23AM    15   cite lots of other patents while they are doing that.

16   It's all what the patent lawyers do.  And that did

17   happen in this case; but importantly, what also happened

18   is that Samsung, completely on its own, without knowing

19   anything about Acorn, began their design for this

10:23AM    20   process back in 2011.

21        They built out a factory in 2014, long before

22   Acorn got its patents.  You can see the first patent --

23        THE COURT:  Mr. Cordell, your time's expired.

24   Take a few seconds and finish up.

10:23AM    25        MR. CORDELL:  Thank you, your Honor.  May I

1  introduce my witnesses?

2        THE COURT:  You may.

3        MR. CORDELL:  Thank you.  Ladies and gentlemen,

4  I'd like to introduce you to Dr. Bokor, who is going to

10:23AM  5  be our technical expert.  He is from -- he's got degrees

6  from MIT and Stanford.  Apparently he couldn't get into

7  LSU, but he's a professor at Berkeley now.

8        We have Mr. Meyer, who is our financial expert,

9  who is going to help us respond to some of the damages

10:24AM  10  claims that have been made by Acorn.

11        We have Mr. Chi Won Cho, who is one of the

12  engineers from Samsung who is going to testify about

13  some of his processes.  Dr. Hong Lae Park did a study to

14  look at oxide and decided that it wasn't really

10:24AM  15  appropriate; it didn't work in Samsung's trials.

16        So with that, ladies and gentlemen, I'll thank

17  you for your time and attention, and I look forward to

18  putting on the rest of the case.

19        THE COURT:  Counsel, does either party wish to

10:24AM  20  invoke the Rule?

21        MR. DIXON:  Yes, your Honor.  Acorn invokes the

22  Rule.

23        THE COURT:  And I take it that that would

24  exclude application of the Rule to the expert witnesses?

10:24AM  25        MR. DIXON:  Yes, your Honor.  Both corporate

1    representatives.

2         THE COURT:  All right.  The Rule has been

3    invoked excluding expert witnesses and, by definition,

4    corporate representatives are excluded.  That means if

10:25AM    5    you are a fact witness in this case, you will have to

6    remain outside the courtroom until you are called to

7    present testimony.  Expert witnesses and corporate

8    representatives are excluded and they remain in the

9    courtroom.

10:25AM    10         Ladies and gentlemen, we're going to take a

11    brief recess, and when we come back, Plaintiff will call

12    their first witness.  Please just simply close your

13    notebooks and leave them there in your chairs.  Follow

14    all the instructions I have given you, and we'll be back

10:25AM    15    shortly to continue, and we'll start with the

16    Plaintiff's case-in-chief and Plaintiff's first witness.

17    The jury is excused for recess.

18         (Whereupon, the jurors exit the courtroom.)

19         THE COURT:  Court stands in recess.

10:26AM    20         (Recess from 10:26 a.m. to 10:45 a.m.)

21         THE COURT:  Counsel, during jury selection, I

22    limited counsel to three at counsel table.  I'm happy

23    with there being four people at each counsel table

24    during the trial, all right?

10:45AM    25         Plaintiff, are you prepared to call your first

                 1    witness?

                 2            MR. DIXON:  We are, your Honor.  Plaintiff will

                 3    call Dr. Dan Grupp.

                 4            THE COURT:  Let me get the jury in, and we'll

    10:45AM     5    do that on the record.

                 6            MR. DIXON:  Okay.

                 7            THE COURT:  If you'll bring the jury in,

                 8    please.

                 9            (Whereupon, the jurors enter the courtroom.)

    10:46AM    10            THE COURT:  Please be seated.

                11            Plaintiff, call your first witness.

                12            MR. DIXON:  Thank you, your Honor.  Acorn calls

                13    Dr. Dan Grupp --

                14            THE COURT:  All right.

    10:46AM    15            MR. DIXON:  -- to be examined by Mr. Hueston.

                16            THE COURT:  If you'll come forward and be

                17    sworn, please.  Come around, please.  Raise your right

                18    hand to be sworn.

                19            (Whereupon, the witness was duly sworn.)

    10:46AM    20            THE COURT:  All right.  Now, if you'll come

                21    around and have a seat at the witness stand, sir.

                22            THE WITNESS:  Thank you.

                23            THE COURT:  All right.  Counsel, you may

                24    proceed with direct examination.

    10:47AM    25            MR. HUESTON:  Thank you, your Honor.

|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   | DANIEL GRUPP,                                                |
| 2   | having been first duly sworn, testified as follows:          |
| 3   | DIRECT EXAMINATION                                           |
| 4   | BY MR. HUESTON:                                              |
| 5   | Q.   Good morning, Dr. Grupp.                                |
| 6   | A.   Good morning.                                           |
| 7   | Q.   Could you please state your full name for the           |
| 8   | record.                                                      |
| 9   | A.   Dr. Daniel Grupp.                                       |
| 10  | Q.   Now, I would like to start by asking you a couple       |
| 11  | questions about your educational background.  Have you       |
| 12  | earned any professional degrees?                             |
| 13  | A.   Yes, I have.                                            |
| 14  | Q.   And where did you get those?                            |
| 15  | A.   My undergraduate degree is from -- physics is from      |
| 16  | Cornell and my Ph.D. is from University of Pennsylvania.     |
| 17  | Q.   All right.  And what is your understanding as to why    |
| 18  | you are here testifying today?                               |
| 19  | A.   Because I'm the inventor of the technology in           |
| 20  | question.                                                    |
| 21  | Q.   All right.  And for which company were you working      |
| 22  | when you invented that technology?                           |
| 23  | A.   Acorn Technologies.                                     |
| 24  | Q.   And how long did you work at Acorn?                      |
| 25  | A.   About five years.                                       |

10:47AM (line 5)
10:47AM (line 10)
10:47AM (line 15)
10:47AM (line 20)
10:48AM (line 25)

1   Q.   And do you have any relationship with Acorn

2   currently?

3   A.   Yes, I do.

4   Q.   And what is the nature of that relationship?

10:48AM   5   A.   I'm a consultant and I have a minuscule amount of

6   stock in the company.

7   Q.   All right.  Can you briefly describe your employment

8   history after you left Acorn in 2005.

9   A.   Sure.  So I worked for a number of medical device

10:48AM   10   and semiconductor and solar companies.

11   Q.   All right.  And I'll get into a couple those

12   examples in a moment, but is there a common thread in

13   your employment over the last 25 years?

14   A.   Yes.  They were all at the leading edge of

10:48AM   15   innovation and invention.

16   Q.   And let me ask you, when did you start inventing?

17   A.   Well, as long as I can remember, I've been an

18   inventor.  I remember being in a car when I was 5 years

19   old and my sister would ask me a question and I would

10:49AM   20   say, "Don't talk to me.  I'm inventing."

21   Q.   And can you remember the first time that you thought

22   about trying to fix something as a kid and what you did

23   there?

24   A.   Yeah.  So I've always done that.  And my father

10:49AM   25   bought me those old adding machines with a crank on it,

and he got it for -- I remember he told me he got it for

a dollar from the old television repair store.  And I

sat there for years taking it apart and tinkering with

and seeing how all the insides of this thing worked.

10:49AM   Q.   Now, you mention you're married.  Do you also have

children?

A.   Yes, I do.  I have two sons.

Q.   And how old are they?

A.   9 and 11.

10:49AM   Q.   And are they inventors?

A.   They are inventors in their own right.  They

invented a toy called a straw blaster that they

discovered in the kitchen, that you could actually

launch a straw out of a cardboard tube, and I said,

10:49AM   "That's amazing; we have to make this into a product."

And I helped them develop a whole little toy out of it

with a handle and everything, and we actually sold them

at the local toy store, and we sold out.  We sold a

couple dozen.

10:50AM   Q.   What do you like about inventing?

A.   What I love about it is it's very exciting.  It's

like exploring and I'm going into an unknown realm and

discovering something, and that's the place I like to

live, in the unknown.  It's like going across the ocean

10:50AM   when you've never seen what's across the ocean and you

1    get to discover a whole new continent.

2    Q.    And have you been inspired by any particular

3    inventor?

4    A.    My favorites are really the Wright Brothers.

10:50AM  5    Q.    Now, the Wright Brothers who invented the airplane?

6    A.    Yes, that's right.

7    Q.    And why is -- why are the Wright Brothers your

8    favorite?

9    A.    Well, they took on this problem of flight and they

10:50AM  10   solved it in a couple years with just really sticks and

11   pieces of cloth and glue, stuff that had been around for

12   hundreds of years, just these two guys together in a

13   bicycle shop really just figured out how to do it right

14   and how to get through this complete unknown with really

10:51AM  15   simple things, and they solved a problem that people

16   have spent millions of dollars in today's dollars and,

17   like, Langley, head of Smithsonian, he spent a million

18   dollars and he launched an airplane that crashed

19   straight into the Potomac with great fanfare, and these

10:51AM  20   guys, for something like tens of thousands of dollars in

21   today's dollars, overturned the whole world.

22   Q.    In your view, is inventing new technology easy?

23   A.    No.  It's really hard.

24   Q.    Why is that?

10:51AM  25   A.    I'd say at the heart of it is that Mother Nature is

1   just really tough.  She's just not going to give up her

2   answers easily.

3   Q.   And does it involve trial and error?

4   A.   A lot of trial and error.

10:51AM  5   Q.   Now, in your career, have you focused your inventing

6   on any particular areas or industries?

7   A.   Really on two:  Semiconductors and medical devices.

8   Q.   Okay.  Let's talk about a few of these inventions.

9   Let me ask you about the medical devices that you just

10:52AM  10   referenced.  What's the first medical device you

11   invented after leaving Acorn?

12   A.   The first one was a method for doing prostate

13   surgery that had no risk of nerve damage.  It just uses

14   cold water, whereas the previous technology uses a hot

10:52AM  15   water with a high risk of nerve damage, with some very

16   unwanted, life-changing consequences, and our technique

17   had no chance of this, and it's now, thankfully,

18   available in the U.S.

19   Q.   And what is the next medical technology you

10:52AM  20   developed?

21   A.   Then I worked for -- I built a device from the

22   ground up that has a chance to save millions of kids'

23   lives.  It's now for sale in India.  It just recently

24   went on the market, and it's the world's fastest,

10:52AM  25   cheapest, portable, most sensitive malaria diagnostic.

1  Q.   And where do you work currently?

2  A.   At my own start-up company called LifeAir.

3  Q.   And have you invented any technology at your

4  start-up?

5  A.   Yes, I did.

6  Q.   What was that?

7  A.   So it's a new kind of ventilator.  What we

8  discovered, what I discovered when I started to look at

9  in the beginning of the pandemic to see how I could

10  help, because I was building medical devices; there's a

11  lot that needed to be done, and I discovered this major

12  design flaw.

13         But it turns out that using a ventilator

14  after someone else has used it is like -- someone sick

15  has used it is like sharing someone's mask.  And it

16  turns out that ventilators are never cleaned inside;

17  and, in fact, you can't do it, and it's never done, and

18  I thought this just has to change.

19         So I invented a way to clean it and change all

20  the parts in under a minute.  It was clean and fresh,

21  and you're good to go.

22  Q.   All right.  Now, we're going to be talking about

23  patents in this case.  Do you have any patents,

24  Dr. Grupp?

25  A.   Yes, I do.  I have 37 issued patents and another

1  handful that are on file.

2  Q.   All right.  I now want to talk with you about your

3  time at Acorn and the technology you invented there, but

4  first let me ask you:  How did you come to join Acorn?

10:54AM  5  A.   I was at the University of Minnesota after my Ph.D.

6  doing some research, and I invented a type of

7  transistor.  And then I was introduced to

8  Professor Jim Harris at Stanford, and he said, "Come on

9  out and join my group and get going on this, it's a

10:54AM  10  great idea."  And then shortly after that, I was

11  introduced to Acorn.

12  Q.   What kind of company is Acorn?

13  A.   So Acorn is, you might call it an incubator.

14  Q.   What does that mean?

10:54AM  15  A.   So what they do is they take inventions or

16  technology from universities that are kind of young

17  sprouts, and industries get really interested in things

18  that are that young, really have been developed, and

19  they fill that gap.  They help them grow to the point

10:55AM  20  where industry would like to invest in them.

21  Q.   Great.  And why did you want to join Acorn?

22  A.   Well, that's exactly where I was.  My transistor I

23  invented at the time was just on paper, and it really

24  wasn't ready, and I thought they are just great guys.  I

10:55AM  25  remember after our first meeting, we were talking,

1  saying, "These guys are just A players, and I think they

2  can make us fly."

3  Q.   When did you start working at Acorn?

4  A.   That would be at the spring of 2000.

5  Q.   And what were your job responsibilities?

6  A.   My job responsibility was to develop this new

7  device.

8  Q.   And did you work with any other inventor there?

9  A.   Yes, I did.  Dr. Daniel Connelly in particular.

10  Q.   And how would you describe Dr. Connelly?

11  A.   Well, he's one of the most amazing people that

12  you'll ever meet.  I think he's the smartest person that

13  I've ever met on the planet, and --

14  Q.   Can you give an example of how you thought of that?

15  A.   There was this amazing thing he could do with his

16  incredible memory, that at the end of the meeting, I

17  would say, "Dan, summary?"  Now, look.  Me, after a

18  three-hour meeting, you say, "What did you talk about?"

19  I'd say, "Well, we talked about a lot of good stuff and

20  made some good points."  And you'd ask Dan, and he would

21  just read out this outline that he had in his head of

22  everything we talked about.  He said, "First we talked

23  about this and then we talked about this and we talked

24  about this.  Now, under those three things, first, there

25  were these three things."

10:55AM (line 5)
10:55AM (line 10)
10:56AM (line 15)
10:56AM (line 20)
10:56AM (line 25)

1        And everyone would sit in the room with

2   their jaws dropped and open.  This is, like, something

3   that none of us could ever imagine doing.

4        THE COURT:  All right.  Dr. Grupp, I'm going to

10:56AM   5   ask you to not refer to anybody by first name only.

6        THE WITNESS:  Oh.  Sorry, Judge.

7        THE COURT:  If you'll refer to "Dr. Connelly"

8   or "Dan Connelly."  You and he have the same first name,

9   so let's just not use first names only.  All right?

10:56AM   10        THE WITNESS:  My apologies.  I will be --

11        THE COURT:  All right.  Let's continue.

12        MR. HUESTON:  Thank you, your Honor.

13   Q.   At a very high level -- and, by the way, Dr. Grupp,

14   I even mixed up the names in the opening and said it was

10:57AM   15   going to be Dr. Connelly, and it's yourself.  So let's

16   keep it to last names.

17   A.   My apologies.  We used to have fun with that, the

18   two Dans.  I'm sorry.

19   Q.   All right.  At a very high level, can you describe

10:57AM   20   the technology that you and Dr. Connelly invented?

21   A.   Yeah.  So at the highest level, it's a way to get

22   electricity to flow easier from a metal into a

23   semiconductor.

24   Q.   Now, why does that matter, on an everyday level, for

10:57AM   25   me and people in this courtroom?

1    A.   Sure.  So if you can't get electricity to flow, then

2    -- let me say it the other way.  You want electricity to

3    flow so that things like your battery lasts longer and

4    so that things like your cell phone can think faster and

10:57AM  5    compute faster and do all these tricks we want, like

6    face recognition and voice recognition.  It takes a lot

7    of computing power.

8             And if it's going -- it can't get

9    electricity through, then everything slows down.

10:58AM  10   Q.   When did you invent this technology?

11   A.   In spring of 2001.

12   Q.   And what work were you doing leading up to this

13   invention?

14   A.   Well, I had started at Acorn with another type of

10:58AM  15   transistor.

16   Q.   And the jury's begun to hear about transistors, but

17   maybe you can start with, if you can, a simple

18   explanation of what a transistor is.

19   A.   So real simple, what they do, in your phone or in

10:58AM  20   your computer, is they are just switches.  That's all

21   they are, nothing more than that.  The electricity's

22   coming in, and you've got another wire actually attached

23   to your switch, and you can turn it on and off.

24   Q.   And by the way, how small are those switches?

10:58AM  25   A.   They are really, really small.  Right now, the one

1  you have in your pocket, you can write about a million

2  transistors on the end of a hair.

3  Q.   Now, you said you were working on a new transistor

4  structure.  Did you encounter any particular challenges

10:59AM  5  when you were working on that?

6  A.   Yes, I did.

7  Q.   And what was that challenge?

8  A.   So I came up against this problem that I have to say

9  I don't feel too bad about, because Acorn had been

10:59AM  10  tasked by a professor from Harvard and a professor from

11  Berkeley, and they hadn't caught it either, so not too

12  embarrassed about it.

13          But we came up against this problem called

14  the Schottky barrier that I hadn't realized would show

10:59AM  15  up in my device.

16  Q.   Okay.  And before I ask you to provide a technical

17  definition of what you just called "the Schottky

18  barrier," would it help you explain this by showing

19  slides that you've prepared?

10:59AM  20  A.   Yes, that would be great.

21          MR. HUESTON:  All right.  With the Court's

22  permission, I'd like to show Grupp Demonstrative

23  Number 1.

24          THE COURT:  Proceed.

10:59AM  25  Q.   So, Dr. Grupp, explain this first slide here.

A.    Okay.  So what we're seeing here is I'm going to
make an analogy between metal and a semiconductor
contact by imagining the metal is a road and the
semiconductor, the silicon, as a bridge.

11:00AM      When you bring these two together, you'd like
electricity to flow across.  So here we have, on the
left side, we've got a metal, and that's a roadway, and
imagine that electricity is like a car that you want to
flow.  Let's say the electricity is something that
11:00AM  flows, so we imagine this is a car.

      And when you -- if this is an ideal situation,
you'd like to bring the metal into contact, and the
roadway of the metal lines up with the roadway of the
bridge, and the electricity or the cars will go right
11:00AM  across.

Q.    Just like that?

A.    Just like that.

Q.    All right.  So that's the ideal thing that you want?

A.    Right.

11:00AM  Q.    That they can just go slide right across the metal
over to that silicon?

A.    That's correct.

Q.    On a smooth road; is that right?

A.    Yes, sir, that's correct.

11:00AM  Q.    All right.  Do you have a next slide to show what

1   the issue really is inside?

2   A.   Yes, please.

3   Q.   Let's go to the next slide.

4   A.   So --

11:01AM  5   Q.   What is this?

6   A.   So what actually happens is that when the metal

7   touches the silicon, that it actually ends up below the

8   roadway, below the beginning of the bridge.  And the

9   cars just run into this wall and can't get across, and

11:01AM  10  that's called the Schottky barrier.

11   Q.   That wall right there?

12   A.   That wall right there.  They are just stuck.

13   Electricity can't get across, ran into the Schottky

14   barrier.

11:01AM  15   Q.   Okay.  Let's take these slides down.  Thank you for

16   that illustration.

17   A.   I'd like to add that the goal is to get back to the

18   ideal case.

19   Q.   The "goal" there meaning the bridge?

11:01AM  20   A.   Yeah.  And to that point, you couldn't do it.  It's

21   just stuck down there; and we wanted to get it -- the

22   road matching up with the bridge so electricity would

23   just flow across.

24          THE COURT:  Let me interject.  We need to do

11:01AM  25   this direct examination with questions from counsel and

1   answers from the witnesses, not a dialogue, not a

2   conversation.  Discrete questions and direct answers

3   limited to those questions.

4        So let's go forward on that basis.

5        MR. HUESTON:  Thank you, your Honor.

6        THE WITNESS:  Thank you, Judge.

7   Q.   And is there another name to describe something that

8   hinders the flow of electricity in a transistor?

9   A.   Yes.  That would be called resistance.

10  Q.   Okay.  And let me ask you:  What happens when

11  resistance is too high?

12  A.   When resistance is too high, electricity can't flow.

13  Q.   And when resistance is high, does something happen

14  like heating up in devices?

15  A.   So what happens is resistance is too high, the

16  device either slows down or you can drive -- try and

17  drive the cars faster, but then everything begins to get

18  hot, and you can actually burn out your computer.

19        It's kind of like when -- you could make a car

20  go faster, you could put the pedal all the way down, put

21  the pedal to the metal, but then you are risking burning

22  out your transmission.

23  Q.   Okay.  So I want to focus back on the Schottky

24  barrier.  Was there a known solution around the Schottky

25  barrier back when you were looking at it in 2001?

1    A.    No, there was no solution.  It was just accepted

2    that this is the way things are, that the Schottky

3    barrier's stuck there.

4    Q.    All right.  So what did you do when you discovered

5    this barrier, the Schottky barrier?

6    A.    Well, I said, "I have to fix this because I've got a

7    whole project.  I've got people working for me.  I've

8    got a whole project/company on the line, and I'm going

9    to make this work."

10          And so I went to the library and just read

11   everything I could.  I didn't accept that that is just

12   the way it is, but I said, "I've got to find out is this

13   a law of nature or is there some way around it."

14   Q.    And so then what happened after you tried to read

15   everything you could on this and to dig in?

16   A.    So after I really understood everything there was to

17   understand, there was a moment when I'm sitting in the

18   library and I put it all together.  I remember the light

19   coming in from this big window in the library and this

20   moment when I said, "I think I know how to solve this."

21   Q.    And what was that idea that came to you?

22   A.    So what everyone had been doing was trying to

23   squeeze the two together, trying to get that metal

24   really tightly up to the semiconductor; and the insight

25   I had was that there's a range where, if you actually

1  separate them by a very small amount that the current

2  should actually flow faster," and it's completely

3  opposite to what everybody thought at this point and

4  nobody had tried that.  It was an unknown realm.

11:04AM  5  Q.   And so how was this a new idea?

6  A.   So it's a new idea because what people had been

7  trying was to get them closer, and what I said was,

8  "Actually, what you want to do is pull them apart a

9  little bit."

11:04AM  10  Q.   And did you have a thought about an insulation

11  layer?

12  A.   Yes.  So the idea, how would you pull them apart,

13  the idea is that you put in a layer of insulator,

14  something that doesn't let electricity flow, but in this

11:05AM  15  special case that it actually would let a little bit of

16  electricity flow.  It's very, very thin.  You put an

17  insulator in between the metal and the semiconductor.

18  Q.   All right.  And can you think of an analogy for the

19  jury that would help illustrate why this was really a

11:05AM  20  new and different idea that others weren't thinking of?

21  A.   Yeah.  So the technical language for this, for the

22  description of what happens would be that the electron's

23  wave of -- the electrons reaches into the gap of the

24  semiconductor and induces states called metal-induced

11:05AM  25  gap states at the interface, and the metal, the

1  semiconductor to maintain a charge of neutrality; it

2  creates a surface states, the virtual crossing point of

3  the band.  That's what the scientist would say.

4  Q.   All right.  But let me stop you there.  And that is

11:06AM  5  a bit of a mouthful.  Can you explain what you were just

6  describing in everyday terms for me and the rest of the

7  folks here?

8  A.   Yes.  So the way I actually think about it is this:

9  That what happens is the metal, as you bring a metal up

11:06AM  10  to a semiconductor that, think of the semiconductor

11  having, like, this alligator sitting there with its

12  mouth open, just sitting there.  And you bring the

13  semiconductor up to it, right, you bring the metal up to

14  it.

11:06AM  15       The fingers, kind of like these fingers of the

16  metal, they tickle the alligator when it gets real

17  close, and the alligator wakes up and it snaps down on

18  this, on the metal approaching, kind of like a mouse

19  approaching, just grabs it and sticks it there.  And --

11:06AM  20  Q.   Let me just ask you there.  So when that alligator

21  snaps in and holds it there, what is that?  What's the

22  problem?

23  A.   So that, that's actually creating this barrier.

24  That's actually what's keeping that metal down below the

11:07AM  25  roadway of the bridge.

1    Q.    Okay.  And so, again, on a simple level, how did

2    your invention solve the issue of the alligator snapping

3    in on the metal and creating the barrier?

4    A.    So the key insight is that if you bring the metal up

11:07AM    5    real close but not too close, don't wake up the

6    alligator, that you could kind of fool the alligator,

7    because if you come close enough, then it won't wake up

8    and it doesn't snap down, and then the road that the

9    cars or electrons can go from the metal, right across

11:07AM    10    the roadway, to the bridge to the silicon.

11          And the key there is that there's a strange

12    region where, if it's really thin and gets really close,

13    the insulator doesn't look like an insulator anymore.

14    That electricity can actually go through an insulator.

11:08AM    15          Right, I won't get into this, but this is the

16    screening role of quantum mechanics, and it's really

17    important here that when that insulator gets thin,

18    doesn't look like an insulator and electricity can

19    actually flow through, and you don't wake up to the

11:08AM    20    alligator.

21          So the idea is to come close enough that

22    electricity can flow but not too close that you wake up

23    the alligator, and there's kind of this range in there

24    where things should get a lot better.

11:08AM    25    Q.    All right.  And was there another aspect of the

1    Schottky barrier that your invention solved?

2    A.   Yes.  So there's -- not only is there an alligator,

3    but the surface has these other states, and you can

4    think of states kind of like static electricity that

5    attracts something.  And these other states would be

6    called dangling bonds, and you've got to get rid of

7    those.

8              So you've got to get rid of what's called

9    the MIGS, or the alligator, and you've also got to get

10   rid of these surface states called dangling bonds.

11   Q.   And how did your invention get rid of those dangling

12   bonds?

13   A.   So if you add a layer that called passivates, it

14   satisfies these dangling bonds, then you get rid of

15   those as well.

16   Q.   All right.  So you have this idea, and what do you

17   and Dr. Connelly do next?

18   A.   So we immediately begin to try to prove that we are

19   right, because this is an idea that's never been done

20   and we want to show that it really works.

21   Q.   And what kind of hours were you working at this

22   point to try to get to a solution?

23   A.   Well, it might be easier to try to answer how many

24   hours wasn't I working at the time.  I was working

25   something like 15-hour days and weekends.  I think I

11:08AM

11:09AM

11:09AM

11:09AM

11:09AM

1    gave myself a Saturday morning off until 1:00, and I was

2    back in the lab.

3    Q.   What kind of working relationship did you have with

4    Dr. Connelly?

11:09AM   5    A.   We had a -- Dr. Connelly and I had a great working

6    relationship, where we could just talk for hours and

7    dive deep into a subject from blackboard, and we never

8    had any arguments.  We just dove really to the heart of

9    the matter, and I think we once had a six-hour meeting

11:10AM   10   at the Blackboard.  And after that, I thought, that was

11   amazing.

12   Q.   And what kind of tests did you and Dr. Connelly do?

13   A.   Well, there were several different kinds.

14   Q.   Did you -- before we get into this, did you actually

11:10AM   15   record the results of these tests?

16   A.   Yes, we did.

17   Q.   And what were you recording this in?

18   A.   In notebooks.

19   Q.   Are they called lab notebooks?

11:10AM   20   A.   Lab notebooks, yes.

21   Q.   All right.  So let's put up PTX-9, which will appear

22   on the screen, and I'll just ask you, looking at the

23   cover here, Dr. Grupp, can you tell me what this is?

24   A.   This is one of my lab notebooks.  That's my

11:10AM   25   handwriting.

1    Q.   All right.  And now we're going to turn to Page 64

2    in this document here on the computer, and there's a

3    graph here at the top of the page, and I want to ask

4    you:  What does this reflect?

11:11AM  5    A.   These are the measurements we were doing on some

6    devices that we're making examples of our invention.

7    Q.   All right.  And then I notice some writing there off

8    to the right.  Do you recognize the handwriting?

9    A.   Yes.  That's my handwriting.

11:11AM  10   Q.   What does it say?

11   A.   Says, "Dropping like a rock."

12   Q.   And what did you mean when you wrote, "Dropping like

13   a rock"?

14   A.   What I mean is that we're changing this layer in

11:11AM  15   between by a very small amount and that's making this

16   huge change; and that huge change means that, in the

17   analogy I'm using, that we haven't -- we've gotten

18   really close and electricity's flowing and we've shown

19   we can do it without waking up the alligator.

11:11AM  20   Q.   And did you continue your testing?

21   A.   Yes, certainly.

22   Q.   Let's turn to Page 114 of your lab notebook, and

23   we're at the page -- and I want to direct your attention

24   to the top of the page.  There's a graph there.  Is this

11:12AM  25   a printout?

A.    Yes, this is a printout.

Q.    And let me just ask you:  Is it significant to you that this is a printout in your lab notebook?

A.    Yes, it is.

Q.    Why is that?

A.    Because in those days, printers were not little, cheap desktop things; and that to print something out meant I had to go from the basement, where I did measurements, up and find a printer and print it out, because I really wanted to stick it in my notebook.  And so I only did that when I had something really worth recording.

Q.    All right.  And what level of contact resistance did you achieve here, as reflected in the printout?

A.    So without -- as a direct measurement that this gets down to, a couple little microns squared.

Q.    And was this of significance to you?

A.    Yes, certainly.

Q.    Why is that?

A.    Because the ability -- the best context that anyone could make at the time was about 20 times worse than this.  This is the best that anybody's ever seen.

Q.    What was your reaction when you were able to record these results?

A.    Well, it was really exciting because it had all just

1  been an idea, and we didn't know how good the idea was.

2  So the graph before, where I said, "Dropping like a

3  rock" showed, okay, it looks like -- it looks like we're

4  correct; it looks like the underlying physics of how it

11:13AM  5  works, the idea of it works, but how good is it going to

6  be.  And this is, I think, the first one where we

7  showed, yeah, this really works well, that the effect is

8  really profoundly huge, very important.

9  Q.   All right.  Again, on a practical level, why does a

11:13AM  10  20-times reduction in contact resistance matter for

11  everyday folks?

12  A.   So again, it can make your battery last longer, it

13  can make your computer run faster, your cell phone run

14  faster, calculate more things, do more tricks; and it

11:14AM  15  also keeps -- every year, the phones get faster and

16  faster and computers get faster and faster, and it meant

17  that we can keep going with that for years ahead.

18  Q.   So you talked about how your invention addresses

19  this issue of contact resistance.  Has the importance of

11:14AM  20  contact resistance changed over time?

21  A.   No, it has -- but, yes, it has; that, in fact, it

22  gets more important over time.

23  Q.   And why is that?

24  A.   Because there are two parts, really, to a

11:14AM  25  transistor.  One is the part you turn on and then

there's all the other parts that try and get the
electricity to the switch.  And those other parts are
called parasitic resistances; and those, it's hard to
get those smaller and smaller, and they end up being a
11:14AM  bigger and bigger part of the problem.
Q.    All right.  So you described how you developed this
new technology and you tested it.  Did you do anything
next to protect your invention?
A.    Yes, we did.
11:15AM  Q.    What did you do?
A.    We wrote a patent.
Q.    And why was it important to write a patent to
protect your invention?
A.    Because we wanted to establish that this is our
11:15AM  technology and so we could own it and bring it to the
world and have control over it.
Q.    Now, you said you wrote a patent.  Did you actually
help write out the patent?
A.    Yes, in fact, I did.
11:15AM  Q.    And you mentioned earlier that you currently have 37
patents and there are others pending.  On all those
other occasions, did you actually write out those
patents?
A.    No, I didn't.
11:15AM  Q.    So why did you decide to write out this one?

1  A.  Well, it was so new and so complex that -- and

2  profound that we thought we really want to tell the

3  world how this works, and the best people to do it would

4  be Dr. Connelly and myself, the scientists and engineers

11:16AM  5  that understood it and invented it.

6  Q.  When do you recall drafting that patent application,

7  approximately?

8  A.  That would be in the fall of 2002.

9  Q.  Okay.  And then what happened with that patent

11:16AM  10  application after it was filed?

11  A.  Well, eventually the patent was allowed and issued.

12  Q.  Do you remember roughly when that was?

13  A.  2006.

14  Q.  Okay.  And later did you file other patent

11:16AM  15  applications relating to this invention?

16  A.  Yes, we did.

17           MR. HUESTON:  And at this time, your Honor,

18  with the Court's permission, I'd like to pass out

19  physical copies of the patents at issue.

11:16AM  20           THE COURT:  Pass out to whom?

21           MR. HUESTON:  To the witness.  I'm sorry.

22           THE COURT:  You can approach the court security

23  officer; he will hand them to the witness.

24           MR. HUESTON:  Thank you, your Honor.

11:17AM  25  Q.  Dr. Grupp, I've handed you the physical copies of

1  the patents here.  I'd like to talk to you first about

2  the one at the top, the '336 Patent.  Do you recognize

3  that document?

4  A.   Yes, I do.

11:17AM   5  Q.   Is this one of the patents at issue in the case?

6  A.   Yes, it is.

7  Q.   And let me ask you about the next one in order

8  there, which is PTX-2470, which is the '167 Patent, the

9  written copy.  Do you recognize that patent?

11:17AM  10  A.   Yes, I do.

11  Q.   And what is that?

12  A.   This is another patent of my invention.

13  Q.   All right.  And let me ask you, then, about the

14  other two there in your hands, PTX-1306 and 1308.  Do

11:18AM  15  you recognize those patents?

16  A.   Yes.

17  Q.   Are these your patents, sir?

18  A.   Yes, these are my patents.

19  Q.   And, Dr. Grupp, I want to ask you:  How does it feel

11:18AM  20  to hold those patents in your hand?

21  A.   Well, it's admittedly very emotional that this is,

22  you know, kind of what, you know, I dreamed about my

23  whole life.  I've never actually seen these.  You just

24  get a notice that you got them, but I've never seen the

11:18AM  25  actual patent, and this is -- this is what I've dreamed

1   about from the time I was 5.

2   Q.   Thank you, Dr. Grupp.  Let me ask you -- you can put

3   that aside for now.  In addition to the patent

4   application, did you try to publish to the world your

5   technology in any other way?

6   A.   Yes, we did.

7   Q.   How did you do that?

8   A.   We wrote papers that we submitted to journals.

9   Q.   All right.  Let me put up PTX-92.  And there is

10  PTX-92 on your screen, Dr. Grupp.  Do you recognize this

11  document?

12  A.   Yes, I do.

13  Q.   What is it?

14  A.   This is our first paper that we wrote in 2004.

15  Q.   When was this published?

16  A.   In 2004.

17  Q.   And let's look at the first sentence.  It says, "A

18  new method for dramatically lowering the Schottky

19  barrier resistance at a metal/Si interface by

20  interposing an ultrathin insulator is demonstrated for

21  the first time."

22           And let me just ask you, Dr. Grupp, in

23  general what does this paper describe?

24  A.   This describes our invention.

25  Q.   Okay.  Put that down.  And next I'm going to put up

1    PTX-91.  Dr. Grupp, do you recognize this invention?

2    A.   Yes, I do.

3    Q.   And what is this?

4    A.   This is another paper that we wrote.

11:20AM    5    Q.   And when was this published?

6    A.   In 2006.

7         THE COURT:  You're going to need to speak up,

8    Dr. Grupp.

9         THE WITNESS:  Thank you, your Honor.

11:20AM   10    Q.   And in general, what does this paper describe?

11    A.   This paper also describes our invention as applied

12    to a transistor.

13    Q.   And let me ask you:  Did these papers that we just

14    showed, did these papers generate any interest in the

11:20AM   15    scientific community?

16    A.   Yes, they did.

17    Q.   And how do you know that?

18    A.   Because these papers have been referenced by over

19    300 other journal articles.

11:20AM   20    Q.   And when you say "referenced," what does that mean?

21    A.   That means -- a reference is when a scientist or

22    engineer writes a paper, they give credit and they say

23    where their ideas came from, what is the origin of the

24    work that they are doing.  And so they -- in those

11:21AM   25    papers, they would write that -- a reference or they

1  write down the details of this paper, where they found

2  it, saying that we were the ones that inspired their

3  work.

4  Q.   And how many times have your papers been referenced

5  by other scientists to date?

6  A.   Over 300 times.

7  Q.   Now, is that unusual, in your experience, for a

8  scientific paper to be referenced and talked about in

9  other papers over 300 times?

10  A.   300 times is a lot, that -- and so it's very

11  unusual.  So I have other papers that haven't come close

12  to that.  And it's not like -- it's not like "likes" on

13  TikTok where you just hit a button and 300 would be

14  significant.

15              300 is like hitting a game in the World

16  Series in this kind of game, because what it means is

17  that some scientist or engineer decided to focus months

18  or years of their efforts and resources on this idea.

19  Q.   Dr. Grupp, you mentioned earlier that you were

20  working at Stanford for a while.  Do you remember that

21  testimony?

22  A.   Yes.

23  Q.   Did you ever share your research on this invention

24  with anyone there?

25  A.   Yes, I did.

1    Q.    And who was that?

2    A.    I would have shared it with Professor Jim Harris and

3    Professor Krishna Saraswat and his graduate students.

4    Q.    All right.  And you mentioned the graduate students.

11:22AM   5    Do you remember discussing your invention with

6    Dr. Saraswat specifically and his graduate students?

7    A.    Yes, I do.  We had a number of meetings, and I

8    remember having a first long meeting where we told him

9    all about our technology and how it worked, and they

11:22AM   10   were very interested.

11   Q.    Now, you mentioned earlier your papers have been

12   referenced by over 300 other scientists.  Have your

13   papers also been cited by Samsung?

14   A.    Yes, they have.

11:23AM   15   Q.    All right.  Let's put up PTX-1087, and I'll direct

16   your attention to this, Dr. Grupp.  What is this

17   document?

18   A.    This is a journal article.

19   Q.    And who prepared this journal article?

11:23AM   20   A.    This is written by engineers at Samsung.

21   Q.    And how do you know it's written by folks at

22   Samsung?

23   A.    Because the affiliation of where the engineers work

24   is always written at the front of a paper; and it says

11:23AM   25   here that these engineers worked at the Samsung Advanced

1    Institute of Technology and the Samsung Electronics

2    Company.

3    Q.   Okay.  Now, let's go to the second column on the

4    first page, and I want to direct your attention to the

11:23AM    5    fourth sentence there, and it states -- we pointed it

6    out; I'll quote it -- "To solve these problems, many

7    researchers have tried to increase $I_{th}$ by alleviating the

8    Fermi-level pinning effect using thin oxide or nitride

9    films."

11:24AM    10         Is that language familiar to you, Dr. Grupp?

11   A.   Yes, it is.

12   Q.   Why?

13   A.   Well, I've read this before, and what it's saying is

14   that they are giving credit to our work for inspiring

11:24AM    15   work that they are doing, in particular because these

16   little numbers, 17 through 19, are referring to the

17   papers that are at the end of the article.

18   Q.   Okay.  Let me -- yeah.  So let me just break that

19   down.  So you just mentioned those numbers, 17 and 19,

11:24AM    20   right?

21   A.   Yes.

22   Q.   And let's go to the last page of the document and

23   see if we can find the numbers there.  And do you

24   recognize what this list of numbers is?  What's this

11:24AM    25   part of the paper called?

A.  This is the bibliography, or the references, of the paper.

Q.  Okay.  And you mentioned that there was a list from 17 to 19 after that sentence.  What's the significance of what you're seeing here?

A.  That these are the papers that inspire their work; and in particular, they are listed in chronological order, that the one that comes first they list first, and ours is the one that's listed first; and that means that's a way to give credit to the people that invented it.

Q.  And just briefly, looking at references 18 and 19, do you recognize any names there?

A.  Yes, I do.

Q.  And which ones do you recognize?

A.  I recognize the name that's, "Saraswat, K," in both papers, and that would be Professor Saraswat at Stanford.

Q.  Okay.

        MR. CORDELL:  Your Honor, I hate to interrupt, but at least typically we're given copies of these exhibits before when the examination occurs.

        THE COURT:  Does someone have an additional copy to share with opposing counsel?

        MR. HUESTON:  Yes.

1      MR. CORDELL:  Your Honor, we would like all of

2  them, if we could, so we could have them.

3      THE COURT:  Well, we don't need to stop and do

4  this each time.

11:26AM  5      MR. CORDELL:  I've been doing my best to follow

6  along, but it's just difficult.

7      THE COURT:  It's all right, Counsel.

8      All right.  If counsel will have a seat, we'll

9  proceed.

11:26AM  10      Go ahead, Mr. Hueston.

11      MR. HUESTON:  Thank you, your Honor.

12  Q.   All right.  So we were talking about these reference

13  here, 17 to 19, and you just referenced Dr. Saraswat's

14  name, correct?

11:27AM  15  A.   Yes.

16  Q.   Now let's go to Page 2 of this article, and I'd like

17  for you here, at Page 2 of this article, to focus on the

18  images in the top of Figure 1A.  And what do these

19  reflect?

11:27AM  20  A.   These figures reflect an explanation of the

21  underlying physics of how the invention works, what they

22  are describing.

23  Q.   And how is this image of significance to you?

24  A.   Because it's the same images that we disclosed that

11:27AM  25  describes our invention.

1   Q.   Okay.  And what is your reaction to seeing this

2   Samsung article on these images?

3   A.   Well, in one sense it's very satisfying that it says

4   that, you know, we did something useful, that people are

5   taking notice and they think it's valuable.

11:27AM

6   Q.   And let's look at the bottom of Page 1.  I'd like to

7   blow that out.

8        And can you tell when Samsung published this

9   article?

10  A.   Yes, sir.

11:28AM

11       MR. CORDELL:  Your Honor, I have to object to

12  lack of foundation.  He's having a lay witness interpret

13  these documents.  I got no notice --

14       THE COURT:  Do you have a response?

15       MR. HUESTON:  Yes.  He is a scientist and he

11:28AM

16  has testified that he carefully tracked who had been

17  publishing and following his work, and that's exactly

18  what he is noting here.

19       THE COURT:  Well, then, if you will lay that

20  foundation in anticipation of these direct questions, I

11:28AM

21  think we'll be all right.

22       MR. HUESTON:  All right.  Thank you.

23       THE COURT:  I'll overrule the objection at this

24  time, based upon a foundation being laid going forward.

25       MR. HUESTON:  Thank you, your Honor.

11:28AM

1  Q.   So, Dr. Grupp, did you, in fact, monitor, once your

2  papers were published, other scientists and other folks

3  writing about your invention?

4  A.   Yes, I did.

11:28AM  5  Q.   And do you remember, in fact, reading and finding

6  this article as you monitored?

7  A.   Yes, I do.

8  Q.   All right.  Great.  And by the way, when was this

9  published?

11:29AM  10  A.   In 2013.

11  Q.   Okay.  You can take that down.

12       And did you continue to monitor the publishing

13  by other scientists and engineers in the years

14  afterwards on your papers?

11:29AM  15  A.   Yes.

16  Q.   And why would you do that, by the way?

17  A.   Well, for several reasons.  I'd want to know that my

18  work had impact and I'd want to see how it's moving out

19  into the world.

11:29AM  20  Q.   Okay.  So let me show you PTX-19 and ask you if you

21  can identify this document.

22  A.   Yes.

23  Q.   And what is this?

24  A.   This is a -- it's kind of like a -- it's like a

11:29AM  25  paper, but it's just the short version that might have

1  been submitted to a conference.

2  Q.   Okay.  And who, can you tell, was this prepared by?

3  A.   By engineers at Samsung.

4  Q.   And let's look at the bottom of the page.  Do you

5  see where it says, "References"?

6  A.   Yes, I do.

7  Q.   And does Reference Number 4 look familiar to you?

8  A.   Yes, it does.

9  Q.   And who is that there?

10  A.   That's --

11  Q.   In Reference 4?

12  A.   That's Dr. Connelly and myself and other Acorn

13  employees.

14  Q.   Okay.  Let's scroll that down and let's go to

15  PTX-1103, and I'll ask you if you recognize this

16  document.

17  A.   Yes, I do.

18  Q.   And what is this?

19  A.   This is another journal article.

20  Q.   And who is this written by?

21  A.   Samsung engineers.

22  Q.   Okay.  Let's look at the bottom of this page, to

23  where it says "References."  You see that?

24  A.   Yes.

25  Q.   Okay.  I want to direct your attention to Number 11

```
 1  and ask if that one looks familiar to you.
 2  A.   Yes, it does.
 3  Q.   And what does it show?
 4  A.   That is another of our papers.
 5  Q.   Okay.  Relating to the invention?
 6  A.   Yes.
 7  Q.   Let's go back to the first page of this article and
 8  let's look on the left side.  When did Samsung publish
 9  this article?
10  A.   This article was published in 2018.
11  Q.   Now, earlier Samsung's lawyer, in opening, suggested
12  that Samsung didn't know about your patents before the
13  lawsuit in 2019.  What is your reaction to that?
14  A.   I can't see how that can be true.
15       MR. CORDELL:  Objection to foundation, your
16  Honor.
17       THE COURT:  Sustained.
18  Q.   Dr. Grupp, in your experience, is it difficult to
19  find a patent?
20  A.   No.
21  Q.   How does one find a patent?
22  A.   You would just go on --
23       MR. CORDELL:  Same objection.  Again, calls for
24  opinion, your Honor.
25       MR. HUESTON:  I just asked him how he does it.
```

11:30AM (line 5)
11:31AM (line 10)
11:31AM (line 15)
11:31AM (line 20)
11:31AM (line 25)

1          THE COURT:  He can testify as to how he locates

2    patents but not opine as to how everybody does it.

3          Restate the question, counsel.

4          MR. HUESTON:  Thank you, your Honor.

11:31AM   5    Q.   Dr. Grupp, how do you find patents?

6    A.   I go on Google Patents and I would do something like

7    put in my name and hit "enter," and my patents would all

8    show up.

9    Q.   All 37?

11:32AM  10    A.   Yes.

11    Q.   All right.  Let's now go to PTX-2460, and I'm going

12    to ask you whether you recognize this patent.

13    A.   I don't know the numbers.

14    Q.   Let's go to the next page.  Yeah, there we go.  Do

11:32AM  15    you recognize this patent?

16    A.   Yes, I do.

17    Q.   And let's go to the second page of this.  It says,

18    "Assignee:  Samsung Electronics Company."  Let's get

19    there.  It's the next.  Let me ask you, what does

11:32AM  20    "assignee" mean in a patent?

21    A.   That's -- the assignee is the person that owns the

22    patent.

23    Q.   And so what does that indicate here on the patent?

24    A.   That Samsung Electronics Company owns this patent.

11:33AM  25    Q.   Okay.  Now let's look at the top right.  When was

1   this patent issued?

2   A.    This patent was issued in 2009.

3   Q.    Now let's look to the bottom left.  It says,

4   "References cited."  Do you see that?

11:33AM   5   A.    Yes, I do.

6   Q.    And it says, "U.S. Patent Documents"; is that right?

7   A.    Yes.

8   Q.    And by the way, what does it mean, in your

9   experience, in a patent to have references cited in U.S.

11:33AM   10   Patent Documents?  What is that?

11   A.    References in a patent are saying, "This is the work

12   that came before us."

13   Q.    Okay.  And then looking at those references, does

14   any of those references look familiar to you?  Let's go

11:33AM   15   to the second column at the top.  There we go.

16   A.    Yes, they do.

17   Q.    And which ones?

18   A.    There's one in the middle that ends in 736 that

19   says, "Grupp, *et al*."

11:34AM   20   Q.    And what is that?

21   A.    That is one of our patents.  Actually, that's a

22   patent application.

23   Q.    And does that patent have any relation to the

24   patents at issue in this case?

11:34AM   25   A.    Yes, it does.

1  Q.   Okay.  And is this the -- by the way, did you

2  review -- have you, as part of thinking and monitoring

3  as to whether your invention is still being talked about

4  -- you talked about this in the context of the journal

11:34AM  5  articles.  Have you also done this with patents to see

6  who's been citing your inventions?

7  A.   Yes, I have.

8  Q.   All right.  Let me go to Grupp Demonstrative Number

9  2.  You can put that up.  And I'm going to ask you,

11:34AM  10  Dr. Grupp, what does this slide reflect?

11  A.   This slide reflects Samsung's patents and lists ones

12  that have references to our patents.

13  Q.   And so the first one, May 19, 2009, does that

14  indicate a reference to your patent?

11:35AM  15  A.   Yes, that's the one we were just looking at.  That

16  refers to our '736 application.

17  Q.   Okay.  And just briefly, how many others are there

18  and what are the years?

19  A.   There are five in total, and the years are 2009,

11:35AM  20  2010, 2017, 2018, and 2018.

21  Q.   And, Dr. Grupp, having seen all these Samsung

22  patents referencing your inventions as prior art, what

23  does that suggest to you?

24       MR. CORDELL:  Objection, your Honor.

11:35AM  25       THE COURT:  Sustained.  This is a fact witness.

1    He's not entitled to give opinions.

2              MR. HUESTON:  All right.

3    Q.   Dr. Grupp, these are the additional five where you

4    reference your patent being cited; is that right?

11:35AM  5    A.   That's correct.

6              MR. HUESTON:  All right.  Thank you, your

7    Honor.  No more questions at this time.

8              THE COURT:  You pass the witness at this time?

9              MR. HUESTON:  Yes, your Honor.

11:36AM  10             THE COURT:  Cross-examination by the

11   Defendants?

12             All right, Mr. Cordell.  You may proceed with

13   cross-examination.

14             MR. CORDELL:  Thank you, your Honor.

11:36AM  15                    CROSS-EXAMINATION

16   BY MR. CORDELL:

17   Q.   Good morning, Dr. Grupp.

18   A.   Good morning, sir.

19   Q.   Well, my name is Ruffin Cordell.  I don't think

11:36AM  20   we've met before; is that right?

21   A.   That's correct.

22   Q.   So if I can have your last demonstrative kept up.

23   Can we put that back up, where you listed all these

24   patents?

11:37AM  25             So here in your demonstrative, I guess it's

1    Exhibit 1 -- I thought it was Exhibit 2 -- you list a

2    bunch of Samsung patents, correct?

3    A.   Yes.

4    Q.   And you say in those Samsung patents, they cite a

11:37AM    5    bunch of your patents, right?

6    A.   Yes.

7    Q.   But isn't it a fact, sir, that not any of the

8    patents that you show in this slide are actually at

9    issue in this case?

11:37AM    10    A.   I couldn't say.

11    Q.   You don't know?

12    A.   I know -- what I know is that all of these, I've

13    read these references, and they all refer to our family

14    of patents.

11:37AM    15    Q.   Isn't it a fact, Dr. Grupp, every single of the five

16    Grupp patents you've highlighted here are nowhere

17    asserted in this case, correct?

18    A.   I wouldn't be able to say that.

19    Q.   You just don't know one way or the other?

11:38AM    20    A.   That's not something I've looked at.  What I know is

21    that they are all related in the same family.

22    Q.   Well, when you testified before this jury and you

23    told them that Samsung was citing your patents, didn't

24    you mean to suggest that Samsung had seen the patents in

11:38AM    25    this case?

1  A.   What I mean to say is that Samsung knows about our

2  technology very clearly.

3  Q.   Dr. Grupp, when you sat in that stand, when you

4  testified a few moments ago that Samsung knew about your

11:38AM  5  patents, you didn't mean the patents in this case?

6  A.   What I mean is that we --

7  Q.   Can you answer my question, sir?

8       THE COURT:  Counsel, if you believe the witness

9  is nonresponsive, raise it with the Court.

11:38AM  10      MR. CORDELL:  Thank you, your Honor.

11      THE COURT:  And, Dr. Grupp, you are going to

12  need to answer the questions as asked.  If Mr. Hueston

13  wants to revisit this on direct, you'll have that

14  opportunity, but you need to answer the questions as put

11:38AM  15  forward by counsel.

16      THE WITNESS:  Thank you, your Honor.

17      THE COURT:  Restate your question, Mr. Cordell.

18  Q.   Isn't it a fact, Dr. Grupp, that when you sat there

19  and testified that Samsung knew about your patents, you

11:39AM  20  suggested they knew about the patents in this case,

21  correct?

22  A.   Yes.

23  Q.   And it turns out you don't know whether these are

24  patents in this case or not, right?

11:39AM  25  A.   No.

```
 1   Q.   You have 37 patents, right?

 2   A.   Yes.

 3   Q.   Now, you don't work for Acorn anymore, correct?

 4   A.   That's incorrect.

 5   Q.   That's incorrect?  So --

 6   A.   I -- may I clarify?

 7   Q.   Well, let me see if I can figure out where I went

 8   wrong.  I thought you left the company several years

 9   ago; is that not right?

10   A.   May I clarify?

11   Q.   Well --

12        THE COURT:  You may answer the question.

13        THE WITNESS:  I know.

14        THE COURT:  Did you leave the company several

15   years ago?

16        THE WITNESS:  I left the company several years

17   ago.

18   Q.   In fact, you left in 2005, right?

19   A.   Yes, and I've been consulting for them on and off

20   since.

21   Q.   Okay.  But let's see if we can take this apart.  So

22   you were employed by Acorn Technologies from 2000 to

23   2005, correct?

24   A.   That's correct.

25   Q.   And when you say you've been consulting with them on
```

11:39AM  (line 5)
11:39AM  (line 10)
11:39AM  (line 15)
11:39AM  (line 20)
11:40AM  (line 25)

1   and off, you had two contracts with Acorn, right?

2   A.   That's correct.

3   Q.   And the first one, you never did anything under,

4   right?

11:40AM  5   A.   That's correct.

6   Q.   So, you know, after 2005, you went off and did your

7   medical devices and other things?

8   A.   That's correct.

9   Q.   Okay.  And in 2018, you signed another contract with

11:40AM  10  Acorn, right?

11  A.   That's correct.

12  Q.   And that second contract had to do with your work in

13  this case, right?

14  A.   That's incorrect.

11:40AM  15  Q.   Well, when we asked you about the nature of your

16  work under the 2018 contract, you couldn't tell us,

17  right?

18  A.   I don't believe that's correct.

19       MR. CORDELL:  Well, Mr. Sayres, could I have

11:40AM  20  Mr. Grupp's deposition.

21  Q.   Do you remember your deposition, Dr. Grupp?

22  A.   Yes, I do.

23  Q.   And you swore to tell the truth in that deposition,

24  right?

11:41AM  25  A.   Yes, I did.

1   Q.   Just like you did here today?

2   A.   Yes.

3   Q.   Okay.

4          MR. CORDELL:   Can I have Dr. Grupp's deposition

11:41AM  5   at Page 23, Line 14 through 24, Line 1.

6          Mr. Sayres, do you have the video for this?

7          (Whereupon, video deposition testimony of

8   Dr. Grupp played as follows:)

9   Q.   "And what was the nature of the work you provided

11:41AM  10  under the second contractual relationship?"

11  A.   "The nature of the work?  What does 'nature' mean"?

12  Q.   "You don't understand the term "nature of the work"?

13  A.   "I don't understand the term 'nature of the work.'"

14          (End of video testimony.)

11:41AM  15  Q.   And yet, Dr. Grupp, when you took the stand this

16  morning, one of the first questions you answered was the

17  nature of your work for Acorn, right?

18  A.   Yes.

19  Q.   And you're being paid under that contract, correct?

11:42AM  20  A.   Yes.

21  Q.   And you've been paid for your work on this piece of

22  litigation, right?

23  A.   I am being paid for my work in this litigation, yes.

24  Q.   And you are making $250 an hour?

11:42AM  25  A.   Yes, I am.

1    Q.   Do you have any idea how much you've actually billed

2    and been paid for by Acorn under the second contract?

3    A.   I haven't submitted all my invoices, so it

4    approximately comes to a total, to date, of about

11:42AM   5    $20,000 over a year or two.

6    Q.   Now, Dr. Grupp, you don't have any current ownership

7    of Acorn, right?

8    A.   No.   That's incorrect.

9    Q.   That is incorrect?

11:42AM   10   A.   Yes.

11   Q.   I'm sorry.   So you do have an ownership of Acorn?

12   A.   I have a minuscule amount of stock in Acorn.

13   Q.   Okay.   But more than that, sir, you have a financial

14   interest in the outcome of this case, right?

11:43AM   15   A.   Well, no.   In a sense, no.   It's so small that it

16   doesn't move my needle.

17   Q.   Well, when we asked you at your deposition, you

18   couldn't tell us whether or not you had a financial

19   interest in the outcome of this case, right?

11:43AM   20   A.   That's correct, because I don't know how much stock

21   I have.   It's small, but I don't know.   So when you

22   asked me what my interest is, my answer is I'm not

23   really very interested because it's so small.

24   Q.   You didn't tell us that you had stock in Acorn,

11:43AM   25   right?

1    A.    I wasn't asked whether I had stock in Acorn.

2    Q.    Well, you were asked pretty directly whether you had

3    any financial interest.

4    A.    You asked me whether I have an interest, and that

5    means am I interested in it.  You didn't ask me whether

6    I have an ownership in the company.  That's a different

7    question.  I'm not really very interested because it's

8    so small; it's not going to change my life one way or

9    the other.

10   Q.    So you just didn't understand what he meant when he

11   asked if you had a financial interest?

12   A.    I'm a scientist and a plans man.  I like to be

13   clear, especially in a deposition.  I think it was an

14   unclear question.

15   Q.    I see.  Okay.  Well, let's talk a little bit more

16   about your invention.

17         MR. CORDELL:  Could I have PTX-1304, which is

18   the '167 Patent.

19   Q.    This is your patent, right?

20   A.    Yes.

21   Q.    And while we're here, you see the reference as

22   cited?  You testified about that a few moments ago,

23   right?  On the right-hand side, this area?

24   A.    Yes.

25   Q.    Yeah.  Did you copy those other patents as part of

1  your '167 Patent?

2  A.   I did not understand the question.

3  Q.   Very simple.  Did you read those patents?  You

4  talked about references cited in your direct testimony.

11:44AM   5  Did you read those two patents?

6  A.   Yes, I read those patents.

7  Q.   Did you copy them when you were filing your '167

8  Patent?

9  A.   Did I copy them, meaning did I use information from

11:44AM   10  them in what I wrote?

11  Q.   Yes.

12  A.   No.

13  Q.   You say no, you did not copy them?

14  A.   That's correct.

11:45AM   15  Q.   And, in fact, the purpose of these references cited

16  is to show the patent office what other people have done

17  before you, right?

18  A.   Yes.

19  Q.   And that's -- that means that your patent can't

11:45AM   20  cover the same thing that they already did, right?

21  A.   That's correct.

22  Q.   You understand that when there's something in the

23  prior art, your patent's going to have to go in a

24  different direction, fair?

11:45AM   25  A.   That's correct.

1   Q.   I'd love to patent the light bulb, but I'm probably

2   not going to get away with that today; is that right?

3   A.   That's correct.

4   Q.   Okay.  Now, you talked a lot about alligators in

11:45AM   5   your direct testimony.  Is there anything in this '167

6   Patent about alligators?

7   A.   By analogy, there certainly is.

8   Q.   Okay.  Well, certainly, I've read it a few times,

9   and I didn't see alligators.  Would you like to point

11:45AM   10   out where that is?

11   A.   Sir, there are not alligators, but as I said, that

12   it's an analogy to -- I was very clear that that's the

13   analogy to the MIGS.

14   Q.   Okay.  Now, you mentioned the Schottky effect,

11:46AM   15   right?

16   A.   It's called the Schottky barrier, yes.

17   Q.   Okay.  The Schottky barrier.  And people have known

18   about that for almost a hundred years; is that right?

19   A.   Not quite that long.

11:46AM   20   Q.   Not quite?  Well, all right.  In your patent, it

21   says, at Column 142 through 45, that somebody named

22   Grondahl and Geiger first studied the rectifying form of

23   these junctions in 1926.  That's almost a hundred years,

24   right?

11:46AM   25   A.   Yes, but I don't believe the Schottky barrier was

1  explained until Schottky did his work in the '40s or

2  '50s.

3  Q.   Well, you say 1938, here, right?  It was a long time

4  ago, fair?

5  A.   I agree.

6  Q.   Now --

7           THE COURT:  Dr. Grupp, you're going to have to

8  speak up.  You're getting awfully soft.  I want to make

9  sure the jury hears your answers.

10          THE WITNESS:  Thank you, your Honor.  It sounds

11 loud to me.  I apologize.

12          THE COURT:  If you get too loud, I'll tell you.

13          Next question, Counsel.

14          MR. CORDELL:  Thank you, your Honor.

15 Q.   So this patent case, we heard this morning, is about

16 the junction between semiconductor and metal, right?

17 A.   Yes, that's correct.

18 Q.   And there were people in the prior art that came

19 before you who had worked on the junction between

20 semiconductor and metal, right?

21 A.   That's correct.

22 Q.   And there were people in the prior art that used

23 metal silicide as the junction between semiconductor and

24 metal, correct?

25 A.   Yes.

1    Q.   And that was done before you came along, right?

2    A.   Yes.

3    Q.   And it is your view that for forming a metal

4    silicide on the surface of a semiconductor does not

5    practice your invention, correct?

11:47AM

6    A.   Using, to be clear --

7    Q.   Can you answer my question, sir?

8         MR. CORDELL:  I'm sorry, your Honor.

9    A.   You didn't define the system clearly.  If you define

10   a clear system, I'll tell you the answer.

11:48AM

11        THE COURT:  Just a minute.  Dr. Grupp, if you

12   don't understand the question, just answer, "I don't

13   understand the question."  Don't explain why you don't

14   understand it or how you don't understand it or what

15   additional information you'd like.  If you don't

11:48AM

16   understand it to the level that you can give a direct

17   answer, tell counsel, "I don't understand the question."

18   That's all you need to say, all right?

19        THE WITNESS:  Understood, your Honor.

20   A.   I don't understand the question.

11:48AM

21   Q.   Let me try it again.  So if you're forming a metal

22   silicide directly on a semiconductor surface, you are

23   not practicing your invention, right?

24   A.   That's correct.

25   Q.   So if we've got a junction that consists of a metal

11:48AM

1  silicide directly on a semiconductor, we're not

2  practicing your invention, correct?

3  A.   That's correct.  If there's no interface layer, it

4  does not practice our invention.

11:48AM  5  Q.   Now, you talked about some of the work you did

6  leading up to the invention.  Do you remember that?

7  A.   Yes.

8  Q.   You talked about you and Dr. Connelly getting

9  together and doing experiments.  Do you remember that?

11:49AM  10  A.   Yes.

11  Q.   Now, you did lots of experiments, but you never

12  actually made a commercial product at Acorn, right?

13  A.   We didn't make a complete transistor, and I'm not --

14  I don't understand the nature of "commercial product,"

11:49AM  15  as you're asking it.

16  Q.   Well, Acorn certainly tried to make a commercial

17  product, correct?

18  A.   No.

19  Q.   Well, when you were employed by Acorn, your efforts

11:49AM  20  were directed toward making a commercial product, right?

21  A.   I'm unclear about what you mean by "commercial

22  product," so I don't understand the question.

23        MR. CORDELL:  Can I have Dr. Grupp's deposition

24  at Page 108, Lines 4 through 7.

11:50AM  25  Q.   So, Dr. Grupp, do you recall being asked at your

1    deposition --

2              MR. CORDELL:  We may have to back up,

3    Mr. Sayres.  I'm sorry.  Could we back it up to the

4    prior page?  So at Line 25, 107, Line 25, let's begin

11:50AM  5    there.

6    Q.    Okay.  So, Dr. Grupp, do you recall being asked,

7    "Were there efforts by Acorn, during your time there, to

8    come up with a commercial product using the technology

9    of the '423 Patent?"

11:50AM  10             You answer, "Yes."

11             Question:  "And what, generally, were those

12   efforts?"

13             Answer:  "My -- my efforts were always aimed at

14   producing a commercial product."

11:50AM  15   Q.    Is that your testimony, sir?

16   A.    Yes.

17   Q.    So, in fact, your goal was to make a commercial

18   product at Acorn, right?

19   A.    No.  I aimed at producing -- I clearly said, "Aimed

11:51AM  20   at producing a commercial product."  It's not the same

21   as -- we had a fab at Stanford.  We're not going to make

22   a commercial product.  We're making something that's

23   aimed at producing it, aimed at.

24   Q.    I'll let the jury decide that one, your Honor.

11:51AM  25             THE COURT:  All right.  We're not going to have

1  comments about what the jury will or won't decide.

2  That's an improper sidebar.

3        And, Dr. Grupp, I've told you to limit your

4  answers to the questions asked.  You said, "No, that

11:51AM  5  wasn't right."  He didn't ask you to explain why it

6  wasn't right, and then you launched into an explanation.

7  Limit your answers to the questions asked.

8        Mr. Hueston's going to get to follow up with

9  any area he thinks he needs to follow up with.  That is

11:51AM 10  his decision; it is not your decision.

11        And, counsel, you need to refrain from further

12  sidebar remarks.

13        MR. CORDELL:  I will, your Honor.  Thank you.

14        THE COURT:  Let's proceed with this

11:51AM 15  cross-examination.

16        MR. CORDELL:  Yes.

17  Q.   Now, Dr. Grupp, one thing we can agree is that

18  during your time at Acorn, they never made a commercial

19  product, fair?

11:52AM 20  A.   Yes.

21  Q.   And during your time at Acorn, you were never

22  actually able to create a physical device that had a

23  layer of metal oxide as the interface, correct?

24  A.   No.

11:52AM 25  Q.   Well, maybe my question wasn't clear.  Did you

1    create a physical device with a layer of metal oxide as

2    the interface?

3    A.    Yes.

4    Q.    Do you know what it means to reduce to practice,

5    Dr. Grupp?

6    A.    Yes.

7    Q.    And that means that you took your invention and the

8    patents and you actually made a physical device out of

9    it, right?

10   A.    Yes.

11   Q.    And, again, when you were deposed, you told us that

12   you did not make a physical device that was a reduction

13   to practice of your invention, correct?

14   A.    Yes.

15   Q.    And on the stand here just now, I think you told us

16   that you did make a physical device; is that right?

17   A.    That's correct.

18   Q.    Well, whether or not you made a physical device --

19   actually, let me go ahead and show it, if I can.  The

20   Grupp deposition at Page 99, Lines 10 through 15.

21                  (Video played as follows:)

22   Q.    "Did you ever reduce anything to practice using a

23   metal oxide as the interface layer or as part of the

24   interface layer?"

25   A.    "Not in -- not in a physical device."

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | (End of video testimony.)                                    |
|       | 2  | Q.   So, Dr. Grupp, you did some tests at Stanford; is       |
|       | 3  | that right?                                                   |
|       | 4  | A.   Yes.                                                     |
| 11:53AM | 5  | Q.   And the purposes -- and these tests were, like, in    |
|       | 6  | the 2002 time frame; is that right?                          |
|       | 7  | A.   Yes.                                                     |
|       | 8  | Q.   And you said a few moments ago that Dr. Connelly was   |
|       | 9  | your partner in all of this?                                 |
| 11:54AM | 10 | A.   Yes.                                                   |
|       | 11 | Q.   And you believe Dr. Connelly is a pretty bright guy?   |
|       | 12 | I think that's what you testified.                           |
|       | 13 | A.   Yes.                                                     |
|       | 14 | Q.   But according to Dr. Connelly, your tests at           |
| 11:54AM | 15 | Stanford were disappointing, correct?                      |
|       | 16 | A.   No.                                                      |
|       | 17 | Q.   Well, okay.  I'll -- I will get back to that.          |
|       | 18 | MR. CORDELL:  Can I have just one moment, your              |
|       | 19 | Honor?                                                        |
| 11:54AM | 20 | THE COURT:  You may.                                        |
|       | 21 | Q.   So it turns out you were right about that.  It        |
|       | 22 | wasn't Dr. Connelly.  It was Mr. Clifton who said that      |
|       | 23 | the results were disappointing.  Do you recall that?       |
|       | 24 | A.   No.                                                      |
| 11:55AM | 25 | MR. CORDELL:  So, your Honor, this is 30(b)(6)             |

1    testimony I'd like to publish.

2         MR. HUESTON:  Your Honor, we object.  This was

3    the subject of an agreed-upon exclusion of testimony

4    between counsel last week.

11:55AM   5         MR. CORDELL:  This is the 30(b)(6) testimony of

6    Mr. Clifton.

7         THE COURT:  All right.  I'll take this up

8    outside the jury's presence.  It's five minutes until

9    noon.

11:55AM  10         Ladies and gentlemen, I'm going to let you

11   recess for lunch.  Your lunch is waiting for you in the

12   jury room, I am told, by Ms. Clendening.  If you will

13   take your notebooks with you, make sure you follow all

14   my instructions, including not to discuss anything about

11:55AM  15   the case among yourselves.  We'll be back from lunch in

16   approximately an hour and will continue with this at

17   that time.  The jury is excused for lunch.

18         (Whereupon, the jury exits the courtroom.)

19         THE COURT:  Be seated.

11:56AM  20         All right.  Mr. Cordell, tell me what this is

21   and how you intend to use it, then I'll hear from

22   Mr. Hueston.

23         MR. CORDELL:  Sure.  Can we publish it to the

24   Court?  You don't have to play the clip, just have the

11:56AM  25   words.

1    I'm sorry.  It's Clifton 52-4 through 53-6.

2    THE COURT:  All right.  This is deposition

3 testimony by somebody other than the witness.  What's

4 your intended purpose?

11:57AM  5    MR. CORDELL:  It's 30(b)(6) testimony.  It's

6 used for impeachment.  I'm wondering if we should do

7 this outside the presence of the witness, your Honor.

8    MR. HUESTON:  Your Honor, if I may, I think I

9 can help shortcut this.  I have the e-mail here where

11:57AM 10 this very particular depo excerpt that was just

11 published was agreed upon between both law firms last

12 night.  "Sounds like we've reached an agreement, will

13 not be used."

14    MR. CORDELL:  I think that agreement had to do

11:57AM 15 with whether or not we were going to play those depo

16 clips in open court as depo clips.  I don't think we

17 agreed that we wouldn't use any of it for impeachment.

18    MR. HUESTON:  No.  Clearly --

19    THE COURT:  All right.  Let's do this.  We're

11:58AM 20 going to recess for lunch, and I'll see counsel in the

21 chambers outside the presence of the witness, and we'll

22 get to the bottom of this, all right?

23    MR. CORDELL:  Thank you.

24    THE COURT:  The court stands in recess.

11:58AM 25    (Lunch recess from 11:58 a.m. to 1:21 p.m.)

1          THE COURT:  All right.  Are we ready to

2    proceed, counsel?  I understand we had some technical

3    issues.  Is everybody ready to go?

4          MR. DIXON:  Yes, your Honor.

01:21PM   5          MR. CORDELL:  Yes, your Honor.

6          THE COURT:  All right.  Dr. Grupp, if you'll

7    return to the witness stand, please.  I'll remind you,

8    you remain under oath.

9          While he's getting situated, if you'd bring in

01:21PM  10    the jury, please.

11          (Whereupon the jury enters the courtroom.)

12          THE COURT:  Please be seated, ladies and

13    gentlemen.  We will continue with the Defendants'

14    cross-examination of Dr. Dan Grupp.

01:22PM  15          Mr. Cordell, you may proceed.

16          MR. CORDELL:  Thank you, your Honor.

17    Q.   Good afternoon, Dr. Grupp.

18    A.   Good afternoon, sir.

19    Q.   Now, before the break, you had testified about this

01:22PM  20    PTX -- take my notes off -- PTX-1087.  Try it again.

21    There we go.  Do you remember that, sir?

22    A.   Yes.

23    Q.   I'll show you the title, if that helps.

24    A.   Thank you.  Yes.

01:22PM  25    Q.   Do you recall telling the jury about this?

1    A.    Yes, I do.

2    Q.    And you said, in your testimony, that somehow

3    Samsung, well, they cited your paper in this paper; is

4    that right?

01:22PM  5    A.    Yes, that's correct.

6    Q.    And you somehow suggested that Samsung had copied

7    some of your work or something; is that right?

8    A.    No.

9    Q.    Okay.  Well, you did -- you said something about

01:23PM  10   Samsung, right?

11   A.    Yes.

12   Q.    And let me ask you this:  Do you know any of the

13   folks listed at the top of this article?

14   A.    No.

01:23PM  15   Q.    You testified that they -- that they wrote this,

16   right?

17   A.    Yes.

18   Q.    But you're just reading the page, right?

19   A.    That's correct.

01:23PM  20   Q.    You don't know Mr. Kyung-Eun Byun, do you?

21   A.    No.

22   Q.    Okay.  And you're not in the habit of accusing

23   people that you've never met of things, right?

24   A.    No.

01:23PM  25   Q.    So let's look down a little bit to the part here

1  that you referred us all to, and I believe it was this

2  sentence.  It begins with "To."  I'll get this right.

3          "To solve these problems, many researchers

4  have tried to increase the $I_{th}$ by alleviating the

01:24PM  5  Fermi-level pinning effect using thin oxide and nitride

6  films."  That was the sentence you pointed to, right?

7  A.   Yes.

8  Q.   And you said that was a reference to your work,

9  right?

01:24PM  10  A.   Yes.

11  Q.   But, sir, you didn't read the next sentence, did

12  you?  "However, these dielectric films can add

13  additional tunneling barriers where even a few atomic

14  layers can further reduce the tunneling currently

01:24PM  15  rapidly," right?

16  A.   I don't know what your question is.

17  Q.   My question is you didn't bother to read the

18  sentence that followed the passage you showed the jury,

19  right?

01:24PM  20  A.   No.

21  Q.   And, in fact, that sentence says, you know, maybe

22  you shouldn't use these dielectric films, right?

23  A.   No.

24  Q.   It says they have additional tunneling barriers,

01:24PM  25  right?

1  A.   Yes, it says they have additional tunneling

2  barriers.

3  Q.   And that means that your metal oxide, semiconductor

4  oxide approach has these tunneling barriers, right?

01:25PM  5  A.   I am unclear what the question is.

6  Q.   Well, they seem to refer to these dielectric films.

7  Those are your dielectric films, right?

8  A.   Yes.

9  Q.   And when they say, "Your dielectric films," they are

01:25PM  10  talking about a layer of metal oxide and a layer of

11  semiconductor oxide, right?

12  A.   Yes.

13  Q.   And they say that increases these tunneling

14  problems, right?  I should have said, "Tunneling

01:25PM  15  barriers."  I apologize.

16  A.   They say that dielectric films have tunneling

17  barriers.

18  Q.   Everybody knows that, right?  Oxides block electric

19  current, right?

01:25PM  20  A.   No.

21  Q.   Okay.  Well, when you say they are relying on your

22  work, they seem to say, "However, your films have these

23  tunneling barrier problems," right?

24  A.   I wouldn't put it that way, no.

01:26PM  25  Q.   But that's the words that are written there, sir,

1   right?

2   A.   I wouldn't read them that way.

3   Q.   Well, let's look at another one of your papers --

4   or, I'm sorry, one of the Samsung papers that you

01:26PM   5   pointed to.  This is PTX-19.  Do you remember that?

6   A.   Yes.

7   Q.   Okay.  And this has some other folks, although

8   Mr. Byun is in this one.  Do you know any of these folks

9   that wrote this paper?

01:26PM   10   A.   No, I don't.

11   Q.   Do you know anything about the way they work or how

12   they work or what they do?

13   A.   Yes.

14   Q.   Meaning you don't know, right?

01:26PM   15   A.   Meaning that I do know something about that.

16   Q.   Okay.  Well, you know that they are listed as being

17   from Samsung, some Samsung entity, correct?

18   A.   That's correct.

19   Q.   But you've never met any of them, right?

01:26PM   20   A.   I have not met them, that's correct.

21   Q.   You've never traveled over to Samsung in Korea, for

22   example, correct?

23   A.   I have not been at Samsung in Korea.

24   Q.   You've never met -- you've never gone over to

01:27PM   25   Samsung in Texas, correct?

1   A.   That's correct.

2   Q.   Okay.  So here, what you pointed us to -- and I'll

3   come around here so I can actually see it -- is you

4   pointed to this passage in the middle of the page, one,

01:27PM   5   two, three paragraphs down, right?

6   A.   I'm sorry, sir.  I can't see the third paragraph.

7   Q.   Oh, I'm sorry.  That's what I get for walking around

8   it.  Okay.

9            So what you did is you pointed to this

01:27PM   10   third paragraph that begins, "The current approach,"

11   right?

12   A.   Yes.

13   Q.   And you said, "As an alternate option,

14   metal-insulator-semiconductor structure was presented."

01:27PM   15   That's a reference to what you think is your technology,

16   right?

17   A.   Yes.

18   Q.   But then the authors tell us, two sentences later,

19   we've got another "however."

01:28PM   20            "However, this technique has lack of

21   thermal stability and thickness controllability of

22   insulator layer," right?

23   A.   What is the question?

24   Q.   Well, do you see that, sir?

01:28PM   25   A.   I do see what they are saying, yes.

1  Q.   They say --

2  A.   I do see, "However."

3  Q.   They say, "However, this technique" -- referring to

4  MIS, which is your technology -- "lacks thermal

01:28PM  5  stability and thickness controllability of the insulator

6  layer," correct?

7  A.   Are you asking about my technology or what they say?

8  I'm unclear.

9  Q.   I'm just hoping you can answer my question.

01:28PM  10  A.   Okay.

11  Q.   They are saying that in their view, your technique

12  lacks thermal stability and thickness controllability of

13  the insulator layer, right?

14  A.   Sure.

01:28PM  15  Q.   Yeah.  You may disagree with them, but at least

16  these Samsung engineers thought your MIS had some

17  problems, fair?

18  A.   Kind of --

19       MR. HUESTON:  Objection, your Honor.  Calls for

01:29PM  20  speculation.

21       THE COURT:  It does call for speculation, but

22  the witness was in the process of answering the

23  question, so I'll deem the objection untimely.  Let's

24  move on.

01:29PM  25  Q.   So just to orient everybody, this is one of the

1  papers that you said cited back to your work here, down

2  here in Footnote 4, right?

3  A.   Yes.

4  Q.   That's your 2006 paper; is that right?

01:29PM  5  A.   Yes.

6        MR. CORDELL:  Mr. Sayres, can we pull up that

7  2006 paper, which I believe is PTX-91.

8  Q.   It turns out PTX-91 has nothing to do with the metal

9  oxide, semiconductor oxide technology we've been talking

01:29PM  10  about here today, right?

11  A.   No.

12  Q.   It talks about metal source/drains, right?

13  A.   Yes.

14  Q.   That's the first -- well, three out of the first

01:30PM  15  four words of the paper, right?

16  A.   Yes.

17  Q.   And that refers to a technology where, instead of

18  using silicon for that source and drain, you make it out

19  of metal, right?

01:30PM  20  A.   No.

21        MR. CORDELL:  Can I have Dr. Grupp's deposition

22  at Page 108, Lines 17 through 20.

23        Question:  "When you say, 'Metal source/drain

24  MOSFETs,' is that a MOSFET where you actually form the

01:31PM  25  source and drain with a metal instead of the

1  semiconductor?"

2        And your answer, sir, was, "Yes."

3        Do you recall that testimony?

4  A.    Yes.

01:31PM  5  Q.    And you were looking at metal source and drains

6  rather than silicon because you thought you might be

7  able to commercialize that, right?

8  A.    Yes.

9  Q.    And you don't know whether Acorn ever succeeded in

01:31PM 10  commercializing a metal source/drain transistor, right?

11  A.    No.

12  Q.    And you do know that Samsung has never made a --

13  well, let me strike that.  "Never" is a big word.

14        You know that, in this case, the products we're

01:31PM 15  talking about don't have metal sources and drain

16  regions, correct?

17  A.    No.  Incorrect.

18  Q.    So you believe they do have metal source/drain

19  regions?

01:32PM 20  A.    Silicide is a metal in my definition of metals.

21  Q.    I see.  I don't want to go back and play your

22  testimony again, sir, but you just -- I just showed you

23  your deposition where you said that metal source/drain

24  transistors are those where the source and drain are

01:32PM 25  actually formed of a metal.  Do you recall that?

A.   That's right; and I'm a physicist, and silicide is a
type of metal --

Q.   Okay.

A.   -- if it's a conductor.

01:32PM   THE COURT:  All right.  Dr. Grupp, you're not
going to argue with counsel, and he -- you know, he
didn't call for a definition of "silicide."  Just answer
his questions, okay?

This is about the third time I've had to have
01:32PM   this discussion with you.  I'm going to expect you to
comply with my directions, all right?

THE WITNESS:  Yes, sir.

THE COURT:  All right.  Let's go forward.

MR. CORDELL:  Thank you, your Honor.

01:32PM   Q.   Let's go to your 2004 paper that you also showed us,
PTX-92.  And, again, here we're talking about -- we'll
just stay at the title.  We're talking about metal
source/drain transistors, right?

A.   Yes.

01:33PM   Q.   Now, do you know Dr. Jeffrey Bokor, our expert in
this case?

A.   Yes, I do.

Q.   And you think -- you think he's a pretty good
fellow?

01:33PM   A.   Yes, I do.

1  Q.   And are you aware of his work on silicides?

2  A.   No.

3  Q.   Well, that's something, because if I can go to your

4  paper -- and let's look at your first reference,

01:33PM  5  Reference Number 2, which is on Page 6.  You see right

6  here that, in fact, you cited one of Dr. Bokor's papers?

7  A.   Yes.

8  Q.   Okay.  So when you cited one of Bokor's papers and,

9  yet, you weren't aware of his work on silicides, how

01:33PM  10  could that be?

11  A.   That's not a yes/no question, right?

12  Q.   No, it's not.  I'm hazarding an open-ended question,

13  I admit that.

14  A.   So the answer is that I wrote this paper a long time

01:34PM  15  ago and I would have read that at the time and it's gone

16  from my memory, that detail.

17  Q.   And what about the paper at Reference 6?  Would you

18  have recalled that one?  It's another paper from

19  Dr. Bokor on thin-body silicide source/drain devices,

01:34PM  20  right?

21  A.   Yeah, that paper rings a bell.  I knew

22  Jacob Kedzierski, but I don't remember the details of

23  that paper after 15 years.

24  Q.   The fact is that people of academia cite papers now

01:34PM  25  and then to recognize other people's work, right?

A.   That's correct.

Q.   Doesn't mean you were copying his work, does it?

A.   It doesn't mean copying, no.  It means advancing work.

01:35PM  Q.   Right.  In fact, what you really want to do is do something else in your paper, right?

A.   Hmm?

Q.   Is that right?

A.   No.

01:35PM  Q.   Okay.  Well, you testified on direct that your paper was cited 300 times, right?

A.   Yes.

Q.   And just because something is cited in an academic paper doesn't mean that it's a commercial product, does

01:35PM  it?

A.   That's correct.

Q.   In fact, you, at Acorn, never were able to make that commercial product, correct?

A.   That's an undefined question.  I can't answer it.

01:35PM  Q.   Okay.  Well, I think we already have.

          So citations to your paper are a way of just making sure everybody understands what's happening in the business; is that fair?

A.   No.

01:35PM  Q.   Okay.  Well, let me put it this way, sir:  None of

1   the 300 people that cited your paper took a license

2   under the patents in this case, correct?

3           MR. HUESTON:  Objection.  Foundation.

4           THE COURT:  Sustained.

01:36PM  5   Q.   So let me ask you this, Dr. Grupp:  Are you aware of

6   anyone taking a license under the patents in this case?

7   A.   "Aware" is a funny word.  I don't know what that

8   means, in a sense.

9   Q.   Well, I'm trying to lay a little foundation.  Do you

01:36PM  10  have knowledge about whether or not any company has

11  taken a license under the four patents in this case?

12  A.   Yes.

13  Q.   And what does your knowledge have?

14  A.   I do not know of anyone who's taken a license in

01:36PM  15  this case.

16  Q.   And Acorn's had a bunch of meetings with companies,

17  right?

18  A.   Yes.

19  Q.   And they have tried to license this, correct?

01:36PM  20  A.   Yes, I believe so.

21  Q.   And not only has nobody ever taken a license, you've

22  never even done a co-development agreement with another

23  company, right?

24  A.   No.

01:37PM  25          MR. HUESTON:  Objection.  Foundation.

THE COURT:  If he knows, he can answer.

Overruled.

Q.   Has Acorn ever achieved a co-development agreement

with any other company?

01:37PM   A.   Yes.

Q.   For the four patents in this case?

A.   Yes.

Q.   Okay.  Which company?

A.   It's called ATDF.

01:37PM   Q.   That's new.  But, again, to your knowledge, no

company has taken a license under these four patents,

correct?

A.   Yes.

Q.   Okay.  Thank you.

01:37PM   MR. CORDELL:  Nothing further, your Honor.

THE COURT:  You pass the witness?

MR. CORDELL:  I do.

THE COURT:  Is there redirect?

MR. HUESTON:  Yes, your Honor.

01:37PM   THE COURT:  All right.  Proceed with redirect.

MR. HUESTON:  Thank your Honor.

REDIRECT EXAMINATION

BY MR. HUESTON:

Q.   So, Dr. Grupp, you were just shown one of your

01:38PM   papers.  It was from 2004, right?

1  A.   Yes.

2  Q.   Okay.  And that's about 17 years ago?

3  A.   Yes.

4  Q.   All right.  And when you prepared your paper, would

01:38PM   5  you have read everything before you put them in as

6  references at that time?

7  A.   Yes.

8  Q.   Okay.  And so when I showed you those Samsung papers

9  earlier which had your reference, reference to your

01:38PM   10  invention in it, what was your conclusion?

11  A.   I would conclude that they had read my papers.

12  Q.   Okay.  Now, Samsung's lawyer asked whether you ever

13  developed a device using a metal oxide.  Do you remember

14  that?

01:38PM   15  A.   Yes, I do.

16  Q.   Now, to be clear, even though Acorn didn't

17  manufacture that specific device, did you develop other

18  prototype devices for your invention?

19  A.   Yes.

01:38PM   20  Q.   And what kind of results did you achieve with those

21  prototypes?

22  A.   We achieved new, new results that were beyond any

23  current technology's capability.

24  Q.   And so let me ask you:  Why didn't you develop a

01:39PM   25  device using, for instance, titanium oxide?

01:39PM

A.   Well, we had a limited number of resources, and our goal was to just make the best thing we could.  And we tried aluminum oxide and it was a little bit beyond the capabilities of our equipment, so we stuck with silicon nitride as our primary target first.

Q.   All right.  And let's go put up PTX-1087.  This is one of the Samsung articles Counsel just questioned you about.  Do you see that?

A.   Yes.

01:39PM

Q.   Okay.  And so he asked you to read one sentence below the one that you focused on in answer to my questions.  I want to go up a little bit and ask you about the sentence before that.  In fact, this is so small, I have to put my glasses on.  One moment.

01:40PM

     So starting after Footnote 14:  "These scaled devices" -- let me see if we can get it.  A little higher please.  There you are.

     "These scaled devices incorporating highly doped semiconductors need to overcome difficulties such as the fine control in the dopant profile, high leakage current, and power dissipation caused by a large contact resistance."

     And then, "To solve these problems, many researchers have tried to increase the $I_{th}$ by alleviating the Fermi-level pinning effect using thin oxide or

1  nitride films."

2       So I want to ask you, with reference to that

3  earlier sentence, what do you understand the context of

4  this to be in reference to the discussion of your

01:41PM  5  invention?

6       MR. CORDELL:  Your Honor, I'm going to object.

7  This lacks foundation.

8       MR. HUESTON:  Your Honor, this is just getting

9  the complete picture of the sentence after this sentence

01:41PM  10  as cited.

11       THE COURT:  I'll overrule the objection.  I'll

12  allow the witness to answer.

13  A.   So what they are describing is that the previous

14  technology of the heavily doped semiconductors has some

01:41PM  15  difficulties with it that you have to overcome.

16  Q.   And so what did you understand the reference to your

17  invention to be in that context?

18  A.   In that context, it says here, is a way to overcome

19  it.

01:41PM  20  Q.   Great.  You can put that down.  And let me put up

21  the other document that Counsel just showed you, PTX-19.

22  This is the other Samsung paper.  And likewise, I want

23  to go to that third paragraph and read you the earlier

24  sentence that counsel didn't read:  "The current

01:42PM  25  approach to lower Rc is to change the carrier flow

1    mechanism to tunneling emission.  To increase the

2    tunneling current, heavily doped silicon was used to

3    reduce the tunneling barrier width.  However, this

4    method is approaching its limitation because of the

01:42PM   5    dopant solubility in silicon, short-channel effect, and

6    dopant profile control.  As an alternate option,

7    metal-insulator-semiconductor structure was presented."

8              Now, with that whole context, Dr. Grupp,

9    explain to the jury what you understand this discussion

01:42PM   10   to be.

11   A.   So the old approach tried to make the barrier fit

12   the -- tried to dope more heavily to try and squeeze the

13   electrons through there, and it was hitting its limit.

14   And they list the number of reasons why it hits its

01:43PM   15   limit, and so they are saying, "Hey, here is the better

16   option.  You want to go to

17   metal-insulator-semiconductor.  This seems to be a way

18   through to a better solution."

19   Q.   And that was your invention, right?

01:43PM   20   A.   And that was my invention.

21   Q.   Now, Counsel pointed out the next sentence about the

22   lack of thermal stability, and let me ask you about

23   that.

24             Is a thermal stability common or uncommon

01:43PM   25   as an issue in the making of semiconductor devices?

A.   All -- everything in the world has a thermal limit to it.  So depends what you are trying to do, that if you want to give a particular device that has to go to some temperature, then you'd have to choose materials that allow you to go to that temperature.

Q.   And did you understand this reference to mean that Samsung engineers were saying your invention didn't work?

A.   No.  They are saying -- I mean, the invention is how to do it, right?  The invention is that you put an insulator in there, you get a better result.  And they are saying, you know, in our situation, they are trying to show that they are doing something useful.  And what they are saying is that, "For our situation, we've come up with materials that can go meet our needs for temperature stability."

Q.   Okay.  We can take that down.

          So earlier you were asked some questions about Acorn, and when I asked you about Acorn, you described Acorn as an incubator.  So I want to ask you this:  In your experience, do incubators manufacture devices?

A.   No.

Q.   Does Acorn manufacture commercial products?

A.   No.

1   Q.   All right.  You were also shown a reference by

2   Counsel about how people almost a hundred years ago were

3   identifying the Schottky barrier, right?

4   A.   That's correct.

01:44PM   5   Q.   Had they solved the Schottky barrier a hundred years

6   ago?

7   A.   No.

8   Q.   What did your invention do?

9   A.   We solved a way to lower the Schottky barrier that

01:44PM   10   no one had been able to do before.

11   Q.   All right.  By the way, you were asked questions

12   about financial interest.  I want to ask you:  Are you

13   being paid to testify today?

14   A.   No.

01:45PM   15   Q.   Do you stand to get any kind of bonus if, win or

16   lose, out of this trial?

17   A.   No.

18   Q.   And you talked earlier about a minuscule amount of

19   stock in Acorn.  Is that having any impact on your

01:45PM   20   testimony today?

21   A.   No.

22   Q.   Dr. Grupp, you mentioned earlier that you go into

23   Google Patents with your name, I think you said, and all

24   37 of your patents show up, right?

01:45PM   25   A.   That's correct.

1  Q.  Do all those patents relate to the invention you've

2  been talking about?

3  A.  No.

4  Q.  Roughly how many, if you had to estimate?

01:45PM  5  A.  I think it's a little more than half.

6  Q.  All right.  And would that be a reference to patent

7  family?

8  A.  Yes.

9      MR. HUESTON:  No more questions, your Honor.  I

01:45PM  10  pass the witness.

11      THE COURT:  Additional cross-examination?

12      MR. CORDELL:  No, your Honor.  Thank you.

13      THE COURT:  You may step down, Dr. Grupp.

14      THE WITNESS:  Thank you, your Honor.

01:46PM  15      THE COURT:  Plaintiff, call your next witness.

16      MR. DIXON:  Thank you, your Honor.  Acorn calls

17  Mr. Tom Horgan.

18      THE COURT:  Say it again, Mr. Dixon, so I can

19  hear you.

01:46PM  20      MR. DIXON:  Thank you, your Honor.  Acorn calls

21  Mr. Tom Horgan.

22      (Whereupon, the witness was duly sworn.)

23      THE COURT:  Please come around; have a seat on

24  the witness stand.

01:46PM  25      Are there trial binders to distribute?

1      MR. HUESTON:  There will be no exhibits in this

2  exam.  So, no, your Honor.

3      THE COURT:  All right, counsel.  You may

4  proceed with direct examination.

01:46PM   5      MR. HUESTON:  Thank you, your Honor.

6                    TOM HORGAN,

7  having been first duly sworn, testified as follows:

8                 DIRECT EXAMINATION

9  BY MR. HUESTON:

01:46PM  10  Q.   Good afternoon, Mr. Horgan.

11  A.   Good afternoon, Mr. Hueston.

12  Q.   Would you please state your full name for the

13  record.

14  A.   Yes.  My name is Tom Horgan.

01:47PM  15  Q.   Now, I noticed you have an accent.  Where are you

16  from?

17  A.   Yes, guilty.  I am from Ireland.

18  Q.   Can you tell us a little bit about growing up in

19  Ireland?

01:47PM  20  A.   I came from a small town of about 6,000 people.  I'm

21  the eldest of seven.  My father was a town doctor there

22  and my mother was a homemaker, and I met my wife, and

23  she's one of eleven, and we came to the States 28 years

24  ago, and we have two children.  We have a daughter who

01:47PM  25  was born here and a son that we adopted eleven years

1  later.

2  Q.   Mr. Horgan, do you have any college degrees?

3  A.   I do.  I have a bachelor's of engineering and a

4  master's of industrial engineering.

01:47PM  5  Q.   All right.  Now, you mentioned you had your daughter

6  here in the United States.  How long has your family

7  been living here in the United States?

8  A.   Twenty-eight years.

9  Q.   Now, can you provide the jury a brief summary of

01:48PM  10  your employment history after moving to the

11  United States?

12  A.   Yes.  When I came over to the United States, I ran a

13  service operation for two disc drive companies, and I

14  became the vice president of global services for those

01:48PM  15  two disc drive companies.

16  Q.   Okay.

17  A.   For the second one, I think it was.

18  Q.   And did you also work at a company called

19  Maxwell Technologies?

01:48PM  20  A.   I did.

21  Q.   And let me ask you just a couple questions about

22  that.  What kind of company is Maxwell Technologies?

23  A.   Maxwell Technologies was predominantly in the

24  defense sector.  It was a 30-year-old company.  It was

01:48PM  25  struggling, heading to Chapter 11 bankruptcy at the

1  time.

2  Q.   And what was your job title when you first joined

3  Maxwell Technologies as you were just describing it,

4  headed towards bankruptcy?

01:48PM  5  A.   My job title was vice president of business

6  development, and I also had a floor seat as part of the

7  turnaround team.

8  Q.   Okay.  And, briefly, what did you do as part of that

9  turnaround effort?

01:49PM  10  A.   You know, a turnaround is a difficult thing.  So,

11  briefly, it was to help the businesses become more

12  efficient that were non-defense, but more importantly,

13  it was to find the technologies for the future.

14  Q.   And can you recall any, in particular, that you

01:49PM  15  helped Maxwell Technologies help refine and bring?

16  A.   Yes.  The ultracapacitor.

17  Q.   And what did you help do with the ultracapacitor?

18  A.   The ultracapacitor, I basically met the inventor,

19  just one person, and they built some early prototypes,

01:49PM  20  and I made a business out of it.

21  Q.   All right.  And did you remain in your role as VP of

22  business development?

23  A.   No.  I became CEO of the company.

24  Q.   Okay.  And does Maxwell Technologies still exist?

01:49PM  25  A.   Maxwell Technologies was acquired in 2019 by Tesla

1    for its capacitor technology.

2    Q.   And is -- to your knowledge, is it still a

3    subsidiary of Tesla today?

4    A.   Yes, it is.

01:50PM   5    Q.   All right.  Where did you work after Maxwell

6    Technologies?

7    A.   I came to Acorn Technologies.

8    Q.   Roughly, when was that?

9    A.   It was September 2000, I believe.

01:50PM  10    Q.   And what was the position you had when you came to

11    Acorn in September of 2000?

12    A.   I was hired in as the CEO.

13    Q.   And is that the same role you have to do?

14    A.   Yes, twenty years later.

01:50PM  15    Q.   Now, at a high level, how would you describe Acorn's

16    business?

17    A.   At a high level, the company was founded by

18    inventors; and inventors, to us, we love inventions and

19    we love inventors.  And so the idea was to find

01:51PM  20    transformative inventions and to bring them to market.

21    We call the company "Acorn" for a very specific reason.

22    Q.   What's that reason?

23    A.   You know, we have a lot of investors who are

24    inventors, too, and we recognize, with transformational

01:51PM  25    inventions that it's going to take a long time.  So the

1  acorn is the seed of the idea, the germ, and you grow it

2  into a big oak tree over a long time.

3  Q.   And then explain to the jury then, well, how is it

4  that you are nurturing this?  What are you doing at

01:51PM  5  Acorn to nurture this and to try to grow this over time?

6  A.   Well, we essentially believe in the inventor, you

7  know, after a lot of vetting.  So we put the inventor

8  front and center; and by "center," I mean we surround

9  them with capability to bring their technology to

01:51PM  10  market.  And by "front," I mean that front and center,

11  that we put the inventor, if they are really good, we

12  are going to put them in front of the best people in the

13  world to share their idea, to test their idea.

14  Q.   All right.  And on a personal level, what is it like

01:52PM  15  working with inventors?  Have you noticed any quirks?

16  A.   Yes.

17  Q.   Give an example.

18  A.   Well, I remember the first time I met Dr. Grupp in

19  the basement in Stanford, and he was on some mobile

01:52PM  20  platform whizzing around talking physics.

21  Q.   And how about his co-inventor, Daniel Connelly?

22  A.   Dr. Connelly is an interesting man.  When he talks,

23  he never looks you in the eye because he is literally in

24  another place.  So it's like listening to a machine gun

01:52PM  25  talk.  It's fast.

1  Q.   What areas of technology do Acorn's inventors focus

2  on?

3  A.   We focus on two industries essentially.  We focus on

4  semiconductors and telecommunications.  They are, you

01:52PM  5  know, together, smaller than the oil industry but not

6  far from it, and they influence all our lives.

7  Q.   And are there any -- is there anything specific

8  about those two industries that attract you, in terms of

9  looking forward to the future?

01:53PM  10  A.   Yes.  When you go for a transformational technology,

11  that means you're solving something way in advance of

12  its need.  So you need some roadmap.  And the beautiful

13  thing about the semiconductor in telecommunications

14  industry is they have roadmaps that they produce,

01:53PM  15  looking out 15 or more years.  So that helps us give

16  context to what we're doing.

17  Q.   And I was just going to ask you that.  How do those

18  roadmaps that they are making help you focus at Acorn?

19  A.   They tell us -- they give us a sense of the problems

01:53PM  20  to solve and when they are most needed.

21  Q.   Can you identify some of the technology -- excuse

22  me -- some of the technologies that Acorn has developed?

23  A.   Yeah.  Within the Acorn semiconductor portfolio, we

24  have three broad classes of technologies.  The first is

01:54PM  25  the lowering the Schottky barrier, which can be used for

1    a lot of things; in this particular case, lowering

2    contact resistance.

3                We have a second set of technologies which

4    is -- we call it the varied stressor, but it's all about

01:54PM   5    straining, pulling the silicon to where the electrons

6    can flow more, you know, because you get more current

7    again.

8                And then a third area, it's pretty early, but

9    it's very interesting:  We believe that we can create

01:54PM   10   light on these wafers and use that as the basis of

11   computing and not electricity anymore.

12   Q.   Let me ask you, what about in the telecommunications

13   side?

14   A.   In the telecommunications side, we've been working

01:54PM   15   on algorithms that really enhance the way a wireless

16   device connects to a network, and there's a lot of

17   things that we can do with that.

18   Q.   All right.  Now, what happens after an Acorn

19   inventor develops technology?  What's the next step in

01:55PM   20   Acorn's business model?

21   A.   Well, we vet it internally.  We vet it internally,

22   and in some cases, we will bring in world-class

23   expertise to also vet the technology.

24   Q.   Let me just stop you there.  Why do you bother to do

01:55PM   25   that?

A.   You know, the whole point of inventing, it's
extremely difficult, especially when you're solving the
big problems.  So you've got to test your idea
continuously, and that's why we do it:  Do we have

01:55PM   something or not?

Q.   And if this gets through the vetting, then what
happens?

A.   If it gets through the vetting, obviously we -- I
shouldn't say "obviously."  It's just part of the

01:55PM   process.  It's fundamental.  We patent it.

Q.   Why do you patent it?

A.   To protect it.  If you don't have a patent, you lose
your idea.  Someone else can practice it, take it
without any harm.

01:55PM   Q.   And how many patents does Acorn currently have on
inventions?

A.   I think we're approaching certainly almost 200
issued and filed-for patents.

Q.   Now, what is the next step after Acorn obtains a

01:56PM   patent?

A.   You know, depends on the technology; but in the
semiconductor space, we build a team, we bring in
expertise to help advance it and also help develop proof
of concept or proof of principle in a context that's

01:56PM   meaningful to the industry.

1    Q.   All right.  And on the semiconductor side, does

2    Acorn itself manufacture commercial products?

3    A.   No.  There are only a handful of companies that can

4    build semiconductor products.  You need tens of millions

01:56PM    5    of dollars to build a semiconductor facility.

6    Q.   All right.  But what about on the telecommunications

7    side; have you, in fact, created commercial products on

8    that side?

9    A.   Yes, we have.  We have software products in the

01:57PM   10    telecommunications field.

11    Q.   So, now, focusing on the technology at issue in this

12    case.  Has Acorn made, offered for sale, or sold a

13    product using the technology at issue in this case?

14    A.   No.

01:57PM   15    Q.   Okay.  Now, as someone with more than 30 years of

16    experience in this industry, I just want to ask you:  Is

17    it difficult to invent new technology?

18    A.   It's extremely difficult and it's a very risky

19    business.

01:57PM   20    Q.   In your experience, how often are new technologies

21    invented?

22    A.   To have a meaningful invention, you know, in my

23    experience, it's a one-in-a-thousand shot.  It's a long

24    shot.

01:57PM   25    Q.   What are some of the factors that make inventing,

1  you know, that breakthrough invention, difficult?

2  A.   I think in our case -- and I separate it.  I think

3  in our case, what makes it difficult is you are trying

4  to solve a problem.  In the case, for example, of Grupp

01:58PM  5  and Connelly, that's almost a hundred years old that

6  nobody has solved before.  So there's an incredible

7  stroke of genius needed for that.

8  Q.   And is it expensive to try to support invention?

9  A.   Expensive is relative; but certainly, from the

01:58PM  10  standpoint of what you have to do to take that acorn to

11  an oak tree, it's very expensive.

12  Q.   Okay.  So in light of those challenges, what

13  motivates you and Acorn to do this kind of work?

14  A.   I think there's grit in this.  We're pioneering.  We

01:58PM  15  believe in these inventions and we've tested them

16  ourselves, over and over again internally, and we're

17  going to see them through.

18  Q.   Now, you've been comparing Acorn and growth towards

19  an oak tree, and you've talked about the years it takes

01:58PM  20  to do that.  Let me ask you, using that same analogy,

21  what stage is Acorn at now?

22  A.   We're beginning to see the first shoots on the tree.

23  Q.   And what do you mean by that?

24  A.   I mean leaves are growing.  We're close to

01:59PM  25  commercializing telecommunications technologies.

1   Q.    And on the telecommunications technologies, what is

2   that you are referring to?

3   A.    So what I'm referring to is a technology that takes

4   a wireless device and improves positioning to the point

01:59PM   5   where the cellular network can be the basis for all

6   positioning, even undermining GPS.

7   Q.    And to your knowledge, do any other companies offer

8   similar technology?

9   A.    We've been told by our partners that we are years

01:59PM   10   ahead of anybody in the space, six to eight years.

11   Q.    And has Acorn licensed that technology?

12   A.    Yes, we have.

13   Q.    And with whom?

14   A.    With a French company, it's in Paris, Sequans.

02:00PM   15   Q.    And have you initialed any letters of intent with

16   any companies here?

17   A.    Yes.  Just recently, I signed a letter of intent

18   with one of the biggest global wireless carriers.

19   Q.    Now, let me ask you with respect to that:  How long

02:00PM   20   did Acorn take to develop that technology?  When did it

21   start?

22   A.    I think we first announced the technology in 2010,

23   and we were developing it for several years before that.

24   Q.    Is Acorn working on developing new technology today?

02:00PM   25   A.    We continue to all the time.

1  Q.   Are you familiar with the company Atomera?

2  A.   Yes, I am.

3  Q.   And how are you familiar with that?

4  A.   On two levels.  One of our doctors, Dr. Clifton,

02:01PM  5  knows the founder of the company very well, and

6  Dr. Connelly now works for Atomera.

7  Q.   All right.  I now want to shift to another topic.  I

8  want to ask you about the Acorn inventions and patents

9  at issue in this case.  Who at Acorn developed that

02:01PM  10  technology?

11  A.   Dr. Grupp and Dr. Connelly.

12  Q.   And when did you first meet Dr. Grupp?

13  A.   I first met Dr. Grupp when I joined the company in

14  late 2000.

02:01PM  15  Q.   And what were your impressions of Dr. Grupp?

16  A.   Very, very brilliant mind, came extremely well

17  recommended from two professors; in particular,

18  Professor Harris who has helped a lot of companies get

19  established.  These are very credible people.

02:01PM  20  Q.   And did you try to provide support to Dr. Grupp?

21  A.   Yes.  We hired Dr. Connelly to support him

22  originally.

23  Q.   All right.

24  A.   And I'll just say, on Dr. Connelly, I was

02:02PM  25  particularly impressed by him because he had industry

experience.  He had come out of Motorola, and the CEO of

Motorola semiconductor told me he was one of their most

talented people.

Q.   All right.  Now, at some point, did you become aware

of Dr. Grupp and Connelly's invention?

A.   I did.

Q.   And what was your initial reaction when you first

heard of it?

A.   I didn't believe it.  This was something I remember

studying when I went to university 20 years before,

Schottky barriers and semiconductor physics, and I was

in disbelief initially.

Q.   So what did you do next?

A.   Well, I'm not a physicist, so I go and I talk to

people in the company who have skills, and then we

brought in outside people, as well, to help vet it,

essentially.

        I think the turning point for me was when I

hired Dr. Joe Daniele, who was a senior vice president

of a defense company, and he was also a physicist out of

MIT, and he basically said, "I joined because of this."

Q.   All right.  And did you find the invention to be

exciting?

A.   I did.  I could see that, the potential, yes.  Very

exciting.

1    Q.   Did Acorn do anything to protect this invention?

2    A.   Yes.  We applied for patents.

3    Q.   Now, is Acorn asserting some of those patents in

4    this lawsuit?

02:03PM   5    A.   Yes, we are.

6    Q.   And who owns the patents being asserted in this

7    case?

8    A.   Acorn Semi, LLC.

9    Q.   And does the assignment to Acorn Semi, LLC, include

02:03PM   10   the right to sue or collect for past infringement?

11   A.   Yes, it does.

12   Q.   And by the way, what is Acorn Semi, LLC?

13   A.   It's a fully owned subsidiary of Acorn Technologies,

14   Inc.

02:03PM   15   Q.   And just so the record's clear, who is Acorn Semi,

16   LLC, asserting the patents against?

17   A.   We're asserting them against Samsung Electronics and

18   their affiliates.

19   Q.   Did Samsung ever ask permission to use the asserted

02:04PM   20   patents?

21   A.   No.

22   Q.   Did Acorn ever give Samsung permission to use the

23   asserted patents?

24   A.   No.

02:04PM   25   Q.   Mr. Horgan, I want to ask you:  How do you feel

1  knowing that Samsung has been using Acorn's technology

2  without its permission?

3  A.   First of all -- first of all, I felt justified.

4  We've been at this a long time.  So seeing the

02:04PM  5  technology in use, there was a sense there; but

6  ultimately devastation.

7  Q.   Why devastation?

8  A.   We lost a lot, a lot of years where we could have

9  been receiving royalties, and we had to say no to a lot

02:04PM  10  of inventors and other things we wanted to do.

11  Q.   Now, in your more than 20 years as a company, I just

12  want to ask you:  Has Acorn ever filed a lawsuit against

13  any other company, ever?

14  A.   We're just not built to do that.  We have never

02:04PM  15  filed a lawsuit in 20 years -- in 22 years of operation.

16  Q.   All right.  What kind of damages is Acorn seeking

17  for Samsung's use of the technology?

18  A.   We're seeking a reasonable royalty.

19  Q.   And are you seeking a particular type of royalty?

02:05PM  20  A.   Yes.  They call it a running royalty.

21  Q.   What is a running royalty?

22  A.   A running royalty, it's a very fair agreement to

23  both parties.

24  Q.   Why do you think it's fair, yeah?

02:05PM  25  A.   Because, essentially, you pay if you use it, and you

```
 1   don't pay if you -- if you don't use it, you don't pay.
 2   Q.   Now, are you aware of another type of royalty
 3   agreement, other than running royalty?
 4   A.   I am, yes.
 5   Q.   What's that called?
 6   A.   It's called a lump-sum royalty or a one-time royalty
 7   payment for use of the technology, for as long as they
 8   want to use it, until the patents expire.
 9   Q.   And why is it that you are not looking for a
10   lump-sum royalty?
11   A.   I mean, it's essentially unfair.  It drives to
12   establish a value that's independent of usage.
13   Q.   Now, has Acorn entered into any other running
14   royalty agreements in its past?
15   A.   Yes, we have.
16   Q.   And in what area?
17   A.   In the telecommunications space with Sequans.
18   Q.   And has any other company proposed a royalty
19   agreement with Acorn?
20   A.   Yes.
21   Q.   Who?
22   A.   Well, we've had Intel propose a type of royalty
23   agreement to Acorn.
24   Q.   And did Acorn enter into an agreement with Intel?
25   A.   No, we did not.
```

02:05PM (line 5)
02:05PM (line 10)
02:06PM (line 15)
02:06PM (line 20)
02:06PM (line 25)

1    Q.    Why not?

2    A.    They were pushing us towards a lump-sum royalty, and

3    we said no.

4    Q.    Well, let me ask you, are you out there just trying

02:06PM    5    to sell your patents at any price for any kind of

6    royalty?

7    A.    No.  We're in it to see it in use in everybody's

8    pocket, essentially, in technology, and we expect a

9    reasonable royalty for that.

02:07PM    10   Q.    All right.  Now, has Acorn licensed any of the

11   asserted patents in this case?

12   A.    No, we have not.

13   Q.    And when did Acorn start making efforts to license

14   the asserted patents?  What was the time period?

02:07PM    15   A.    I believe it was between 2009 and 2012.

16   Q.    And at a high level, what was happening during that

17   time?

18   A.    We had come out of the Great Recession, where our

19   plans had to change, and we were essentially looking for

02:07PM    20   a semiconductor partner to work with, to bring our

21   portfolio to market.

22   Q.    And when you say "portfolio," what are you referring

23   to?

24   A.    I'm referring to our complete semiconductor

02:07PM    25   portfolio at that time.

Q.   Okay.  And what portion of that complete portfolio
was the asserted patents in this case?
A.   At that time, they were a very small piece of the
portfolio.
Q.   Okay.  And were these -- well, let me ask you:  What
companies did Acorn have those initial discussions with
about Acorn's entire portfolio?
A.   There were several.  There were several --
Q.   Can you remember some?
A.   I'm trying to.  We had -- yes.  There were the
foundry companies.  So there were only a handful of
foundry companies in the world that make advanced
semiconductors; so we approached three of them, TSMC,
UMC -- they're both in Taiwan -- and GlobalFoundries,
which is based here in the U.S.

          And we also approached Soitec, which builds
wafers for the industry, and we approached Freescale,
which was formerly known as Motorola Semiconductor, and
I think the other one was Applied Materials, which was a
tool producer to the semiconductor industry.
Q.   Okay.  And why did Acorn not form an agreement with
those companies?
A.   At this time, we were just in exploratory meetings
and were looking for that right partner.  And in some of
the cases, in Freescale, for example, they were not

1    going to be in the business of doing advancements.  They

2    weren't one of those five, you know, that came to be, as

3    it were.

4          And in other cases, tool companies, other

02:09PM    5    companies that supply tools to the industry, it's just

6    not a good fit.

7    Q.    And again, were you just trying to find any fit you

8    could?

9    A.    No.  We knew what we were looking for.  We knew

02:09PM    10   that, again, the expectation was our technologies will

11   take a long time, and we want to work with a company

12   that we can trust and we want to work with a company

13   where we had access to the senior management, right up

14   to the CEO and the chief technology officer.

02:10PM    15   Q.    Now, did any of those companies express interest in

16   working with you?

17   A.    Yes.

18   Q.    Which ones?

19   A.    You know, in terms of interest, we could argue all

02:10PM    20   of them did.  But specifically, to a more detailed level

21   of interest, the three foundry companies, TSMC, UMC, and

22   GlobalFoundries, and Soitec.

23   Q.    All right.  Well, let me ask you first about TSMC

24   and UMC.  Did you form a relationship with those two

02:10PM    25   companies?

1   A.    Each company, you know, for example, TSMC, we --

2   they asked us to have a relationship where they would

3   fund research in our company and share the IP, and we

4   said no to that.

02:10PM  5   Q.    You didn't want to do that?

6   A.    No.

7   Q.    What about UMC?

8   A.    UMC, in the area they were interested in our

9   portfolio, we found that their process technology just

02:11PM  10   wasn't mature enough to work with that.

11   Q.    So it was your choice, then?

12   A.    Yes.

13   Q.    You moved on?

14   A.    Yes.

02:11PM  15   Q.    So now I want to focus on the specific technology at

16   issue in this case.  You've discussed how Acorn

17   developed that technology starting back in 2001.  Why is

18   it that you've described not even starting to focus on

19   licensing the technology into much later, like 2009 to

02:11PM  20   '12?

21   A.    From my point of view of contact resistance, as you

22   scale transistors smaller, it didn't become a real

23   problem until FinFET came along --

24   Q.    When is that?

02:11PM  25   A.    -- in terms of the performance impact.

1          The first FinFET that was announced by

2    Intel in 2011, I believe.

3    Q.    Okay.  And then who did Acorn try to license

4    technology to once contact resistance was becoming, you

02:12PM  5    know, a new issue in the era of these FinFETs?

6    A.    We had a -- at that time, when it became an issue

7    and was of interest, we were working with

8    Global Foundries on other technologies in our portfolio;

9    and so essentially, GlobalFoundries asked us about that

02:12PM  10    particular technology.

11    Q.    And why was Acorn focused on GlobalFoundries?

12    A.    We liked the fit.  They were good people.  We had

13    access to the chief technology officer and his team, and

14    they were already working on another technology in the

02:12PM  15    company.

16    Q.    All right.  And what was GlobalFoundries' reaction

17    to hearing about Acorn's technology?

18    A.    They were very interested.

19    Q.    Now, how many meetings do you recall, roughly, that

02:12PM  20    Acorn had with GlobalFoundries?

21    A.    I don't recall how many, but we had a lot of

22    meetings with GlobalFoundries.

23    Q.    All right.  And then in connection with those

24    discussions with them, did they ever suggest to you that

02:12PM  25    you should meet with other companies?

1    A.    Yes.   Specifically, they asked us to meet with IMEC,

2    which was a government and industry-funded research

3    group in Belgium; and there was another company they had

4    just entered into a relationship with called

02:13PM   5    Intermolecular.

6    Q.    Okay.   And why were they, to your understanding,

7    asking you to meet with them?

8    A.    They were asking us to work with them, with these

9    particular companies, to look at putting our

02:13PM   10   contact-resistance lowering, the contact resistance

11   technology into a module for the FinFET process.

12   Q.    Okay.   And so what kind of Global Foundry device

13   then, just to be clear, were you discussing using that

14   Acorn technology in?

02:13PM   15   A.    We were discussing all of their FinFET products.   In

16   the short-term, it was the 14-nanometer, which was at

17   that time they were working on, as well as their

18   next-generation FinFET products.

19   Q.    And -- sorry.   And then what happened next?

02:14PM   20   A.    Well, it's a sequence of events.

21   Q.    What happened -- let me be more precise.   What

22   happened next in the discussions with the 14-nanometer

23   FinFET?

24   A.    So GlobalFoundries actually had been reviewing our

02:14PM   25   work with IMEC in terms of the proposals, and they

1  basically said that they wanted us to stop working with

2  IMEC and work directly with them; and that was around

3  the end of 2013.

4  Q.    Did GlobalFoundries eventually take a license to

02:14PM  5  Samsung's 14-nanometer FinFET?

6  A.    Yes, they did.

7  Q.    And did discussions suspend or stop around that?

8  A.    Well, obviously the immediate 14-nanometer

9  discussions didn't continue.  That was April, I think,

02:14PM  10  of 2014.  There were still some discussions for their

11  next-generation FinFETs after that.

12  Q.    Okay.  I was going to ask about that.

13            Is Acorn currently having discussions with

14  any semiconductor manufacturers about the patented

02:15PM  15  inventions at suit here?

16  A.    With Global Found -- I'm sorry.  Could you repeat

17  the question, please?

18  Q.    Sure.  Have you been having discussions with any

19  semiconductor manufacturers about the patented

02:15PM  20  invention?

21  A.    We always continue to have discussions with

22  companies; and in GlobalFoundries' case, they got out of

23  FinFET and were dependent on that license, so the

24  discussions shut down.

02:15PM  25  Q.    What about with Soitec?

A.   With Soitec, we are working with them on a different
technology now.

Q.   And what is the status of the discussions with
Soitec?

A.   We've just actually started to work on a three-way
collaboration between ourselves, Soitec, and another
research center in Belgium.

Q.   And just so I'm clear.  When you reference
GlobalFoundries, are you continuing to have discussions
with them other than the ones they are licensing from
Samsung?

A.   Yes, we do.

Q.   Okay.  Now, we talked about several companies that
Acorn met with to potentially use the technology at
issue in this case.

          How is Samsung different?

A.   Samsung didn't take a license and they're
infringing.

Q.   Has Acorn received any compensation at all from
Samsung for that use of Acorn's technology?

A.   No.

Q.   And please remind the jury, what is Acorn asking for
in this case?

A.   We're asking for a reasonable royalty for use of our
technology.

 1          MR. HUESTON:  Thank you, your Honor.  We pass

 2   the witness.

 3          THE COURT:  All right.  Ladies and gentlemen,

 4   there's a matter I need to take up with counsel very

02:16PM  5   briefly before we proceed with cross-examination.  I'm

 6   going to ask you to retire to the jury room.  You will

 7   only be there a short period of time.  You can leave

 8   your notebooks closed in your chairs.  Don't discuss

 9   anything about the case, and I'll have you back here in

02:17PM  10   just a minute or less, but I need to take something up

11   with you in the jury room.

12          The jury should excuse themselves to the jury

13   room.

14          (Whereupon, the jurors exit the courtroom.)

02:17PM  15          THE COURT:  Be seated, please.

16          Mr. Hueston, I know you were not at the

17   pretrial conference, but the Court entered an order

18   limiting, at plaintiff's request, precluding any

19   assertions that Acorn hasn't asserted its patents

02:17PM  20   against others, and you blew right through the middle of

21   that with your direct examination.

22          In my opinion, that issue is not only the

23   door's not open; the door's off the hinges.  And I feel,

24   since it is an order of the Court, I'm obligated to make

02:18PM  25   defense counsel aware of that as they proceed with

1    cross-examination.

2           So I will not sustain any objections that

3    Defendants are violating Plaintiff's MIL Number 2 if

4    they inquire as to the circumstances regarding Acorn not

02:18PM   5    asserting its patents against other parties.

6    Understood?

7           MR. HUESTON:  Yes.  I apologize, your Honor.

8    Understood.

9           THE COURT:  All right.  Let's bring the jury

02:18PM  10    back in.

11           (Whereupon, jurors return to the courtroom.)

12           THE COURT:  Thank you, ladies and gentlemen.

13    Please have a seat.  We'll proceed with

14    cross-examination of Mr. Horgan by the Defendants.  You

02:19PM  15    may distribute binders to the witnesses.

16           MR. FOWLER:  May I proceed, your Honor?

17           THE COURT:  You may proceed, Mr. Fowler.

18                      CROSS-EXAMINATION

19    BY MR. FOWLER:

02:19PM  20    Q.   Good afternoon.  My name is Mark Fowler, and I

21    represent Samsung.  Good to meet you.

22    A.   The same to you, Mr. Fowler.

23    Q.   Now, Acorn sued Samsung back in late 2019; is that

24    correct?

02:19PM  25    A.   That's correct, I believe.

1   Q.   And as CEO of Acorn, you authorized that decision,

2   didn't you?

3   A.   Yes.

4   Q.   Now before that time, before Acorn sued Samsung back

02:20PM   5   in 2019, Acorn never reached out to Samsung by letter,

6   e-mail, call, meeting to advise Samsung that it had --

7   the patents that it's suing Samsung for infringing in

8   this trial, right?

9   A.   That's correct.

02:20PM  10   Q.   As a matter of fact, Acorn never reached out to

11   Samsung to talk about a co-development agreement,

12   either, right?

13   A.   Correct.

14   Q.   And just to correct one thing, or to make it clear

02:20PM  15   for the jury, you said during your examination that

16   there were three foundries:   TSMC, UMC, and

17   GlobalFoundries, three large foundries.

18                Didn't you leave one off the list?  Isn't

19   there another big foundry that you didn't mention?

02:20PM  20   A.   I would argue in 2009 to 2012 that Samsung wasn't

21   necessarily a foundry.

22   Q.   It's considered one of the big four now, right?

23   A.   It is today, indeed.

24   Q.   Okay.

02:20PM  25                THE COURT:  Let's make sure we talk one at a

1  time, gentlemen.

2          THE WITNESS:  Thank you.

3          THE COURT:  Please, continue.

4  Q.  At that time, though, a foundry you didn't reach out

02:21PM  5  to is Samsung, and you didn't do that between 2015 and

6  2019, right?

7  A.  Yes.

8  Q.  Now, Samsung started selling the products that

9  Acorn's accusing of infringing in this trial back in

02:21PM  10  2015, right?

11  A.  I believe so.

12  Q.  And you knew that?  You knew Samsung was selling

13  these 14-nanometer FinFET products back in 2015, right?

14  A.  Yes, we knew they were selling them, yes.

02:21PM  15  Q.  And you knew they were selling them in 2016, 2017,

16  2018, the first part of 2019, right?

17  A.  Yes.

18  Q.  But you didn't sue Samsung then, right?

19  A.  That's correct.

02:21PM  20  Q.  And you didn't send them a letter that said, "Hey,

21  we think you're infringing our patents," right?

22  A.  That's correct.

23  Q.  You just sued them five years after they started

24  selling the products without any kind of advance

02:21PM  25  warning; is that correct?

A.   That's correct.

Q.   Now, I think, as you mentioned, you were -- you've been the CEO of Acorn since 2000; is that right?

A.   Yes.

02:22PM   Q.   But the Plaintiff in this case is something called Acorn Semi; is that right?

A.   That's right.

Q.   When was that founded?

A.   I believe Acorn Semi was founded sometime in 2019.

02:22PM   Q.   Right.  And it has three employees; is that right?

A.   I believe so, yes.

Q.   Okay.  And it's the one that's suing in this courtroom today, right?

A.   Yes.

02:22PM   Q.   Okay.  Now, the thing you've been the CEO of since 2000-something called Acorn Technologies, that's a separate company, right?

A.   It's not separate.

Q.   It's the parent of Acorn Semi?

02:22PM   A.   Correct.

Q.   Okay.  Now, you gave a bunch of testimony today about Schottky barrier and contact resistance and whatnot; but you're not an expert in the field of semiconductor technology, right?

02:22PM   A.   I think that's fair.

1  Q.   And, in fact, you've never, in your entire long

2  career, worked in the semiconductor --

3  A.   I did --

4  Q.   -- technology field, right?

02:22PM  5  A.   I did work for Digital Equipment Corporation.  They

6  were in the semiconductor business.

7  Q.   Well, let's look at your testimony, Mr. Horgan --

8  well, first of all, you gave a deposition in this case,

9  too, didn't you?

02:23PM  10  A.   I did, of course, yes.

11  Q.   And it was just back in last November, I believe; is

12  that right?

13  A.   Yes.

14  Q.   And you swore to tell the truth, didn't you?

02:23PM  15  A.   Yes.

16  Q.   So let's look at your testimony, if we could just

17  pull it up.  We can just look at the paper at 169, 15

18  through 19.  If we could blow that up.

19        And you were asked this question:  "What are

02:23PM  20  Acorn's contact technologies?"

21        Answer:  "They're based on -- on the -- again,

22  I am not a semiconductor expert and I have never worked

23  in the industry, but I believe that it's to do with

24  metal contacts in silicon chips."

02:23PM  25        Now, that's a question you were asked and

1    that's the answer you gave at the time, right?

2    A.    Yes.

3    Q.    Now, that's as much as you were able to tell us back

4    in November about what Mr. Grupp and Mr. -- or Dr. Grupp

02:24PM    5    and Dr. Connelly's contact technology was about, right,

6    that it was something to do with metal contacts in

7    silicon chips; is that right?

8    A.    That's what I said, yes.

9    Q.    You weren't able to elaborate back in November like

02:24PM    10    you did today about the technologies, right?

11    A.    I don't believe I was asked to elaborate.

12    Q.    So if we wanted to talk to a current employee of

13    Acorn Semi who could tell us about contact technologies,

14    would that be Mr. Clifton?

02:24PM    15    A.    Dr. Clifton, yes.

16    Q.    Dr. Clifton?  Dr. Clifton's the vice president of

17    semiconductor technologies for Acorn Semi, right?

18    A.    That's correct.

19    Q.    So if the jury wants to hear something from a

02:24PM    20    current Acorn employee about contact technologies,

21    that's the person they would want to hear from; is that

22    right?

23    A.    He's one of them, yes.

24    Q.    Okay.  So you testified that Acorn doesn't make any

02:25PM    25    products, and had said it goes out to companies to try

1    to promote the products; is that right?

2    A.    Yes.

3    Q.    And so for many years, Acorn has gone out and

4    attempted to obtain a joint development agreement with a

02:25PM    5    large semiconductor company or someone in the industry

6    in order to get into the market or license your

7    technology; is that right?

8    A.    Yes.

9    Q.    Okay.  And the companies that you have met with have

02:25PM    10    included, if I've got the list right -- I wrote them

11    down here -- Texas Instruments, Freescale,

12    GlobalFoundries, TSMC, Applied Materials, UMC,

13    Intermolecular, Soitec, IMC; is that right?  Did I get

14    the list right?

02:25PM    15    A.    That sounds right.

16    Q.    And each of those companies is either a

17    semiconductor manufacturer or somehow involved in the

18    industry in making wafers or equipment for semiconductor

19    products; is that right?

02:26PM    20    A.    I think there's an additional category there.

21    Q.    Which is?

22    A.    Which is government-funded, industry-funded research

23    center.

24    Q.    Now, it's fair to say that those nine companies are

02:26PM    25    all large companies; is that right?

1    A.    No.

2    Q.    Well, let me put it this way:  How about

3    Texas Instruments, Freescale, GlobalFoundries, TSMC,

4    Applied Materials; those are all very large companies,

02:26PM   5    right?

6    A.    Yes, they are.

7    Q.    And you tried hard to work with them to obtain a

8    co-development agreement and to license your patents

9    with them; is that right?

02:26PM   10   A.    I don't understand the question.

11   Q.    Well, did you -- when you went and visited them, you

12   were trying to get, in each case, either a

13   co-development agreement or a license agreement; is that

14   right?

02:26PM   15   A.    In some cases, we were just introducing the company

16   to the other company to see if there was any basis for a

17   discussion along those lines.

18   Q.    Well, let's take a quick look, if we could, at

19   DTX-42.  Let's put that up on the screen right now.

02:27PM   20         Now, you understand, sir, that during the

21   course of this case, Samsung asked Acorn some written

22   questions that Acorn was responding -- had responded

23   under oath in terms of answering the questions; is that

24   right?

02:27PM   25   A.    I do, yes.

1    Q.    Okay.  So let's turn to Page 50 in DTX-42 --

2    actually, let's start at Page 49.  And I'm showing you

3    one of these questions and answers.  And before we go

4    any further, do you understand that this was a response

02:27PM    5    that Acorn provided in just last October; is that right?

6    I can refresh your memory, if you don't remember.

7    A.    Are we talking about the interrogatory?

8    Q.    Yes.

9    A.    I don't recall when that was submitted.

02:28PM    10    Q.    Well, let's go to the very last page, 71.  And do

11    you see there that you served your response back in

12    October of 2020?

13    A.    Yes.

14    Q.    And so as of October of 2020, your answer was full

02:28PM    15    and complete, right?

16    A.    That was the document we submitted in October 2020.

17    Q.    Well, it was full and complete, your answer at that

18    time, right?

19    A.    I assume so.

02:28PM    20    Q.    Well, you're the CEO of the company.  Didn't you

21    want to make sure that your answers in this case were

22    full and complete?

23    A.    Yes.  To the best of our ability, yes.

24    Q.    And you went on most of these meetings yourself,

02:28PM    25    right?  You met with most of these companies, along with

1    Mr. Clifton, right?

2    A.    I went to most of them, not all.

3    Q.    Okay.  So let's go back to Page 49, if we could,

4    just to see what the question is.  So the question --

02:28PM    5    it's a long question.  It's a lawyer's question.

6                "Identify all communications between Acorn and

7    any other person or entity regarding actual or potential

8    infringement, licensing, assignment, damages and/or

9    royalties (potential or actual) with respect to the

02:29PM    10    asserted patents or related patents."  And let me stop

11    there.

12               Do you understand the "asserted patents," those

13    are the four patents we're talking about in this trial,

14    right?

02:29PM    15    A.    Yes.

16    Q.    Okay.  "Including the identity of each person or

17    entity involved, the dates of each such communication,

18    the products at issue, the patents and patent claims at

19    issue, any resulting royalty rates, damages or other

02:29PM    20    terms, and the outcome, result and/or status of such

21    communications."

22               Do you see that?

23    A.    I do.

24    Q.    Now let's start on Page 50.  Now, there's some

02:29PM    25    objections at the start, and let's go to the first full

1    paragraph that starts, "Over the years."

2              Now, there, you, Acorn, responded, "Over the

3    years, Acorn has had discussions with several developers

4    and manufacturers of semiconductor devices concerning

02:29PM    5    potential co-development and/or licensing relating to

6    the technology claimed in Acorn's asserted patents."

7              That's correct, right?

8    A.   That's correct.

9    Q.   And what we're talking about here, just to be clear,

02:30PM   10    is not just, "Hi, I'm introducing myself"; this is about

11    co-development and/or licensing, right?

12    A.   It's where we're -- in some cases, it's where we're

13    starting our relationship and we're showing that

14    technology is part of our portfolio.

02:30PM   15    Q.   So let's go through these one by one very quickly.

16    So the first paragraph we have is you, in December of

17    2005, met with Texas Instruments, right?

18    A.   Yes.  In Cleveland, yes.

19    Q.   And the result of that, as we saw at the bottom, is

02:30PM   20    no co-development or licensing agreement was reached

21    with Texas Instruments, right?

22    A.   Correct.

23    Q.   And that was it.  You had no further success with

24    Texas Instruments since 2005, right?

02:30PM   25    A.   We had a breakfast meeting at Denny's and introduced

1    the two companies.

2    Q.    Let's go to the next page, if we could.   Now, at the

3    top of this -- I'm not going to go through the full

4    answer -- it says, "On or around February 24, 2009,

02:31PM    5    there was a meeting with Applied Materials and some

6    members of Acorn."

7                    And then down below, it talks about another

8    meeting in February 8, 2017, again, with

9    Applied Materials.

02:31PM   10                If we could go down a little bit further,

11    please.

12                Ultimately -- it says, "Ultimately, no

13    co-development or licensing agreement was reached with

14    Applied Materials or Applied Ventures."

02:31PM   15                So for at least, it looks like, a period of

16    eight years, or it spans eight years, there were

17    communications with Applied Materials, and you were

18    unable to have a co-development or licensing agreement

19    with Applied Materials during that period of time; is

02:31PM   20    that right?

21    A.    That's correct.

22    Q.    Okay.   Without belaboring the rest of this, you also

23    met, from 2009 onward, with GlobalFoundries, with

24    Freescale, TSMC, UMC, Intermolecular, Soitec, and IMC,

02:32PM   25    and in each of those cases, the end result was no

1    co-development or licensing agreement was reached with

2    that company, correct?

3    A.   Not at this time.

4    Q.   Well, let's talk about "not at this time."  I think

02:32PM    5    we heard Dr. Grupp say that he had his invention moment

6    back in -- it was either 2001 or 2002, right?

7    A.   Yes.

8    Q.   Okay.  So we're now talking about 20 years, and you

9    haven't been able to get anybody in the world to license

02:32PM   10    any of these patents, right?

11    A.   That's correct.

12    Q.   That's an indication that nobody needs the patents,

13    right?

14    A.   I disagree.

02:32PM   15    Q.   Well, nobody seems to want to pay any money for

16    them; is that right?

17    A.   Certainly, that's true.  Nobody wants to pay money

18    for using our technology.

19    Q.   Well, are you saying that other people are using

02:32PM   20    your technology?

21    A.   No.  I'm talking about Samsung.

22    Q.   Okay.  Is anyone else in the world using your

23    technology, sir?

24    A.   Any -- anyone else?

02:33PM   25    Q.   Yeah.  Anyone else in the world besides Samsung?

1    Does anyone else use this technology, other than what

2    you allege Samsung does?

3    A.   I don't know at this time.

4    Q.   Haven't you looked into it?

02:33PM   5    A.   We've looked into it, but we haven't made final

6    determinations yet.

7    Q.   Well, have you made any determinations, sir?

8           MR. HUESTON:  I'm going to -- your Honor, I

9    just want to object to the extent this may call for

02:33PM   10    attorney-client privilege communications.  If you can

11    answer without referencing that.

12           THE COURT:  To the extent the inquiry asks for

13    communications with counsel, you can raise it at that

14    time.  I assume Mr. Horgan knows not to volunteer

02:33PM   15    communications with counsel.

16           Let's proceed.

17           MR. FOWLER:  Should I reask the question, your

18    Honor?

19           THE COURT:  That's up to you, counsel.

02:33PM   20           MR. FOWLER:  Thank you.

21    Q.   So, Mr. Horgan, have you reached any, even

22    preliminary determinations, as to whether any company,

23    anywhere in the world, is using the supposedly

24    breakthrough invention of Dr. Grupp and Dr. Connelly,

02:34PM   25    other than your allegations against Samsung?

A.   I cannot divulge information.  That's under

attorney-client privilege.

Q.   Well, have you sued anyone other than Samsung for

infringement?

02:34PM   A.   No.

Q.   Have you sent any letters to anyone saying, "Hey,

you're infringing our patents"?

A.   No.

Q.   Have you even told anyone, even on the phone or in a

02:34PM   meeting, "Hey, you better watch out.  We think you're

using our patents"?

A.   No.

Q.   So let's go back and look at one specific example

of -- before we do that, I take it, as a result of the

02:34PM   fact that you haven't licensed any of these patents, you

haven't generated any revenue off of any of these four

patents to date; is that correct?

A.   That's correct.

Q.   Okay.  So let's look at one specific example of

02:35PM   meetings that you had with Applied Materials.

MR. FOWLER:  If we could bring up DTX-62,

please.

Q.   Now, this has got -- it's a string of e-mails, but

let's focus initially at the very top.  First of all,

02:35PM   this is an e-mail from you to Mr. Clifton.  And forgive

1  me.  I don't know how to pronounce his name.  Is it

2  Mr. Goebel?

3  A.   Goebel.

4  Q.   Goebel.  I hit it.  So -- and just for the jury's

02:35PM  5  benefit, Mr. Clifton is the vice president of

6  semiconductor technologies at Acorn?

7  A.   Dr. Clifton, yes.

8  Q.   Dr. Clifton.  And is it Dr. Goebel?

9  A.   Yes.

02:35PM  10  Q.   And Dr. Goebel is who?

11  A.   Dr. Andreas Goebel, who is also working at

12  Acorn Semi, LLC.

13  Q.   Okay.  Now, those are the three employees at Acorn

14  Semi, LLC, right, just the three of you?

02:36PM  15  A.   Actually, it's both Dr. Clifton and Dr. Goebel.  I'm

16  CEO of Acorn Technology.  So --

17  Q.   Okay.  I'm sorry.  Two employees plus the CEO?

18  A.   That's correct.

19  Q.   That's the full makeup of Acorn Semi?

02:36PM  20  A.   Today, yes.

21  Q.   Okay.  And it's the three of you that go out and

22  meet with companies to try to talk to them, to try to

23  convince them to do a co-development agreement or

24  license agreement; is that right?

02:36PM  25  A.   No.

1  Q.   Okay.  Is it Mr. Clifton and Mr. Goebel that are

2  appointed to do that?

3  A.   It's Dr. Clifton and Dr. Goebel.

4  Q.   Forgive me.  So let's start with this.  So this

02:36PM  5  particular e-mail string has to do with a meeting that

6  Dr. Clifton had with Applied Materials; is that right?

7  A.   That's correct.

8  Q.   Okay.  So before we address the rest of your e-mail,

9  let's go to the e-mail below that, and we can just --

02:36PM  10  that's fine.  Just leave it there.

11       So this is an e-mail from Dr. Clifton to you,

12  February of 2017, reporting on this meeting with

13  Applied Materials; is that correct.

14  A.   That's correct.

02:36PM  15  Q.   Okay.  Let's look at the beginning of that.  He told

16  you, "We learnt" -- and then there's something redacted

17  there -- "much of it surprising and mostly not good news

18  for MIS contact prospects."

19              Now, MIS stands for

02:37PM  20  metal-insulator-semiconductor, right?

21  A.   On silicon.

22  Q.   On silicon.  And that's the technology that we're

23  talking about in this courtroom, correct?

24  A.   Just to be correct, it's metal insulator on silicon.

02:37PM  25  Q.   And that MIS contact technology, that's what we're

1  asking the jury to look at in this trial; is that

2  correct?

3  A.   That's correct.

4  Q.   And so Mr. -- or Dr. Clifton is telling you that he

02:37PM   5  has mostly not good news for you from his meeting with

6  Applied Materials, right?

7  A.   That's -- sorry.  What's the question again, please,

8  Mr. Fowler?

9  Q.   Dr. Clifton is telling you that he has mostly not

02:37PM   10  good news for you about your MIS contact prospects.  Is

11  that --

12  A.   Yes, he does say that.

13  Q.   Okay.  So let's go --

14        THE COURT:  I'm going to ask both of you one

02:37PM   15  more time to make sure the other one has stopped talking

16  before you begin talking.  The court reporter can't take

17  down two people at the same time, and it's very

18  important that the record be clear here.  So I'm going

19  to insist that you make sure the other one is stopped

02:38PM   20  before you talk further, all right?

21        THE WITNESS:  My apologies --

22        MR. FOWLER:  Thank you, your Honor.

23        THE WITNESS:  -- your Honor.

24        THE COURT:  Let's continue on that basis.

02:38PM   25  Q.   So, Mr. Horgan, here Mr. Clifton says, in the first

full paragraph, "As Andreas alluded in his text, the

opportunity for MIS contacts in FinFETs and nanowire

FETs does appear to have gone."

Q.        FinFETs, that's the type of products that you

02:38PM  are suing Samsung on in this courtroom today?

A.    That's correct.

Q.    The next sentence says, "Epi doping and silicide is

just too successful."

Epi doping and silicide, that's the technology

02:38PM  Samsung uses, isn't it?

A.    I don't know, but I'm -- that's what it says.

Q.    And you understand -- you understood Dr. Clifton to

be comparing MIS on the one hand and epi doping and

silicide on the other hand as two different approaches

02:39PM  to manufacturing FinFETs, right?

A.    Could you repeat the question, please?  Just so --

Q.    Sure.  When you read this --

A.    Yes.

Q.    -- and he was telling you about the bad news, you

02:39PM  understood that there were two different ways, at least

two different ways to make FinFETs.  One was with MIS

and one was epi doping and silicide, right?

A.    I would agree with that.

Q.    And you were here when Dr. Grupp said that putting a

02:39PM  silicide on top of metal doesn't practice the invention.

1  You heard that testimony, right?

2  A.   Directly on metal, correct, yes.

3  Q.   And then Dr. Clifton goes on to say, "The

4  universally adopted epi S/D silicide approach has been

02:40PM  5  advanced so successfully by Applied and the big four

6  foundries that MIS has no competitive advantage."

7        Do you see that?

8  A.   I do.

9  Q.   And the big four foundries, I think we went over

02:40PM  10  this before.  The big four foundries that Dr. Clifton is

11  referring to here includes Samsung, right?

12  A.   Yes.

13  Q.   So he's telling you that Samsung is using this

14  epi doping and silicide approach that's different than

02:40PM  15  MIS, right?

16  A.   He's telling me what he has been told in a meeting

17  by somebody else.

18  Q.   By Applied Materials?

19  A.   By somebody from Applied Materials.

02:40PM  20  Q.   I'd like to focus one other thing on this e-mail

21  before we go back to your response.  In the next

22  sentence, in the next paragraph, it says, "MIS only has

23  an opportunity now in contacts to lower doped silicon -

24  DRAM stands out as a real possibility."

02:41PM  25        Now, you understand that this case is not about

1    DRAM; that's a different kind of semiconductor, right?

2    A.   That's right.

3    Q.   And what Mr. Clifton -- or Dr. Clifton is saying

4    here is that your MIS technology's only hope right now

02:41PM    5    is in lower-doped silicon; that's the way you read this,

6    isn't it?

7    A.   I guess I'm a little confused by what it says.  It

8    says, "MIS only has an opportunity now in contacts to

9    lower doped silicon; therefore, DRAM stands out as a

02:41PM    10   real possibility."

11   Q.   You understood this, when you read it, to mean that

12   really the only area that MIS might be successful in is

13   in lower-doped silicon; is that right?

14   A.   That's how I read that.

02:41PM    15   Q.   And you understand, don't you, Mr. Horgan, that

16   Samsung uses higher-doped silicon, right?

17   A.   I don't know what Samsung uses.

18   Q.   As a matter of fact, Samsung uses, like, the

19   highest-doped silicon you can get, right?

02:41PM    20   A.   I don't know what Samsung uses.

21   Q.   But you sued Samsung anyway?

22   A.   Yes.

23   Q.   So let's go back up to what your response to

24   Dr. Clifton was.  Your first comment was, "Very

02:42PM    25   comprehensive discussion."  So you appreciated all these

1    details Dr. Clifton gave you, right?

2    A.    Indeed.

3    Q.    But then you told him, "Let's not put anything more

4    in writing.  Let me call you tomorrow to check in before

02:42PM    5    the board meeting."

6          You were concerned about him putting this kind

7    of bad news in writing, weren't you?

8    A.    No, I wasn't.

9    Q.    Well, you certainly told him not to do it anymore,

02:42PM   10    right?

11   A.    I did.

12   Q.    And you had a board meeting the next day, didn't

13   you?

14   A.    Yes, I did.

02:42PM   15   Q.    And you didn't want to -- anything in writing that

16   the board might see on this; isn't that right?

17   A.    No, not at all.

18   Q.    Let me change the subject here a bit.  You mentioned

19   something about a Sequans agreement.  Do you recall

02:43PM   20   that?

21   A.    Yes.

22   Q.    Now, that Sequans agreement has nothing to do with

23   the four patents in this case, right?

24   A.    That's correct.

02:43PM   25   Q.    It's not even had anything to do with semiconductor

1  technology; is that right?

2  A.   That's correct.

3  Q.   It has something to do with wireless technology,

4  right?

02:43PM  5  A.   Yes.

6  Q.   Okay.  And you were talking about some fruit on the

7  tree at Acorn, some recent fruit on the tree, perhaps

8  something that came out after your interrogatory

9  response in October; but if I was hearing you correctly,

02:43PM  10  all that fruit on the tree, that's also not in the

11  semiconductor space, right?

12  A.   At this time, that's true.

13  Q.   So after, I guess, it's now 21 years of Dr. Clifton

14  and -- I'm sorry, not Dr. Clifton -- Dr. Connelly and

02:43PM  15  Dr. Grupp's invention, there hasn't been any fruit on

16  the tree for Acorn; is that right?

17  A.   No.

18       MR. FOWLER:  Your Honor, I have no further

19  questions.

02:44PM  20       THE COURT:  Pass the witness?

21       MR. FOWLER:  Yes, your Honor.

22       THE COURT:  All right.  Is there redirect?

23       MR. HUESTON:  Yes, your Honor.

24       THE COURT:  All right.  Let's proceed with

02:44PM  25  redirect.

1        MR. HUESTON:  Thank you.

2                REDIRECT EXAMINATION

3   BY MR. HUESTON:

4   Q.   Let's put back the e-mail that was just shown,

02:44PM   5   please, DTX-62.  Mr. Horgan, you were asked a number of

6   questions about -- let's get it up first.  Asked a

7   number of questions about this document.  I want to ask

8   you a few follow-up ones.

9            Now, in that e-mail from Mr. -- Dr. Clifton,

02:44PM  10   what did you understand him to be doing here?  What was

11   he describing?

12   A.   He's describing the opinions of somebody he met at

13   Applied Materials.

14   Q.   Okay.  And just to be clear, did you understand that

02:45PM  15   Dr. Clifton had these views?

16   A.   No.

17   Q.   That --

18            THE COURT:  Just a minute.  Pull that down,

19   please.  That's an unredacted version.

02:45PM  20            MR. HUESTON:  I apologize.  I thought we had

21   the right one up.  We'll use this one.  I apologize,

22   your Honor.

23   Q.   All right.  Let's put this up.

24            All right, Mr. Horgan.  So, again, to

02:45PM  25   orient here, that's Dr. Clifton writing below, right?

1    A.   Yes, correct.

2    Q.   And, again, did you understand what he was saying

3    there to be his own opinion?

4    A.   No.

02:46PM   5    Q.   Did you understand this to be Dr. Goebel's opinion?

6    A.   No.

7    Q.   What was their opinion?

8    A.   Their opinion was essentially to -- well, their

9    opinion isn't captured in this.

02:46PM   10   Q.   What's Dr. Clifton's view about the asserted

11   technology in this case?

12        MR. FOWLER:  Objection, your Honor.

13        MR. HUESTON:  He's opened the door on this.

14        MR. FOWLER:  Dr. Clifton will be here to

02:46PM   15   testify by deposition.

16        THE COURT:  I'll sustain the objection.

17        MR. HUESTON:  All right.

18   Q.   You were asked above what's -- move this back.

19   Counsel said, oh, you wrote, "Let's not put anything

02:46PM   20   more in writing."

21             Mr. Horgan, why did you write that?

22   A.   I was sensitive to something else in the document.

23   Q.   What was that other thing in the document?

24   A.   I believe it was more in the document where we --

02:47PM   25   where Applied Materials talked about interest in our

1   technology.

2   Q.   Okay.  I'm going to show you a portion of this

3   document and put this up.  Now, I want you to ignore my

4   squiggles on this.  I want to direct your attention to

02:47PM   5   this top where it says "DRAM opportunity."  Is that the

6   portion that you were responding to?

7   A.   Yes.

8   Q.   What is it about that that caused you to say "Let's

9   not put this in writing"?

02:47PM   10   A.   The name, "Samsung."

11   Q.   Okay.  And I do want to ask you about some of what

12   was written here, you were responding to.  It says in

13   the first line, "A couple of DRAM manufacturers have an

14   interest in MIS for contacting access transistors."

02:48PM   15             What did you understand that to mean?

16   A.   I understand our technology, people's interest in

17   our technology, and there's potential other use of the

18   technology.

19   Q.   Okay.  And you said there's reference to Samsung.

02:48PM   20   Is that in the bracketed sentence there at the bottom of

21   that paragraph?

22   A.   Correct.

23   Q.   And let's review it.  It says, "When I asked,

24   Chudzik was less knowledgeable of any opportunity in 3D

02:48PM   25   NAND (flash memory) because there's no standard in 3D

1    NAND.   Each manufacturer (Samsung, Intel/Micron,

2    Sandisk/Toshiba) runs proprietary tech.]"

3                What did you understand that to mean?

4    A.   I understood that to mean there was potentially more

02:48PM  5    infringers on our technology.

6    Q.   And what about that language led you to say, "Let's

7    not put this in writing"?

8    A.   We had done something we were reluctant to do

9    over -- and in 20 years, we have never sued anyone, and

02:48PM  10    now we had outside counsel advising us that any such

11    discussions needed to be under attorney-client

12    privilege.   That's why I didn't want any more written

13    about it.

14    Q.   All right.   Now, you were asked questions about why

02:49PM  15    you didn't ask -- go to Samsung or travel to Korea and

16    ask them for a license, so I want to ask you about that.

17    Why didn't Acorn just ask Samsung if it wanted a

18    license?

19    A.   Because we had already gone to Korea in the telecom

02:49PM  20    space.

21    Q.   And what happened in that encounter with Samsung?

22    A.   It was a uncommunicative meeting and nonresponsive.

23    We found it very difficult.

24    Q.   Did you believe you'd have any more luck just asking

02:49PM  25    them this time?

A.    No.

Q.    All right.   Now, Samsung's lawyer just asked you again about the discussions with several other companies.   You remember that?

02:49PM A.    Yes, I do.

Q.    And just to be clear, did all those discussions that he referenced, did those all focus on just the technology at issue in this case?

A.    No.

02:50PM Q.    And, in fact, in each of those meetings, like the breakfast meeting you mentioned with TI, did Acorn make a strong effort to license the technology at issue in this case to all those companies?

A.    No, we did not.

02:50PM Q.    Why not?

A.    It was a small piece of our portfolio, and interest at that time was elsewhere on our various stressor technologies.

Q.    And, in fact, are you still pursuing discussions

02:50PM today with some companies --

A.    Yes.

Q.    -- on this technology?

A.    Yes, we are.

           MR. HUESTON:   Pass the witness, your Honor.

02:50PM            THE COURT:   Further examination, Mr. Fowler?

```
          1        MR. FOWLER:  Thank you, your Honor.  Very
          2   briefly.
          3        If we could bring back up DTX62-2.
          4             RECROSS-EXAMINATION
02:50PM   5   BY MR. FOWLER:
          6   Q.   Now, yes, that's the paragraph we were looking at.
          7        You see this thing called "DRAM opportunity"
          8   that you just gave some testimony on?
          9   A.   Yes, I do.
02:51PM  10   Q.   First of all, just to confirm, DRAM is not a
         11   technology that you are accusing of infringement, right?
         12   A.   Not today.
         13   Q.   Not today?  Not ever so far, right?
         14   A.   Not ever so far, correct.
02:51PM  15   Q.   Okay.  If there were a time to do it, it would be
         16   now, wouldn't it?
         17   A.   I don't know.
         18   Q.   Okay.  Now, you mentioned something about, "Well,
         19   you know, we were lawyered up and so we didn't want to
02:51PM  20   talk about anything."  You sued Samsung in late 2019,
         21   right?
         22   A.   Yes.
         23   Q.   Let's go to the first page of this document.  The
         24   first page.  This e-mail, though, is in 2017.  So that
02:51PM  25   was almost -- well, over two and a half years before you
```

1    sued Samsung, right?

2    A.   That's right.

3    Q.   Now, again, you mentioned other folks that you

4    thought might be potential infringers, but you haven't

02:52PM    5    told any of them that they might be infringing and you

6    haven't sued any of them, right?

7    A.   That's right.

8    Q.   And you also mentioned the visit to Samsung.  What

9    year was that?

02:52PM    10    A.   2013.

11    Q.   Okay.  And the folks that you met with, they weren't

12    associated at all with the semiconductor business,

13    right?

14    A.   No, they weren't.

02:52PM    15    Q.   Okay.  So you've never actually even tried to talk

16    to anyone in the semiconductor business -- is that

17    right -- at Samsung?

18    A.   That's right.

19             MR. FOWLER:  Thank you, your Honor.

02:52PM    20             No further questions.

21             THE COURT:  Redirect, further direct?

22             MR. HUESTON:  Very briefly.  Thank you, your

23    Honor.

24                      REDIRECT EXAMINATION

02:52PM    25    BY MR. HUESTON:

1    Q.   Mr. Horgan, just to be clear, in 2017, had you

2    retained outside counsel to investigate possible

3    infringement by Samsung?

4    A.   Yes, we had.

02:52PM    5    Q.   And so that was the time period here on the e-mail,

6    right?

7    A.   That's correct.

8    Q.   And that's before you eventually decided to move

9    forward with the lawsuit, right?

02:52PM   10    A.   That's correct.

11              MR. HUESTON:   No further questions, your Honor.

12              THE COURT:   All right.  Additional cross,

13    Mr. Fowler?

14              MR. FOWLER:   No, your Honor.

02:52PM   15              THE COURT:   All right.  You may step down,

16    Mr. Horgan.

17              THE WITNESS:   Thank you, your Honor.

18              THE COURT:   Plaintiff, call your next witness.

19              MR. DIXON:   Your Honor, Acorn will now play the

02:53PM   20    videotaped deposition of six witnesses.  The first will

21    be Samsung engineer Kin-Sang Lam, and this deposition

22    clip will take just under eight minutes, your Honor.

23              THE COURT:   I'd like you to announce each one

24    just before you play it.  Don't give me all of them in a

02:53PM   25    row.

1    MR. DIXON:  All right.  Thank you.  Your Honor,

2  as part of this deposition testimony, Acorn will be

3  introducing Exhibit PTX-874, which is a source code

4  exhibit; and, therefore, we would request that we seal

02:53PM  5  the courtroom.

6    THE COURT:  All right.  Based on Counsel's

7  request, I'll order the courtroom sealed at this time.

8  If you are present in the courtroom and not subject to

9  the protective order that's been entered in this case,

02:53PM  10  you should exit the courtroom and remain outside until

11  it's reopened and unsealed.

12    And, Mr. Dixon, this source code material is

13  only presented through this first deposition witness?

14    MR. DIXON:  That is correct, your Honor.  For

02:54PM  15  the next five deposition witnesses, we will not need to

16  seal the courtroom, so we may unseal as soon as this is

17  over in 7 minutes and 42 seconds.

18    THE COURT:  The courtroom is sealed.  Proceed

19  with this witness by deposition.

02:54PM  20    MR. DIXON:  And, your Honor, not to -- sorry to

21  interrupt.  But just to clarify, our Samsung witnesses

22  may remain?  They're not witnesses.  They're just

23  representatives.

24    THE COURT:  Is there objection?

02:54PM  25    MR. DIXON:  No objection.











16              (Proceedings now unsealed.)

17              THE COURT:  Now if you'll identify your next

18  witness by deposition, please, counsel.

19              MR. DIXON:  Thank you, your Honor.  Acorn would

20  like to call, by deposition, Acorn engineer

21  David Moreau.  This deposition clip will take 13

22  minutes, 25 seconds.

23              THE COURT:  Please proceed with this witness by

24  deposition.

25              MR. DIXON:  Thank you, your Honor.

DAVID MOREAU,

having been first duly sworn, testified via deposition

testimony as follows:

Q.   Can you please state your name and address for the

03:03PM   record.

A.   My name is David Moreau.

Q.   What is your title at S2?

A.   I'm a manager of one of the processing integration

team.  The name of that team is PI-TD, which stands for

03:03PM   "process integration-technology development."

Q.   Okay.  So to your knowledge, does Samsung monitor

the amount of oxide on the surface of an epitaxial

source or drain region on monitor wafers related to the

14-nanometer process?

03:03PM   A.   So the answer to that question would be "no."

Q.   Okay.  Does Samsung monitor the amount of oxide on

the surface of an epitaxial source/drain region on

production wafers related to the 14-nanometer process?

A.   So there are some ways of monitoring whether or not

03:04PM   there are some oxide left in the epitaxial fluorine

layer.

Q.   And what are some -- and what are those ways?

A.   One of the ways to measure the contact resistance.

Q.   In what way does measuring the contact resistance

03:05PM   let you know whether there's oxide left?

A.   So in our process flow here at Samsung with 14 -- 14
FinFET nanometer, there is no oxide at the interface
between the epitaxial and the contact.  If you had
some -- some -- some oxide, you will expect to see a
shift in the contact resistance measurement.

Q.   And when you say, "shift in the contact resistance
measurement," do you mean that if you had some oxide,
contact resistance measurement would go up?

A.   Yes.

Q.   How do you know?

A.   So that's part of the -- I mean, of -- the intent of
the process flow, if we have, again, oxide left,
silicide formation will be not done properly with the
process flow that Samsung has.

Q.   But you said that if there were oxide left, the
contact resistance measurement would go up.  What was
the basis for that statement?

A.   So if there is oxide left at the interface, we are
not going to be able to form a proper silicide, then
there will be very poor contact resistance between.  We
mentioned -- higher contact resistance.  That's what I
meant.

Q.   Okay.  So you're saying that if a proper silicide is
not formed, the contact resistance will go up; is that
right?

1   A.   That's correct.

2   Q.   How do you know that?

3   A.   The -- this is a common -- this is knowledge from

4   the contact team -- from the contact process that we

03:07PM   5   have that good silicide is mandatory.

6   Q.   So in what other ways does Samsung monitor where

7   there's -- that there's some oxide left in the epitaxial

8   layer?

9   A.   I assume your -- your -- and your question is

03:07PM   10   relating to the contact formation to the epitaxial

11   layer, correct?

12   Q.   Yes.

13   A.   So we have a -- we have a process flow -- we have a

14   process step where the process is to ensure there is no

03:08PM   15   oxide left on top of the epitaxial regions, and we -- we

16   monitor that particular process steps on NPW.

17   Q.   And what is the process step to ensure there's no

18   oxide left?

19   A.   So before -- at some point when the -- after the

03:08PM   20   contact have been etched, we are depositing titanium and

21   titanium nitride layers.  During that particular step,

22   there is a processing chamber where the purpose is to

23   remove oxide.

24   Q.   Okay.  And in what way do you monitor that process

03:09PM   25   step on NPW?

A.   So we monitor the particular silicon oxide etch rate where we monitor the amount of oxide removed.

Q.   Okay.  So does "NPW" mean nonproduction wafer?

A.   This is correct.

Q.   Okay.  So on a nonproduction wafer, you test how much oxide the SiConi step removes, and then you assume that that SiConi step removed that amount on production wafers; is that right?

A.   This is how the process step is -- the -- this is how the SiConi process is being -- being monitored, correct.

Q.   Okay.  Is there any way in which Samsung monitors or measures the -- whether or not there is actually oxide left in the contact layer to the epitaxial region?

A.   So we -- again, we have electrical measurement of contact resistance that is one way to detect if there are oxide -- which is your claim -- left on top of the epitaxial layer.

Q.   Okay.  And we discussed that one.  Are there any other ways in which Samsung monitors or measures whether or not there is oxide left in the contact layer to the epitaxial region?

A.   No.

Q.   Have you ever been involved in any analysis of whether there is oxide present in the contact layer to

|  | 1 | the epitaxial region in a completed wafer? |
|---|---|---|
|  | 2 | A.   Have I personally been -- personally been involved? |
|  | 3 | No. |
|  | 4 | Q.   Okay.  Are you aware of any analysis of whether |
| 03:11PM | 5 | there is oxide present in the contact layer to the |
|  | 6 | epitaxial region in a completed wafer? |
|  | 7 | A.   I know that we have a failure analysis laboratory |
|  | 8 | that is capable of those type of analysis. |
|  | 9 | Q.   Are you aware of whether any of those elemental |
| 03:12PM | 10 | composition analyses have shown oxide at the interface |
|  | 11 | layer? |
|  | 12 | A.   No, I am not aware that any oxide is being shown. |
|  | 13 | Q.   Did you prepare in any way to testify on that point? |
|  | 14 | A.   Yes. |
| 03:12PM | 15 | Q.   Okay.  So did you confirm that their elemental |
|  | 16 | composition analyses have not shown oxide, or do you |
|  | 17 | just not know? |
|  | 18 | A.   No, I have not confirmed with them. |
|  | 19 | Q.   Why not? |
| 03:13PM | 20 | A.   So our process flow is designed to not leave any |
|  | 21 | oxide at the interface.  Should we have oxide at the |
|  | 22 | interface, we would see that silicide formation contact |
|  | 23 | resistance and additional -- and potentially -- so |
|  | 24 | that's why I did not confirm anything with them because |
| 03:13PM | 25 | that's not the -- |

1   Q.   Well -- I'm sorry.  Go ahead.

2   A.   Because that is not the purpose of our 14-nanometer

3   contact scheme, to have any oxide layer there.

4   Q.   Do you understand that an allegation in this

03:13PM  5   litigation is that there is an oxide layer there?

6   A.   Yeah, I understand this is a -- correct.

7   Q.   Okay.  And I'm scrolling up to Topic 8, which

8   includes a discussion of any presence of oxygen there;

9   right?

03:14PM  10   A.   Yes, it's what is written on Item Number 8.

11   Q.   Okay.  And you prepared to testify on Topic 8 on

12   behalf of Samsung; right?

13   A.   Yes, I am.

14   Q.   And you believe that the failure lab has elemental

03:14PM  15   analyses of the contact layer that may show whether or

16   not there is an oxide there; right?

17   A.   Yes.

18   Q.   But you chose not to look at those analyses in

19   preparing for Topic 8; is that right?

03:15PM  20   A.   There is no -- I mean, again, there is no oxide --

21   the purpose -- and we went through this, the purpose of

22   how the silicide is being formed into the SiConi chamber

23   that we briefly discussed previously in your previous

24   question.  The purpose of a 14-nanometer FinFET process

03:15PM  25   flow silicide formation is to not have any oxygen left

1  before the titanium layer is deposed.

2  Q.   I understand that that's the purpose, but you chose

3  not to check in preparing for Topic 8; is that right?

4  A.   I didn't go check the FA record; this is correct.

03:16PM   5  Q.   Has Samsung made or does Samsung intend to make any

6  modifications or design-arounds to the 14-nanometer node

7  as a result of this lawsuit?

8  A.   No.

9        (End of video testimony of David Moreau.)

03:16PM   10        THE COURT:   Does that conclude this witness by

11  deposition?

12        MR. DIXON:   It does, your Honor.

13        THE COURT:   Call your next witness.

14        MR. DIXON:   Thank you, your Honor.   Acorn would

03:16PM   15  like to call, by deposition, Samsung engineer Moon-Young

16  Jeong.   This deposition clip will take 3 minutes and 35

17  seconds.

18        THE COURT:   Please proceed.

19                MOON-YOUNG JEONG,

03:16PM   20  having been first duly sworn, testified via deposition

21  testimony as follows:

22  Q.   Can you please state your name for the record?

23  A.   Moon-Young Jeong.

24  Q.   What is your position at Samsung?

03:17PM   25  A.   Principal engineer.

1  Q.   Have you ever worked with logic devices while at

2  Samsung?

3  A.   No.

4  Q.   Have you had any involvement with attempts to lower

03:17PM   5  contact resistance?

6  A.   I have not participated in the development of the

7  process.

8  Q.   It says here on the Exhibit 1 that you were a

9  visiting scholar at Stanford University from 2012 to

03:17PM   10  2013.  Do you see that?

11  A.   Yes, I see it.

12  Q.   What is the role of a visiting scholar?

13  A.   I think the main reason is to figure out certain

14  trends or trajectory of research.

03:18PM   15  Q.   Did you work with Professor Saraswat while at

16  Stanford?

17  A.   Yes.  I went to Professor Saraswat's lab.

18  Q.   What were you doing at Professor Saraswat's lab?

19  A.   So I observed what was going on in that lab and

03:18PM   20  trying to figure out if there is anything that I could

21  be -- that I could find anything of use that I could

22  apply to DRAM.  I was trying to figure that out.

23  Q.   And did you have any interactions with

24  metal-semiconductor contacts while a visiting scholar?

03:19PM   25  A.   No, I did not.

1   Q.   Did you live in California while you were a visiting

2   scholar?

3   A.   Yes.

4   Q.   Have you ever heard of Daniel Grupp?

03:19PM   5   A.   No.

6   Q.   Have you ever heard of Daniel Connelly?

7   A.   I'm not sure.  I don't know.

8   Q.   Have you ever read any papers by Daniel Connelly?

9   A.   I'm not sure.

03:19PM   10   Q.   What about any patents by Daniel Connelly?

11   A.   I'm not sure.

12   Q.   Have you read an article called "Fermi-Level

13   Depinning For Low-Barrier Schottky Source/Drain

14   Transistors"?

03:19PM   15   A.   I don't know if it's the same titled article or not,

16   but I've read a similar top- -- similar article that

17   deals with that topic.

18   Q.   Do you recall when you first read this article which

19   is similar?

03:20PM   20   A.   I'm not sure when the first time was exactly.

21   Q.   Would it have been when you were a visiting scholar

22   at Stanford?

23   A.   I think that could be possible.

24        (End of video testimony of Moon-Young Jeong)

03:20PM   25        THE COURT:  Does that complete this witness by

1    deposition?

2         MR. DIXON:  It does, your Honor.

3         THE COURT:  All right.  Before we proceed with

4    the next witness by deposition, we're going to take a

03:20PM   5    short recess.

6         Ladies and gentlemen, it's been roughly two

7    hours since you were back from lunch.  We'll try to keep

8    this relatively short.  If you would just simply leave

9    your notebooks closed in your chairs, follow all my

03:20PM  10    instructions, including not to discuss the case with

11    each other, and we'll be back shortly to continue.  Use

12    this opportunity to stretch your legs and get a drink of

13    water.

14         The jury's excused for recess.

03:21PM  15         (Whereupon, the jurors exit the courtroom.)

16         THE COURT:  The Court stands in recess.

17         (Recess from 3:21 p.m. to 3:42 p.m.)

18         MR. DIXON:  Your Honor, may I raise one point

19    of procedural issue?

03:42PM  20         THE COURT:  What's that, Mr. Dixon?

21         MR. DIXON:  Your Honor, we have 50 minutes left

22    of deposition testimony.  That will take us to 4:30.  I

23    wanted to renew my request that after that, we rest for

24    the day so that Dr. Piner can be our first witness and

03:42PM  25    Mr. Dell could testify after him.  We will still get

through both tomorrow, which means that Acorn will

complete its presentation of evidence tomorrow, subject

to one agreement between Acorn and Samsung, that one

witness who was not available to be called on our

03:43PM   direct, we could go beyond the scope of his direct when

Samsung calls him in their case-in-chief.

THE COURT:  4:30 is awful early in the day to

recess.  My understanding was you were prepared to go

forward with Dell today with the idea that Piner will be

03:43PM   available and return from his child's graduation for

tomorrow.

I certainly don't intend to go further than

Dell, but I'm not sure I can be comfortable resting for

the day before Dell testifies.

03:43PM   MR. DIXON:  Thank you, your Honor.

THE COURT:  All right.  Let's bring in the

jury.

(Whereupon, the jurors enter the courtroom.)

THE COURT:  Please be seated.

03:44PM   Plaintiff, call your next witness.

MR. DIXON:  Thank you, your Honor.  Acorn would

like to call, by deposition, Samsung engineer

Kyung-Eun Byun.  This deposition will take 7 minutes and

42 seconds.

03:44PM   THE COURT:  Proceed with this witness by

                 1    deposition.

                 2          MR. DIXON:   Thank you, your Honor.

                 3                     KYUNG-EUN BYUN,

                 4    having been first duly sworn, testified via deposition

03:44PM          5    testimony as follows:

                 6    Q.   Ms. Byun, can you please state your name for the

                 7    record.

                 8    A.   Kyung-Eun Byun.

                 9    Q.   What was your first position at Samsung?

03:44PM         10    A.   I was the expert engineer or special engineer,

                11    either of the two.

                12    Q.   And in which department were you working?

                13    A.   Initially, I worked at the graphene center.

                14    Q.   At any point in your career, have you worked with

03:45PM         15    Samsung's 14-nanometer FinFET process?

                16    A.   No.

                17    Q.   Before the break, we were talking about your

                18    research when you first started at Samsung.  Did that

                19    research result in a publication of the Nano Letters?

03:45PM         20    A.   Yes.

                21    Q.   And can we please introduce Exhibit 2, Tab 7.  Have

                22    you seen this document before?

                23    A.   Yes.

                24    Q.   Is this the Nano Letters article that we've

03:45PM         25    discussed today?

A.    Yes.

Q.    Was there a previous research that suggested that a graphene interface layer would reduce contact resistance?

03:46PM    A.    To my understanding before this paper, there was no -- no such thing.

Q.    So on the right side of the first page, about nine lines down, do you see a sentence that starts with, "To solve these problems," after Footnote 11?

03:46PM    A.    Give me a second.  Yes.

Q.    Did you write this sentence?

A.    Yes.

Q.    How are you aware of the fact that other groups had used thin oxide or nitride films to reduce the

03:46PM    Fermi-level pinning effect?

A.    From the textbook that I mentioned earlier.

Q.    And that was the SZE textbook?

A.    Yes.

Q.    And then there are three footnotes at the end of

03:47PM    this sentence.  Do you see that?

A.    You're talking about 17-19, right?

Q.    Yes.

A.    Yes, I see it.

Q.    Did you make the decision to add Footnote 17, 18,

03:47PM    and 19?

1    A.    Yes.

2    Q.    Did anyone else on the team have any input regarding

3    those three citations?

4    A.    No.  I did it.

03:47PM  5    Q.    How did you decide which papers to cite here?

6    A.    I picked one of the results of the Google search --

7    searches.

8    Q.    Before writing this paper, did you know that other

9    groups were researching thin oxide or nitride films to

03:48PM  10    reduce the Schottky barrier?

11    A.    Yes.

12    Q.    Do you know if any of those groups researching thin

13    oxide or nitride films have patents for their work?

14    A.    No.

03:48PM  15    Q.    Do you know if any group has a patent on a thin

16    dielectric interface layer between a metal and

17    semiconductor?

18    A.    No.

19    Q.    Would it surprise you if a group had such a patent?

03:48PM  20    A.    Well, I was only aware or read it -- read about the

21    MIS structure in the textbook, so I thought there could

22    be patent or maybe there is no patent.  That's the

23    extent of my thinking.

24    Q.    When did you first become aware of this -- of this

03:49PM  25    Connelly paper, Exhibit 4?

A.    I don't recall the exact time.

Q.    How long prior to the publication of your 2013 article was this?

A.    Like I said earlier, I think that would have been between July or August of 2011 until the paper was published.

Q.    When you are doing your research, other than when you, yourself, apply for a patent, do you ever look at patents filed by other teams?

A.    No, not based on my recollection.

Q.    What is the investigation team?

A.    So the investigation team is an agency that searches if there are any documents that were done previously on that patent.

Q.    Outside of the process of applying for your own patent, have you ever contacted the investigation team to look for patents?

A.    No.

Q.    Does Samsung measure the Schottky barrier height of its processes?

A.    When you say "Samsung's processes," what are you referring to?

Q.    Such as a 14-nanometer logic transistor.

A.    I don't know what they do with the products that are mass produced.

1    Q.    Have you worked on any mass-produced products?

2    A.    No.

3    Q.    Have you worked on any products which, when you

4    worked on them, they were new, but they later became

03:51PM    5    mass produced?

6    A.    No.

7    Q.    Did you share the work with anyone who was working

8    on the FinFET logic process?

9    A.    No.  There is no one that I know in that area or in

03:52PM   10    that side.

11    Q.    Did you share your 2013 paper with others at that

12    time?  Let me specify.  I meant in 2013.

13    A.    No.  I don't think so, not at that time.

14          (End of video testimony of Kyung-Eun Byun.)

03:52PM   15          THE COURT:  Does that complete this deposition

16    by witness by deposition?

17          MR. DIXON:  It does, your Honor.

18          THE COURT:  Call your next witness.

19          MR. DIXON:  Acorn calls Samsung engineer

03:52PM   20    Joon-Il Lee by deposition.  This deposition video will

21    last 18 minutes and 41 seconds, your Honor.

22          THE COURT:  Proceed with this witness by

23    deposition.

24          MR. DIXON:  Thank you.

25          ///

<pre>
                              JOON-IL LEE,

        having been first duly sworn, testified via deposition

        testimony as follows:

        Q.   Hello, Mr. Lee.  Could you please state and spell

03:52PM your name for the record.

        A.   My name is Joon-Il Lee.  Spelling is L-e-e.  That's

        the last name, J-o-o-n I-l.

        Q.   Who is your current employer?

        A.   Samsung Electronics.

03:53PM Q.   What department do you work in at

        Samsung Electronics?

        A.   I'm working at the department that is in charge of

        the patent-related work.

        Q.   Is there a name for that department within

03:53PM Samsung Electronics?

        A.   At the present time, it's called IP team DS.

        Q.   What are the responsibilities of the IP team DS?

        A.   We are doing the work for patent applications,

        filing patent applications, and also licensing patents.

03:54PM Q.   What are your job responsibilities today in the IP

        team DS?

        A.   I'm in charge of licensing work.

        Q.   Does Samsung have a written policy against entering

        into running royalties for patent license agreements?

03:54PM A.   No.  There is no such kind of policy.
</pre>

Q.   Does Samsung have a written policy outlining its approach to exploring patent license agreements?

A.   There is no such kind of policy.

Q.   And Samsung has entered into patent license agreements involving running royalties; correct?

A.   Probably there would be agreements that has the form of running royalty.

Q.   Not just probably; right?  Samsung entered into a patent license agreement with Tessera that involved a running royalty; correct?

A.   So in case of Tessera, as I mentioned earlier, such content was included as part of the other side's request or demand, but the payment was done in lump-sum form.

        THE INTERPRETER:  Let me just verify the last.

A.   So the actual payment was based out of lump-sum payment.

Q.   What makes a running royalty more appealing to Samsung Electronics in those circumstances?

A.   So it's not as simple or clear-cut when it comes to running royalty versus lump sum because it is not just a matter of simply thinking about running rate -- royalty rate, I mean, but you have to look at overall patent agreement, how that's basically agreed upon.

        For example, when it comes to semiconductor, these agreements tend to include lump sum as well as

1    permanent license.  Those are included as well because

2    when it comes to running royalty, there is a possibility

3    that down the road, some of the patents that needs to be

4    part of these licensing agreement, that those could

03:58PM    5    increase in terms of number.  So that's why, in such

6    cases, sometimes lump-sum payment is preferred.

7    Q.    Mr. Lee, can you see Exhibit 3 on your screen?

8    A.    Yes, I do.

9    Q.    Exhibit 3 is a copy of a nonexclusive license

03:58PM    10    agreement and release between Samsung Electronics

11    Company and the board of trustees of the University of

12    Illinois; correct?

13    A.    It is correct that this was an agreement with the

14    University of Illinois.

03:59PM    15    Q.    Were you personally involved in the negotiation of

16    this agreement?

17    A.    No.

18    Q.    Whom did you speak to at Samsung to prepare to

19    testify on behalf of Samsung today regarding Exhibit 3?

03:59PM    20    A.    I spoke with an individual named Chung Il Lee, who

21    was involved with this agreement.

22    Q.    Did the University of Illinois insist that Samsung

23    needed to take a license to its patents?

24    A.    Yes.  What I heard is that University of Illinois

04:00PM    25    said that Samsung must get the license for the patents.

1  Q.   Did Samsung dispute whether it needed to take a

2  license to the University of Illinois's patent?

3  A.   Well, I think this applies to -- in all other cases,

4  probably, but I believe, basically, they had a dispute.

04:00PM  5  Q.   Was that dispute over whether Samsung needed a

6  license to the University of Illinois's patents?

7  A.   That is correct.  While there was a dispute over

8  whether the University of Illinois's patents are worth

9  licensing.

04:01PM  10  Q.   At the time the University of Illinois approached

11  Samsung about taking a license, did Samsung practice any

12  of the University of Illinois's patents?

13  A.   Whether that was actually practiced or not, but in

14  order to answer the question, you have to compare the

04:01PM  15  product against the claims of a patent.  So I do not

16  know.

17  Q.   Mr. Lee, if you will turn on Page 8 of 9 of the

18  agreement and release of Exhibit 3.

19  A.   Eighth page, yes.

04:02PM  20  Q.   So Page 9 of the actual agreement and release, so

21  one more page down.  Oh, 8.  There we go.  And do you

22  see a reference there to five U.S. patents?

23  A.   Yes.

24  Q.   Was it Samsung's position that these patents were

04:02PM  25  invalid?

1   A.   To my understanding, there were a lot of disputes in

2   the process of negotiation of the validity of the

3   patents.

4   Q.   How did Samsung determine the appropriate royalty

04:02PM   5   for this agreement and release with the University of

6   Illinois?

7   A.   Well, since there are many factors that are

8   considered in the negotiation, so I don't know exactly

9   what factors contributed to the final amount that

04:03PM   10   resulted in this agreement.

11   Q.   Do you know if Samsung shared any information with

12   the University of Illinois about sales of products

13   potentially practicing the patents in connection with

14   the determination of the royalty agreement?

04:03PM   15   A.   I do not know.

16   Q.   Mr. Lee, can you see Exhibit 4 on your screen?

17   A.   Yes, I see it.

18   Q.   Mr. Lee, is Exhibit 4 a settlement and patent

19   license agreement between Katana Silicon Technologies,

04:04PM   20   LLC, and Longhorn IP, LLC, and Samsung Electronics?

21   A.   Yes, it is the patent agreement with Katana,

22   correct.

23   Q.   Can I refer to "Katana Silicon Technologies" as KST?

24   A.   Yeah.  Sure.

04:04PM   25   Q.   This settlement agreement resolved litigation

1  between KST and Samsung, correct?

2  A.   To my knowledge there was litigation that began

3  towards the end of negotiation, but that was resolved

4  immediately.

04:05PM 5  Q.   And you don't know one way or the other whether

6  Samsung believed that any of its products practiced the

7  patents covered by the patents licensed under this

8  settlement agreement, correct?

9  A.   My point is that under a license agreement, Samsung

04:06PM 10  will have it, the right to practice the patented

11  technology; however, the license agreement is concluded

12  between Samsung and the other party to the agreement in

13  order to resolve a dispute over whether Samsung

14  practiced the patent as claimed in the patent.  So I'm

04:06PM 15  not saying whether Samsung did or did not practice the

16  patent.

17  Q.   Do you know whether Samsung practiced the licensed

18  patents under Exhibit 4 prior to the execution of the

19  settlement agreement?

04:06PM 20  A.   KST claimed that Samsung Electronics Company was

21  using Katana's patent.

22  Q.   And what did Samsung claim?

23  A.   To my knowledge, in the process of negotiation,

24  Samsung claimed the invalidity of the --

04:07PM 25            THE INTERPRETER:  Invalidity and

1   noninfringement.

2   Q.   And how did Samsung determine the appropriate

3   royalty under this settlement and patent license

4   agreement with KST?

04:08PM  5   A.   I don't know how they calculated the specific amount

6   or how they came up with that amount, but I believe they

7   had a discussion about the validity and relevance of the

8   patent while they were negotiating.

9   Q.   Do you know if Samsung shared any revenue

04:08PM  10  information with KST in connection with determining the

11  appropriate royalty?

12  A.   Typically such information is not shared.

13  Q.   And you don't know one way or the other whether it

14  was shared with KST; correct?

04:09PM  15  A.   I did not ask with regard to that information.

16  Q.   Do you know what information, if any, was shared

17  with KST in connection with determining the appropriate

18  royalty under this agreement?

19  A.   I don't know.

04:09PM  20  Q.   Why doesn't Samsung provide revenue information

21  during the negotiation process?

22  A.   Well, typically, based on my experience during the

23  negotiation stage, that almost never happens using the

24  revenue information provision.

04:09PM  25  Q.   Why not?

A.   Well, basically the other party can figure out the semiconductor sales figure based on the outside sources, but the -- as far as the detailed revenue information, it almost never happens during the negotiation stage that it is shared.

Q.   Did Samsung have any understanding of whether a small amount of products would be covered under the University of Illinois and Samsung agreement?

A.   What I heard from Mr. Chung Il Lee was that, even at that time, there were some relevant products to some degree and amount, and there was expectation that ongoing, from that point on, there would be a lot more relevant products.

Q.   Did Samsung have any understanding of how many products would be covered under the Katana-Samsung agreement?

A.   To my understanding, those were products related to the 14-nanometer.

         (End of video testimony of Joon-Il Lee.)

         THE COURT:  Does that complete this witness by deposition?

         MR. DIXON:  It does, your Honor.

         THE COURT:  Call your next witness.

         MR. DIXON:  Thank you, your Honor.  The last witness we'll call, by deposition, today is Samsung

1  engineer Min-Hyun Lee.  This deposition will last 24

2  minutes and 45 seconds, your Honor.

3        THE COURT:  Proceed with this witness by

4  deposition.

04:12PM  5        MR. DIXON:  Thank you, your Honor.

6            MIN-HYUN LEE,

7  having been first duly sworn, testified via deposition

8  testimony as follows:

9  Q.   Please state your name for the record.

04:12PM  10  A.   My name is Min-Hyun Lee.

11  Q.   When you started at Samsung in 2013, what was your

12  first job title?

13  A.   Researcher.  So in English my job title was

14  researcher, and in Korean it is expert engineer.

04:12PM  15  Q.   At any point while at Samsung, have you worked with

16  Samsung's 14-nanometer FinFET process?

17  A.   No, I have not.

18  Q.   Mr. Lee, when did you first become aware of the 2006

19  Connelly paper?

04:12PM  20  A.   My recollection is it was around the beginning of

21  2017.

22  Q.   And how did you become aware of the 2006 Connelly

23  paper?

24  A.   My recollection is it was through Google search of

04:13PM  25  "metal-insulator-semiconductor contact."

1  Q.   So who from the team was first made aware of the

2  Connelly paper?

3  A.   So what I found out through the meetings that I had,

4  the first person was Kyung-Eun Byun.

04:14PM  5       THE INTERPRETER:  Can the interpreter just make

6  clear one title of Ms. Byun?

7       Oh, okay.  So the title is better referenced as

8  Dr. Byun.

9  Q.   How did Dr. Byun first become aware of the Connelly

04:14PM  10  paper in 2013?

11  A.   When you say "how," are you asking about a

12  methodology?

13  Q.   Yes.

14  A.   Did I hear "yes"?

04:14PM  15  Q.   Yes.

16  A.   I heard that she was Googling a search in order to

17  write a journal article or journal paper.

18  Q.   Do you recall ever seeing a patent by Daniel Grupp

19  and Daniel Connelly?

04:15PM  20  A.   I am not certain.

21  Q.   Do you recall --

22  A.   As to -- as to my being uncertain, to explain that,

23  the reason I cannot be certain to give the actual names

24  of the patent person is because when we receive an

04:16PM  25  evaluation for the novelty of our patents, the external

1    institution evaluates our patent content, and they give

2    notice to us whether there is such novelty or not in

3    comparison to other patents, other certain patents.  But

4    those other certain patents are only represented by the

04:16PM    5    application number, registration number, title, and

6    contents only.  So I don't necessarily remember the

7    names of the person who made the patents at that time.

8             Additionally, my recollection is that they

9    send a PDF file along with organized patents of each

04:17PM   10    patent file; but since they are organized already, I

11    don't necessarily read those -- each patent's files.

12    Q.   Do you recall ever reading a patent regarding using

13    an interface layer to depin the Fermi level of a

14    semiconductor-metal junction?

04:18PM   15    A.   I think you're asking two separate questions in one

16    question.  I think depinning is one question, Fermi

17    level, and there's another question for the other one.

18    I think I read --

19             THE INTERPRETER:  The interface layer.

04:18PM   20             THE INTERPRETER:  Interface layer.

21    A.   I think I read on the interface layer one.

22    Q.   And what do you recall reading on the interface

23    layer?

24    A.   I only recall the main request items, or main items.

04:19PM   25             THE INTERPRETER:  Main claims.

1          THE INTERPRETER:  Main claims.  Sorry.  Thank

2     you.

3     A.   Main claims items -- main claimed items when

4     comparing the patents, and that is the metal -- between

04:19PM   5     the metal and silicon, there's a layer which is very

6     thin.  And when I say "thin," it's a

7     couple-nanometer-thick layer.  That was the main claimed

8     item.  That's what I recall.

9          THE INTERPRETER:  And the layer is dielectric

04:20PM  10     layer.

11          MS. HARRIS:  Okay.

12          THE INTERPRETER:  Dielectric layer.

13          THE INTERPRETER:  Dielectric layer.

14          THE COURT REPORTER:  I'm sorry.  Say that last

04:20PM  15     part again, please.

16          THE INTERPRETER:  Dielectric layer.

17          THE INTERPRETER:  Di -- dielectric.

18     Dielectric.

19     Q.   Do you recall whether that patent described what

04:20PM  20     material the interface layer was, for example, an oxide

21     or a nitride?

22     A.   I don't have a --

23          THE INTERPRETER:  Oh, go ahead.

24     A.   I'm not certain whether I saw it in the patent or

04:20PM  25     through the patent itself.  I may have seen it through

1  the papers or Google search.  I'm not certain.

2  Q.  Do you have any recollection as to the material?

3  A.  Are you talking about the patent, or are you talking

4  about the papers I saw?

04:21PM  5  Q.  The patent.

6  A.  No, I do not recall clearly about the patent

7  material.

8  Q.  What about in the papers?

9  A.  What I can recall, off the top of my head right now

04:21PM  10  for the materials is silicon oxide, silicon nitride,

11  titanium oxide, and zinc.  Zinc --

12          THE INTERPRETER:  Oxide.

13          THE INTERPRETER:  Oxide.  Thank you.

14  Q.  Did the paper and the patent have the same authors?

04:22PM  15  A.  I think it's hard for me to answer that question

16  because I do not recall the author of the patents.

17  Q.  Do you recall the author of the paper?

18  A.  As for paper authors, I do recall the authors that I

19  used in my paper:  Connelly, Philip Wong, and Saraswat.

04:23PM  20  I don't remember the first name of Saraswat.

21  Q.  Do you recall what year this was when you came

22  across that patent?

23  A.  Well, I must have received the reviewing materials

24  to verify for submission of that paper.  So I think that

04:23PM  25  would have been 2016 or 2017.

Q.    You mentioned three authors.  You mentioned
Connelly, Philip, and Saraswat.  Did those refer to one
paper or to three separate papers?
A.    Three separate papers.
Q.    Is it Samsung's policy to respect the intellectual
property rights of others?
A.    I believe so.
Q.    Samsung takes that seriously, I assume; correct?
A.    I don't think this is a scope that I can answer
because I'm just a researcher, and I'm not involved in
exercising the property -- I mean, exercising the patent
rights or such.
Q.    In your job as a researcher, do you take any steps
to ensure that the research you are doing does not
infringe on other companies' patents?
A.    So in my job as a researcher, I'm not hindered or
restricted by such things, but it is only when I apply
for a patent that I have to conform or verify in that
matter that -- yeah, that I do that.
Q.    Can you please put up Tab 3 and introduce that as
Exhibit 4.  Have you seen this document before?
A.    Let me verify, if you may.
Q.    Please.
A.    Yes.  I have verified it.
Q.    What is this document?

1  A.    I remember this as the article that I submitted in

2  the -- in 2017 to the peer review called RTGR.

3  Q.    If you scroll to the bottom of the page, do you see

4  that there are four references listed?

04:26PM   5  A.    Yes.  I'm looking at it.

6  Q.    Were you the one that added these four references to

7  this abstract?

8  A.    That is correct.

9  Q.    Do you see at Number 4, there's a reference to a

04:26PM   10  paper by Connelly?

11  A.    Yes, I do see it.

12  Q.    When you cited the Connelly paper in this abstract,

13  did you believe that the Connelly paper was an important

14  paper in this field of metal-semiconductor interfaces?

04:27PM   15  A.    The answer is no, and I did not choose based upon

16  importance of the paper, but when I researched or made a

17  search, the result of the search among the searches were

18  that this was the most easily chosen one.

19  Q.    Did you understand when you cited the Connelly paper

04:28PM   20  in the abstract that the Connelly paper was the first to

21  teach a thin interface layer?

22  A.    To my understanding, that is not the case.  Way

23  before this abstract, when I took graduate course,

24  master's class -- master's degree class, I learned that

04:29PM   25  when you lower the insulator, the contact electric

1   current improves.

2            THE INTERPRETER:  When you insert the

3   insulator.

4            THE INTERPRETER:  When you insert the

04:29PM   5   insulator.  I'm sorry.  Yeah.

6   A.   I picked this Connelly paper in the abstract I

7   submitted because I don't know -- I don't know in which

8   ranking, or first, second, or third, when in the showing

9   up in the list in the search it came up, but it was one

04:29PM   10   of the fastest search results when I did the search.  So

11   it was easily searchable.  That is why I picked it.

12   Q.   Did you write the sentence that, "The interface

13   insulator is working as a tunnel barrier and depinning

14   materials," and then try to find a footnote that

04:30PM   15   supported the sentence, or did you find the Connelly

16   paper first and then write a sentence to go into the

17   abstract, after first finding the paper?

18   A.   It was the former method.  I wrote the sentence for

19   abstract first and looked for the material as evidence.

04:30PM   20   And that's what I do when I write an abstract, in

21   general.

22   Q.   What was the basis for your understanding that an

23   interface insulator is working as a tunnel barrier and

24   depinning material?

04:31PM   25   A.   So basis is two things.  The same way I mentioned

1  earlier, number one is from my past study in my

2  college -- no, in my graduate school that I learned

3  about it.  And other than that, second is even though I

4  did not do the additional thesis or article search, but

04:31PM  5  it was a result from my general search and my knowledge

6  from those searches in the past.

7  Q.  Okay.  So can you please introduce Tab 4 as Exhibit

8  6?

9  A.  Yes.

04:32PM  10  Q.  Did you write this paper?

11  A.  Let me briefly review this and confirm.

12       Yes.  This is the correct paper that I

13  submitted at the Nano Letter publication.

14  Q.  Is there a reason that the 2018 paper does not cite

04:32PM  15  the Connelly paper?

16  A.  For me, I only have the reason to use certain

17  reference.  I don't have reasons not to use citing of

18  the reference -- or certain references.

19       MR. VINSON:  Could you please bring up Exhibit

04:33PM  20  3 again, and could you please scroll down to the last

21  page to Footnote 17.

22  Q.  Does Footnote 17 of this paper reference the 2006

23  Connelly paper?

24  A.  That is correct.

04:33PM  25       MR. VINSON:  Can you scroll back to the top

1  where the list of authors is written.

2  Q.   And what team does Hwang Sung Woo work on?

3  A.   He is the director of SAIT site.

4  Q.   Which group does Kim Kinam work with?

04:33PM  5  A.   He is the vice president of the whole

6  Samsung Electronics Company itself.

7  Q.   Do you know if Mr. Kim is aware of the Connelly

8  paper?

9  A.   That, I do not know.

04:34PM 10  Q.   Is it custom and practice for the person who did the

11  writing to be the first author?

12  A.   Yes.  That is, in general, common.

13  Q.   Is it custom and practice for the last author to be

14  an advisor or a manager?

04:34PM 15  A.   No.  Just because you're manager, you are not put in

16  as a last author, no.

17  Q.   I would like to introduce Tab 5 as Exhibit 8.

18           Have you seen this document before?

19  A.   Let me verify the document, if I may.

04:34PM 20  Q.   Yes.

21  A.   Yes, I verified the document.  I reviewed it.  Yes,

22  I am familiar with this paper because this was written

23  by Seung-Geol Nam, Dr. Nam, who had written on other

24  type of 2D material and contact while I was writing a

04:36PM 25  paper on graphene and hBN in 2017.

1  Q.   Do you see that this article at Footnote 11 cites

2  the Connelly paper?

3  A.   Yes, I see it.

4  Q.   Do you know whose decision it was to cite the

04:36PM  5  Connelly article in this paper in 2D Materials?

6  A.   This paper was written by Seung-Geol Nam himself,

7  and it was his decision to cite that reference, and

8  nobody had objected to that decision.  So I believe

9  Mr. Nam chose to make that decision.  That is my

04:36PM  10  understanding.

11     (End of video deposition testimony of Min-Hyun Lee.)

12           THE COURT:  Does that complete this witness by

13  deposition?

14           MR. DIXON:  It does, your Honor.

04:37PM  15           THE COURT:  All right.  Are you prepared to

16  call your next witness?

17           MR. DIXON:  We are, your Honor.  Acorn calls

18  Stephen Dell.

19           THE COURT:  All right.  Mr. Dell, if you'll

04:37PM  20  come forward and be sworn, please.

21           (Whereupon, the witness was duly sworn.)

22           THE COURT:  If you'll come around, Mr. Dell,

23  have a seat on the witness stand.

24           Let's distribute the witness binders, please.

04:38PM  25  If you'll approach, please.  Bring one to me and hand

1    one to the court security officer.

2           All right.  Mr. Dixon, you may proceed with

3    direct examination.

4           MR. DIXON:  Thank you, your Honor.

04:38PM    5                    STEPHEN DELL,

6    having been first duly sworn, testified as follows:

7                    DIRECT EXAMINATION

8    BY DIXON:

9    Q.   Sir, would you please introduce yourself to the

04:38PM   10   ladies and gentlemen of the jury.

11   A.   My name is Stephen Dell.

12   Q.   Mr. Dell, were you asked to determine the amount of

13   damages that Samsung owes Acorn for Samsung's use of

14   Acorn's patented technology?

04:38PM   15   A.   Yes, sir, I was.

16   Q.   And were you able to determine that amount of

17   damages?

18   A.   Yes, I was.

19   Q.   And what is that amount?

04:39PM   20   A.   My calculation of damages in this matter owed to

21   Acorn as a result of Samsung's infringement of the

22   asserted patents is $326.2 million.

23   Q.   And are you prepared to explain today how you

24   determined that $326.2 million?

04:39PM   25   A.   Yes, sir.

1   Q.   Well, before we get to that, maybe you could tell us

2   a little bit about yourself.  Where do you live?

3   A.   Sure.  I was born and raised in Houston, Texas.  I

4   currently live just -- in suburb just north of Houston

04:39PM   5   called The Woodlands.

6   Q.   Do you have a family?

7   A.   I do.  Married going on 20 years this year.  I have

8   two boys, 13- and 14-year-old.

9   Q.   Mr. Dell, what do you do for a living?

04:39PM   10   A.   So I'm the founder and president of NOVUM Consulting

11   Group.  It's a firm, as -- that I founded.  We provide

12   financial consulting and valuation services to both

13   publicly held companies, as well as privately held

14   companies, such as those like Acorn.

04:40PM   15   Q.   And did you prepare some slides to assist you in

16   rendering your opinions today?

17   A.   Yes, sir, I did.

18        MR. DIXON:  Please publish those.

19   Q.   Mr. Dell, would you briefly, please, briefly explain

04:40PM   20   your education.

21   A.   Yes.  Although I was introduced as a professor, I

22   actually am not a professor.  I have an economics degree

23   from the University of Texas at Austin with a minor in

24   business administration.

04:40PM   25   Q.   Do you have any professional certifications?

1    A.    I do.  I am a Certified Valuation Analyst.

2    Q.    Mr. Dell, can you please explain, what is a

3    Certified Valuation Analyst?

4    A.    So a Certified Valuation Analyst, or CVA as short --

04:40PM    5    for short, is similar to a Certified Public Accountant,

6    or CPA, in that a CPA has a credential which allows them

7    to prepare your taxes or attest to the accuracy of your

8    taxes.

9         A CVA has a similar certification which allows

04:40PM    10    me to provide certified opinions of value in both

11    litigation matters, as well as other business disputes,

12    or even in mergers and acquisitions transactions, things

13    such as that.

14    Q.    Mr. Dell, how long have you worked in the area of

04:41PM    15    patent valuation and licensing?

16    A.    Twenty years.

17    Q.    And have you received any recognition or awards for

18    your work in that area?

19    A.    Yes, I have.  I have been recognized by Intellectual

04:41PM    20    Asset Management, which is an industry group which looks

21    at the field in the intellectual property space, and I

22    have been recognized as one of the top patent damages

23    and valuation experts in the world.

24    Q.    Have you published any papers or any articles on

04:41PM    25    patent licensing?

A.   Yes, I have.  I've published articles, as well as chapters that have been published in books.  I have also presented on the issue of patent damages, including to the University of Texas Patent Law Institute.

04:41PM

Q.   Have you previously testified in courts in the United States on patent damages and valuation -- patent valuation?

A.   Yes, sir, I have.

Q.   About how many times?

04:42PM

A.   Well, as I mentioned, I've been doing this work for 20 years.  I've testified in court probably over 11 years ago for the first time and have done it on several occasions, five times to be exact.

Q.   Is all the work that you do, Mr. Dell, related to litigation and testifying?

04:42PM

A.   No, it is not.  I actually do quite a bit of work outside of the litigation world.  As I mentioned, my firm, as well as I, do business advisory work.  So we assist clients or companies seeking to license

04:42PM

technology, both license out, as well as license in for companies that are seeking to license in other technology.

Q.   Have you personally, Mr. Dell, been involved in the negotiation of patent licenses?

04:42PM

A.   Yes, I have, on several occasions.

1  Q.   Are you being compensated for your time in this

2  case?

3  A.   Yes, I am.  I am being compensated at my standard

4  hourly rate of $495 per hour.

04:42PM  5  Q.   And is that the same rate you charge for litigation

6  work and non-litigation work?

7  A.   Yes, it is.

8  Q.   Is your payment in this case in any way dependent

9  upon the outcome or what the jury may decide in this

04:43PM  10  case?

11  A.   No, sir, it is not.

12       MR. DIXON:  Your Honor, at this time, we would

13  tender Mr. Dell as an expert in the field of patent

14  valuation and damages.

04:43PM  15       THE COURT:  Is there objection?

16       MR. CORDELL:  No objection, your Honor.

17       THE COURT:  Without objection, the Court will

18  recognize as an expert in those designated fields.

19  Please continue.

04:43PM  20       MR. DIXON:  Thanks, your Honor.

21  Q.   Let's turn to what you did and how you did it.  What

22  you did do in this case, Mr. Dell?

23  A.   Well, I was retained, as I mentioned, to calculate

24  the reasonable royalty damages owed to Acorn as a result

04:43PM  25  of Samsung's infringement of Acorn's patents.

1  Q.   And how did you determine those reasonable royalty

2  damages?

3  A.   Well, the first thing we do is we start with the

4  law, as we've seen previously at the beginning of this

04:43PM  5  trial.

6  Q.   And is that the law you're referring to up there on

7  the screen?

8  A.   It is.  This is the patent damages statute which

9  guides the determination of damages in a litigation

04:44PM  10  matter such as this.

11  Q.   And what does this statute tell you about how we

12  determine the amount of damages in a patent infringement

13  case such as this?

14  A.   As shown on the slide, as we've heard already, the

04:44PM  15  damages are calculated to be adequate to compensate for

16  the infringement but in no event less than a reasonable

17  royalty for the use made of the invention by the

18  infringer.

19  Q.   And I see that you've underlined the phrase, "For

04:44PM  20  the use made of the invention by the infringer."  Why

21  did you do that?

22  A.   Because that's a very important aspect of the

23  damages statute, is understanding the value and use of

24  the invention in ensuring that you're calculating that

04:44PM  25  value attributed to that use.

1  Q.   Now, in determining the appropriate royalty in this

2  case, what type of information and data did you

3  consider?

4  A.   We reviewed quite a bit of information.  I prepared

04:44PM  5  a slide that summarizes, at a high level, the

6  information we reviewed.  We started obviously with

7  looking at the patents, although I'm not a technical

8  expert, but I did review the patents and discuss those

9  with Dr. Piner, who is the technical expert retained in

04:45PM  10  this case.

11       I also had discussions with Mr. Horgan, who you

12  heard from earlier today.  I've also reviewed a

13  significant amount of confidential documents and

14  information that were produced by both sides, Acorn, as

04:45PM  15  well as by Samsung; and included in that, I did my own

16  independent research, looking at license agreements and

17  other types of documents, as well as some of the

18  deposition testimony that we've seen played.  I've

19  reviewed that as well, including the expert reports of

04:45PM  20  the other experts retained in all the other legal

21  filings.  So quite a bit of information.

22  Q.   Can you give us an idea of approximately how many

23  documents you might have reviewed in connection with

24  your analysis?

04:45PM  25  A.   I don't know that I have an exact count of the

number of documents, but it's well over 10,000 pages of

documents, boxes of documents, if they were all printed.

Nowadays we have the benefit of looking at them

electronically.

04:46PM
Q.   About how many hours, approximately, did you spend

on your analysis?

A.   Between myself and my team, we've spent over 500

hours reviewing and analyzing all the information and

preparing my opinion.

04:46PM
Q.   So, Mr. Dell, when we put the patent statute slide

up a moment ago, it referred to a reasonable royalty.

What is a royalty?

A.   I think we saw this earlier.  I think Mr. Hueston

actually stole my thunder in this slide, but this is --

04:46PM
a royalty is very similar to a rent analogy.

As we heard, patents are property.  Just as

real property, you would pay rent for rights to use

property.  So as I tell my friends, if you sign the

lease agreement to an apartment building, you would pay

04:46PM
rent for rights to use that apartment for the term in

which you agree upon.

Similarly with patent licenses, parties agree

to pay for rights to use that patented property, and in

return, they agree to pay royalties, or rent, for rights

04:47PM
to use the technology.

Q.   Are there different forms of royalties or can you structure royalties in different ways?

A.   Yes, you can.  I think we've heard a little bit about this already, as well.

04:47PM   Q.   And what are those ways in which you can structure a royalty, or what are the different forms?

A.   The two general forms are in lump sum, or one-time royalty payment, which is a larger payment made for the use of the technology over the entire period; as well

04:47PM   as, the other form is a running royalty, which is similar to the rent analogy.  You would pay for the right to use the property over -- periodic payments over time.

Q.   And why might someone prefer a running royalty over

04:47PM   a lump sum royalty?

A.   Well, based on my experience, running royalties are often less risky.  They directly calculate the use.  I think you may recall, Mr. Horgan testified that if you use the technology, you pay for it; if you don't, you

04:48PM   don't pay for it.  And so it's a less risky proposition of paying a running royalty.

Q.   Okay.  So let's take a step back for a moment, Mr. Dell.  What is the formula for calculating a reasonable royalty?

04:48PM   A.   Well, the formula itself is rather simplistic.  It's

the royalty base, or extent of use, multiplied by a

royalty rate, or the value of that use, and the

multiplication of the two of those together equals the

royalty damages.

04:48PM   Q.   How do we determine the inputs for this royalty

formula?

A.   Well, again, we turn to the law.  So there's

guidance that damages experts, such as myself, will use,

and I've summarized these factors here on the slide.

04:48PM  And they are known as the Georgia-Pacific factors.

Q.   Now, did you come up with these factors, Mr. Dell?

Is this something of your own creation?

A.   Well, the slide is my creation, but the content of

the slide is not my creation, no.  These are 15 factors

04:48PM  that come from a case called the Georgia-Pacific case.

Q.   And I see that these factors are grouped into three

categories.  Why did you do that?

A.   Well, the -- in analyzing the individual factors,

many times the factors are similar in nature.  So, for

04:49PM  example, Factor 9 and Factor 10 are related to some of

the technology or the benefits of the technology, so I

grouped those or categorized those together.

Similarly, there are factors related to the

licensing of technology, and those would fall under the

04:49PM  licensing factors.  And then there are also other

1   factors that relate to the economics or the

2   profitability, sales, things of that nature, which get

3   categorized as the economic factors.

4   Q.   Does every Georgia-Pacific factor apply in every

04:49PM   5   case?

6   A.   No, not in every case.  In some cases, some

7   information or evidence exists, and in other cases it

8   doesn't.  And even in one case, some factors may be

9   relevant to other factors; so they are not always

04:49PM   10   mutually exclusive, either.

11   Q.   Now, looking at the way that you categorized these

12   factors here on this slide, it looks like Factor 15 is

13   not within any of your three categories.  Why is that?

14   A.   Well, Factor 15 is what's called the hypothetical

04:50PM   15   negotiation, and that factor is oftentimes looked at as

16   a culmination of all the other 14 factors.

17   Q.   So tell us a little bit about this hypothetical

18   negotiation, Mr. Dell.  How should we think of this?

19   A.   Well, I prepared a slide.  There's -- the

04:50PM   20   hypothetical negotiation is an imaginary negotiation

21   that takes place between a patent owner and a patent

22   user, or an infringer in a litigation context, at the

23   date of first infringement.

24   Q.   And what is the purpose of this hypothetical

04:50PM   25   negotiation?

A.   Well, the purpose is that -- unfortunately we're

sitting here today; we know this negotiation didn't

occur -- but it's to look at all of the information that

would be relevant as if the parties did come together at

04:50PM   the date of first infringement and would have agreed

upon a license agreement for rights to use the patents

at issue.

Q.   Are there any assumptions, Mr. Dell, that you're

required to make or any ground rules as you analyze this

04:51PM   hypothetical negotiation?

A.   Yes, there are.

Q.   And are those the ground rules that which we see

here on this slide?

A.   Yes, that's correct.  As you can see, the -- as this

04:51PM   recreated negotiation or imaginary negotiation, the

parties would recognize that Acorn -- it must assume in

part that Acorn's patents are valid and infringed and

enforceable.

Samsung would also acknowledge that they

04:51PM   infringed those patents, and they must pay for rights to

use those patents.  So they must enter into a license

agreement.

And as part of that construct, the parties

would willingly negotiate; and as part of that

04:51PM   negotiation, they would willingly share information, all

1   the information that we've heard or will hear throughout

2   the trial.  They would have willingly shared that in

3   this imaginary negotiation so that they could ultimately

4   come to an agreement.

04:51PM   5   Q.   Now, the second checkmark says, "Samsung's products

6   infringe," correct?

7   A.   Yes, that's correct.

8   Q.   Now, isn't Samsung contending that it doesn't

9   infringe Acorn's patents?

04:52PM   10   A.   Yes, sir, that's correct.

11   Q.   So what's the significance of that second checkmark?

12   A.   Well, that's -- again, we have to assume, in order

13   to calculate damages, that the patents themselves -- or,

14   excuse me, that Samsung does infringe the patents.

04:52PM   15   Q.   And are these ground rules, are these assumptions

16   something that all damages experts must make in

17   considering a hypothetical negotiation?

18   A.   Yes, sir, they are.

19   Q.   When should we assume that this hypothetical

04:52PM   20   negotiation occurred?

21   A.   Well, it takes place at the date of first

22   infringement.

23   Q.   And when was that, sir?

24   A.   In this case, the date of first infringement is

04:52PM   25   January of 2015, when Samsung first manufactured the

1   accused wafers or accused products incorporating the

2   accused technology at its fabrication facility in

3   Austin.

4   Q.   And who would have been the parties at this

04:53PM  5   hypothetical negotiation?

6   A.   At the time in January of 2015, Acorn Technologies

7   was the owner of the patents at the time, and Samsung

8   was the user of the technology, or the infringer of the

9   technology, at that time also.

04:53PM  10   Q.   Now, the Plaintiff in this matter is

11   Acorn Semi, LLC, correct?

12   A.   Yes, sir, that's correct.

13   Q.   And does the fact that Acorn Semi is the Plaintiff

14   and, yet, Acorn Technologies would have been at the

04:53PM  15   hypothetical negotiation table make any difference in

16   your analysis?

17   A.   No, none whatsoever.  As we heard Mr. Horgan testify

18   a little while ago, Acorn Semi is a wholly-owned

19   subsidiary of Acorn Technologies.  It's the same

04:53PM  20   decisionmakers for both companies; and, therefore, it

21   would not have any meaningful impact on the outcome of

22   the negotiation.

23   Q.   Mr. Dell, there are four patents in this case, each

24   with different issue dates.  Does that mean we would

04:53PM  25   have four different hypothetical negotiations?

1   A.    No, it would not be four separate hypotheticals,

2   because at the time of the January 2015 negotiation,

3   some of the patents that are at issue in this case were

4   pending at the time.  And as often common practice in

04:54PM   5   the licensing world, the parties would recognize that

6   they would seek to license the patent that was issued,

7   as well as other patents that would be related to that

8   patent later on.

9   Q.    And did you, Mr. Dell, use the hypothetical

04:54PM   10  negotiation framework in determining the appropriate

11  amount of damages in this case?

12  A.    Yes, sir, I did.

13  Q.    Let's turn to that now.  I believe you told the jury

14  that Samsung would owe Acorn $326.2 million in damages.

04:54PM   15  Why so much, Mr. Dell?

16  A.    Well, as we go back to the damages statute that I

17  mentioned a moment ago, when you look at the extent of

18  use of Acorn's technology, Samsung has sold a

19  significant amount of product incorporating Acorn's

04:54PM   20  technology; so it's a function of the extent of

21  Samsung's use of Acorn's inventions.

22  Q.    And how did you calculate that $326 million?

23  A.    Well, we looked at a lot of confidential information

24  that was produced as part of that analysis, but we go

04:55PM   25  back to, again, the royalty formula that we talked about

1  earlier.

2  Q.   And is that the formula that we see here on this

3  screen?

4  A.   Yes, sir, it is.

04:55PM  5  Q.   And what are the inputs to this formula, again?

6  A.   It's the royalty base times the royalty rate equals

7  the damages.

8  Q.   So let's start with the royalty base, Mr. Dell.  How

9  do damages experts, such as yourself, determine the

04:55PM  10  royalty base?

11  A.   Well, once again, we turn back to what the law -

12  what the law requires.  In the first step of the process

13  of looking at a royalty base is what's called the

14  smallest saleable patent practicing unit.

04:55PM  15  Q.   Okay.  Is that what we see here on this screen?

16  A.   Yes, it is.

17  Q.   It's a mouthful, Mr. Dell.  Can you explain what

18  that is?

19  A.   Well, it's a legal construct; but generally

04:56PM  20  speaking, the smallest saleable patent practicing unit,

21  or SSPPU, is the smallest unit or component that is

22  itself sold or saleable that also practices the claims

23  of the patent or patents.

24  Q.   And how did you determine what the SSPPU is in this

04:56PM  25  case?

A.   Well, it's a bit of a technical exercise, and given
that, again, I'm not the technical expert, I discussed
this with Dr. Piner since that's his area of expertise,
to gain an understanding of the accused products and how
04:56PM  Acorn's patents are within those accused products.
Q.   And what did Dr. Piner tell you, or what did he
identify as the smallest saleable patent practicing
unit?
A.   Well, based on his analysis and on my discussions
04:56PM  with him, although Acorn's patents benefit the chips
that go into the devices that improve performance, as
we've heard, the smallest saleable patent practicing
unit itself is the semiconductor -- finished
semiconductor wafer.
04:57PM  Q.   And do we see an image of that semiconductor wafer
on the slide on the screen?
A.   Yes, sir, at the left, left portion of that slide.
Q.   Okay.  And we also see some other items on the
slide.  What are those, Mr. Dell?
04:57PM  A.   So my understanding, the wafers are, when completed,
are cut up into die and then packaged into chips, which
we see in the middle, and then those are then
incorporated into Samsung's devices such as phones,
televisions, other end-consumer devices.
04:57PM  Q.   And does the wafer itself, do you understand that

1   the wafer itself infringes Acorn's patents?

2   A.   Yes, that's my understanding from Dr. Piner.

3   Q.   And then how do those wafers -- if you could explain

4   again, how do those Samsung wafers end up in the accused

04:57PM   5   products in this case?

6   A.   So as we heard earlier, 90 percent or more, in some

7   years, of the Samsung -- or of the wafers are

8   manufactured at Samsung Austin Semiconductor in Austin,

9   here in the United States.   Those wafers are then

04:58PM   10   shipped over to Samsung Electronics in -- excuse me,

11   Samsung Electronics Company in Korea, where they are

12   then turned into chips and then later incorporated into

13   phones or devices that are then later imported back into

14   the United States.

04:58PM   15          MR. DIXON:   Your Honor, at this time we are

16   going to go into some confidential information, and I

17   would ask that we please seal the courtroom.

18          THE COURT:   All right.   Based on Counsel's

19   request and representations, I'll order the courtroom

04:58PM   20   sealed at this time.   Those present, not subject to

21   protective order that's been entered in this case,

22   should exit the courtroom and remain outside until it is

23   unsealed and reopened.

24          (Whereupon, the following portion of the

04:58PM   25   proceedings is sealed and filed under separate cover as







































05:21PM

05:21PM

11          (Proceedings now unsealed.)

12          THE COURT:  All right, Mr. Dixon.  We're

13   unsealed.  You may continue.

14          MR. DIXON:  Thank you, your Honor.

05:21PM   15   Q.   Mr. Dell, did you find any real-world licenses

16   outside of the settlement context that would have been

17   comparable to the hypothetical negotiation license?

18   A.   Yes, I did.  As part of my analysis, my independent

19   research, I did find several agreements related to

05:22PM   20   semiconductor technologies generally.

21   Q.   How many did you find?

22   A.   My recollection is somewhere, 15 agreements, 16

23   agreements.

24   Q.   And did you identify any that were helpful and that

05:22PM   25   you relied upon in connection with your analysis?

A.   I did.  There were four agreements specifically that
were technologically comparable to the Acorn technology.
Q.   And are those four real-world licenses the ones we
see here on the screen on Slide 34?

05:22PM  A.   Yes, they are.
Q.   And can you please identify those licenses?
A.   Yes.  PTX-171 and 182 is a May 1999 and July 2003
agreement between Chartered Semiconductor and Motorola.
        PTX-179 is a July 1999 IBIS

05:23PM  technology/Mitsubishi Materials license agreement.
        PTX-180, 176, and 2473 is a December 2000
license agreement between IBIS technology and IBM.
        And PTX-1179 is a December 2006 patent license
agreement between ASM International and Atomera, but

05:23PM  also R.J. Mears, which is a predecessor company to
Atomera.
Q.   Mr. Dell, is it common for a damages expert, such as
yourself, to rely upon these real-world license
agreements in determining the appropriate amount of

05:23PM  damages even if these real-world license agreements
don't involve the parties to litigation?
A.   Yes, it is.  In fact, Georgia-Pacific Factor 12, one
of the licensing factors, specifically talks about
royalty rates in the industry for analogous

05:23PM  technologies, or comparable technologies.

1  Q.   So after identifying these four agreements, what did

2  you do next?

3  A.   Well, as I mentioned, I bugged Dr. Piner quite a

4  bit, and I asked him to review the technologies in these

05:24PM  5  agreements to determine if they are also technologically

6  comparable to Acorn's patents.

7  Q.   And did Dr. Piner, was he able to determine whether

8  they were technically comparable?

9  A.   Yes, he was.

05:24PM  10  Q.   And what did he tell you?

11  A.   Well, generally speaking, he indicated that with

12  these agreements specifically, they all relate, in one

13  way or another, to the formation of oxide layers on a

14  semiconductor.

05:24PM  15  Q.   And, Mr. Dell, on Slide 34 here, you refer to

16  patents for each of these agreements.  Was there other

17  technology, in addition to patents, that were -- that

18  was licensed as part of these agreements?

19  A.   In some of them, yes, but not all of them.

05:24PM  20  Q.   And does that mean you were unable to rely upon them

21  or that they are not useful in calculating a reasonable

22  royalty?

23  A.   No, not at all.  It's something I took into account

24  and it was a consideration; and as part of the analysis,

05:25PM  25  you can account for that and adjust for that.

1    Q.    And these four agreements, was any one of them

2    especially helpful in determining the appropriate

3    royalty in this case?

4    A.    There was.   The ASM/Atomera agreement was an

05:25PM   5    agreement of particular relevance given its

6    comparability to the Acorn patents.

7    Q.    And do we see some excerpts from that agreement here

8    on the screen?

9    A.    Yes, we do.

05:25PM   10   Q.    Is that PTX-1179?

11   A.    Yes, sir.

12   Q.    So what was it about this agreement that made it

13   particularly helpful?

14   A.    Well, as a start, there was only two patents

05:25PM   15   licensed, so a small number of patents; and based on my

16   understanding from Dr. Piner, the patents themselves

17   related to in-situ growth of oxide layer and silicon

18   layers in semiconductor devices, or on semiconductor

19   wafers particularly.

05:25PM   20   Q.    And when was this agreement executed?

21   A.    In December of 2006.

22   Q.    Do you know if it ever expired?

23   A.    It did.   It expired in January of 2019.

24   Q.    So would this agreement have been known or

05:26PM   25   potentially known to the parties during the hypothetical

1    negotiation in this case?

2    A.   Yes, it would have.  It's publicly available, which

3    is how I was able to find it, but also it was active and

4    the parties were operating under this agreement at the

5    time of the hypothetical negotiation in January 2015.

05:26PM

6    Q.   Now, I see in the top right corner, we have the

7    name, "Atomera," but in the agreement, we've highlighted

8    the name, "Mears."  Are those two different parties?

9    A.   They were not.  They were -- Atomera was originally

10   known as R.J. Mears, LLC, which ultimately became

05:26PM

11   Mears Technologies.  So it was a name-change, as I

12   understand it, from looking through the documents.

13   Q.   So what, to your understanding, Mr. Dell, did

14   R.J. Mears or Atomera agree to pay royalties on revenue

15   from wafer sales under this agreement?

05:27PM

16   A.   Yes, they did.

17   Q.   And how did you come to that conclusion?

18   A.   Well, I reviewed the agreement and followed the

19   terms of the agreement; and they explicitly provide an

20   indication of how the parties agree to those terms.

05:27PM

21   Q.   Can you walk us through those terms that helped you

22   reach the determination that wafers were one of the

23   licensed products under this agreement?

24   A.   Sure.  We can start at the bottom, which is the

25   license grant; and as you can see, ASM granted

05:27PM

R.J. Mears, or Atomera, a nonexclusive license under the license claims or under the patents to develop, make, have made, use, sell, offer to sell, lease, or import licensed products.

05:27PM          And then if we look above where "Licensed product" is defined, it talks about the products comprising of permitted structures, which is again also defined.

                 And so going to the next term, we can
05:27PM   see -- although I won't read all the formulaic information here, but it talks about, in the middle, the microlayer of atomic oxygen at a specific range between two high-quality, single crystal silicon wafers for the purpose of achieving enhanced semiconductor device
05:28PM   performance.

                 So when putting all those terms together, you can see that the licensed product itself is a semiconductor wafer.

Q.   And why is that relevant to your analysis, Mr. Dell?
05:28PM   A.   Well, one of the relevancies is understanding of economic comparability.  The licensed products in this license are the same or similar to the licensed products that would be contemplated at the hypothetical negotiation between Acorn and Samsung.
05:28PM   Q.   And what rate did Atomera agree to pay ASM under

1   PTX-1179?

2   A.   So under the next slide, you can see, under the

3   royalty provision, Atomera agreed to pay ASM a royalty

4   of 2 1/2 percent of net revenues on the sale of wafers

05:29PM   5   for wafers manufactured on an ASM machine, but they also

6   agreed to pay a royalty of 5 percent of net revenues on

7   the sale of wafers, on wafers manufactured on machines

8   other than ASM machines.

9   Q.   Now, there's a reference for both of those

05:29PM   10   royalties, 2 1/2 percent and 5 percent to net revenues.

11   What does net revenues include?

12   A.   Well, if we go to the next slide, we can see net

13   revenues is, again, another defined term, but it talks

14   about, from an accounting perspective, the net revenue

05:29PM   15   is the sale or other disposition of a licensed product

16   or the performance of the processes.

17            And so, again, using the terms of the

18   license itself indicates that the net sales would

19   include the sale of wafers, as well as other revenues

05:29PM   20   potentially.

21   Q.   Now, you said that there were three other

22   agreements, industry licenses that you relied upon as

23   well.   Let's go through each of those briefly, Mr. Dell.

24   We've got the December 2000 agreement between IBIS and

05:30PM   25   IBM.   How was this relevant to your analysis?

A.   Again, this is another industry agreement for

comparable technology, and it relates specifically to,

again, my understanding from Dr. Piner, implanting

oxygen on silicon wafers.  And, in fact, the licensed

05:30PM  5  product itself is a silicon wafer.

Additionally, as shown in the agreement,

IB- -- excuse me, IBIS agreed to pay IBM a royalty of

4.75 percent on the net revenue for each licensed

product, which is a wafer.  So, again, from an economic

05:30PM  10  comparability and a licensing structure in the industry

in the real world, this is how parties would negotiate

these types of agreements.

Q.   Now, I see a reference in Section 5.1 on the slide

here to a technology transfer fee of $500,000.  What is

05:31PM  15  that, Mr. Dell?

A.   Well, that actually was a payment that was made.

There was some additional technology that was

transferred as part of this agreement.  I believe it may

have been some recipes; they are actually defined in the

05:31PM  20  agreement itself.  And as part of that, they agreed to

pay compensation specifically for that other technology

transfer fee.

Q.   And because this agreement involved a technology

transfer fee or other technologies, does that mean that

05:31PM  25  a damages expert, such as yourself, can't use this in a

1    hypothetical negotiation framework?

2    A.   No, not at all.  And, again, the rate in this

3    agreement is also consistent with the other agreements

4    that I've seen, as well, so you can see that the rates

05:31PM    5    are similar.

6    Q.   Let's look briefly at those other two.  We've got

7    the IBIS/Mitsubishi from July 1999.  Tell us about this

8    agreement, Mr. Dell.

9    A.   So, again, this is another agreement that involves

05:31PM    10   IBIS Technology Corporation.  They are actually

11   licensing patents to Mitsubishi Materials, and there's

12   actually a single patent that was licensed as part of

13   this agreement.  My understanding, again, from Dr. Piner

14   is this relates to the formation of oxide, or oxygen, on

05:32PM    15   semiconductor wafers; and as part of that, they agreed

16   to pay an initial royalty fee of $700,000 but also an

17   ongoing royalty rate, running royalty of 2 1/2 percent,

18   2.5 percent on net sales of SIMOX wafers; so, again, a

19   running royalty based upon revenue attributed to wafer

05:32PM    20   sales.

21   Q.   And the last one is a Chartered

22   Semiconductor/Motorola agreement.  How did you make use

23   of this, Mr. Dell?

24   A.   So similar to the other agreements I reviewed, this

05:32PM    25   is a July -- excuse me.  This is actually a 1999

1  agreement, as well as a follow-on agreement in 2003

2  where Chartered and Motorola had licensed each other's

3  technology; and as part of that, they agreed to pay a

4  royalty of 2 percent to 3 percent on wafer revenue for

05:33PM  5  the term of the license, as well as other considerations

6  paid for other technology transfer that occurred.

7  Q.   I see that you've highlighted, "Payments equaling

8  $41.5 million."  Why did you do that?

9  A.   Because the agreement itself specifies that the

05:33PM  10  $41 million is actually broken out in the agreement, but

11  that was for rights to some of the other technology

12  transfer that occurred; so that was monies paid up front

13  prior to all of the royalty payments that would take

14  place over the term of the agreement.

05:33PM  15  Q.   I believe you testified that as part of your

16  analysis, you spoke with Mr. Tom Horgan, correct?

17  A.   Yes, that's correct.

18  Q.   And did you have an opportunity to discuss any of

19  these industry licenses with Mr. Horgan?

05:33PM  20  A.   I did, yes.

21  Q.   And what did Mr. Horgan share with you about these

22  industry licenses?

23  A.   Well, one, he was obviously very --

24       MR. CORDELL:  Objection, your Honor.  Hearsay.

05:33PM  25       THE COURT:  What's your response?

1          MR. DIXON:  Your Honor, this is the type of

2    information that an expert would normally rely upon.  It

3    was disclosed in his expert report that this is the

4    conversation that he had with Mr. Horgan, and he was the

05:34PM    5    source of this information.

6          THE COURT:  Well, I'll allow the witness to

7    testify as to what he relied on.  He's not going to give

8    verbatim statements or conversation from a third-party

9    source.  He can identify the substance of what he relied

05:34PM   10    on, if it came from Mr. Horgan or wherever it came from.

11    He's not going to be a vehicle by which an out-of-court

12    statement is going to be repeated before the jury.

13          MR. DIXON:  Understood.  Thank you, your Honor.

14          THE COURT:  All right?

05:34PM   15    Q.   So, Mr. Dell, what did you take away from your

16    conversation with Mr. Horgan about these industry

17    licenses?

18    A.   My recollection was that he was familiar with the

19    companies that were involved in these licenses.  In

05:35PM   20    fact, he testified a moment ago that he was familiar

21    with Atomera.  In fact, an Acorn employee is now

22    employed at Atomera, as I understood from his testimony

23    a moment ago.

24    Q.   And did you have an understanding that the form of

05:35PM   25    these agreements, meaning a running royalty on a wafer,

1  would be a form acceptable to Acorn Technologies?

2  A.   Yes.  In fact, as Mr. Horgan testified, Acorn has

3  actually entered into a license agreement with

4  Sequans Technologies -- or Sequans Communications,

05:35PM  5  excuse me.

6  Q.   And is PTX-90, which is Slide 45, is that a license

7  agreement with Sequans?

8  A.   Yes, it is.

9  Q.   Did you rely upon this Sequans agreement to

05:35PM  10  determine your royalty rate in this case?

11  A.   I didn't rely on it to determine my royalty rate,

12  but it does indicate, particularly with respect to

13  Georgia-Pacific Factor 4, the licensing policies and

14  practices of Acorn generally in that it prefers and it

05:35PM  15  has entered into agreements with a running royalty

16  structure.

17  Q.   Are you aware of any evidence -- and perhaps you

18  heard it today -- that Samsung would agree to a running

19  royalty rate in a license such as the hypothetical

05:36PM  20  license?

21  A.   Yes.  I believe we just heard Mr. Lee's testimony in

22  that regard.

23  Q.   And is that the testimony that we see here on

24  Slide 46?

05:36PM  25  A.   Yes, it is.

1  Q.   And Slide 47?

2  A.   Yes, that's correct.  He testified that Samsung has

3  entered into running royalty agreements previously and

4  that there's no policy that they would not enter into a

05:36PM  5  running royalty agreement.

6  Q.   And did you see any industry policies or guidelines

7  indicating that a running royalty was an appropriate

8  form of a royalty for the hypothetical license?

9  A.   Yes, I did.  In fact, there's a well-known and

05:36PM  10  established policy in the semiconductor industry from

11  IBM in which IBM licensed its patents at a royalty rate

12  of 1 percent per patent, not to exceed 5 percent of the

13  selling price of the licensed product.

14  Q.   Now, after analyzing all these, all these

05:37PM  15  agreements, Mr. Dell, does this slide summarize your

16  conclusions?

17  A.   It summarizes my conclusions of all the licensing

18  factors and the evidence that would inform the parties

19  of the hypothetical negotiation and how they would

05:37PM  20  negotiate.

21  Q.   And what was your conclusion after analyzing the

22  Georgia-Pacific licensing factors?

23  A.   So based upon my analysis of the Georgia-Pacific

24  licensing factors, it is my -- I determined that Acorn

05:37PM  25  would enter the negotiation at a royalty rate of

1   5 percent and Samsung would enter the negotiation at a

2   royalty rate of 2 percent based upon the relevant

3   comparable licenses that I reviewed as part of my

4   analysis.

05:37PM  5   Q.   So now that we have this range of values for the

6   licensing of comparable technology, what did you do

7   next?  Did you look at the economic factors?

8   A.   That's correct.  The next step would be looking at

9   that bucket of factors.

05:37PM  10   Q.   And which Georgia-Pacific factors are the economic

11   factors?

12   A.   Generally speaking, the Factor 8, Factor 11, and

13   Georgia-Pacific Factor 13 relate to the Georgia-Pacific

14   factors.

05:38PM  15   Q.   Let's start with Georgia-Pacific Factors 8 and 11.

16   What did you learn with respect to the commercial

17   success and the popularity of the products made that was

18   relevant to your analysis?

19   A.   Well, this is what we talked about a little bit

05:38PM  20   earlier, which is Samsung, the Acorn patents benefit not

21   only the chips but the devices that they go into, and so

22   with faster performance and lower battery use,

23   et cetera; and so based upon that, the parties would

24   recognize that there's been significant commercial

05:38PM  25   success not only in the sales of wafers but also in the

sales of the chips that go into the devices, and that

would be a factor that the parties would acknowledge and

understand in the negotiation.

Q.   And what evidence did you see of the commercial

05:38PM   success?

A.   Well, the sales data, for one; but there was also

other evidence, in terms of Samsung's financial or its

public statements in press releases related to its

financial performance.

05:39PM   Q.   And is this one of the examples that we see here on

Slide 52?

A.   Yes, it is.  This is an earnings release from the

first quarter of 2015, which would be right around the

time of the hypothetical negotiation in January of 2015;

05:39PM   and as part of that, the -- Samsung was acknowledging

that it expected earnings to improve as 14-nanometer

supply would increase and that it would be driven by the

expansion of 14-nanometer FinFET sales so that the

products at issue in this case would actually be helping

05:39PM   Samsung's earnings.

Q.   Now, these -- this slide refers to expectations.

Did you see any future earnings releases or earnings

release statements down the road that indicated whether

these expectations came to fruition?

05:39PM   A.   Yes, I did.

1   Q.   Is this an example here on Slide 53?

2   A.   Yes, sir, it is.  This is a similar press release

3   but from the second quarter of 2016, so about a year and

4   a half later.  And, again, the same types of information

05:40PM   5   were trumpeted by Samsung with respect to its earnings

6   improvement by stronger demand for 14-nanometer and

7   premium smartphones, and it would maintain stable

8   revenues by solid demand for 14-nanometer products and

9   that it expected that demand for 14-nanometer to

05:40PM   10   increase.

11   Q.   So let's turn now to Georgia-Pacific Factor 13.  Are

12   the relevant considerations identified here on Slide 54?

13   A.   They are, yes.

14   Q.   And how did you take these into account?

05:40PM   15   A.   Well, Georgia-Pacific Factor 13 looks at the portion

16   of the profit that would be analyzed as part of the

17   determination of the royalty.  The first step of that,

18   as I talked about a moment ago, is apportionment -- the

19   principle of apportionment.  So we're looking only at

05:40PM   20   the value of a wafer as a starting point.

21        The second part would be looking at the royalty

22   rates that have informed the negotiation are already

23   apportioned because their rates apply to the wafer

24   values isolated to comparable technology.

05:41PM   25        So the first step in the analysis, that's where

1   Georgia-Pacific Factor 13 starts.

2          And then secondly, you then look at what

3   Samsung would bring to the table.  So you give credit

4   for Samsung's contributions.  Samsung has other

05:41PM   5   downstream technologies such as packaging, what I

6   understand to be called end-of-line in semiconductor

7   manufacturing.  They have spent billions of dollars

8   developing fabrication facilities.  All of those factors

9   would weigh heavily in Samsung's favor in the

05:41PM   10   negotiation and how they would ultimately negotiate.

11   Q.   So, Mr. Dell, after considering the technical

12   benefits, the licensing factors, the economic factors,

13   what did you determine was the appropriate royalty rate

14   that the parties would have agreed to in the course of a

05:41PM   15   hypothetical negotiation?

16   A.   So based upon my analysis of all the factors,

17   ultimately, with respect to Factor 13, from that

18   2-to-5 percent negotiation range, Samsung and Acorn

19   would have ultimately agreed to a royalty rate of 3.5

05:42PM   20   percent to be applied to the value of the wafers that

21   are incorporating Acorn's technology.

22   Q.   And how did you determine that this 3.5 percent was

23   the appropriate royalty rate?

24   A.   Well, as I mentioned, the starting point of a

05:42PM   25   5 percent royalty based on a comparable license, as well

as giving Samsung credit, in fact, significant credit

for its contributions would drive the royalty, from that

5 percent starting rate, down; and as a result, the

parties would also acknowledge the counterbalancing

05:42PM   factor of the downstream sales of products and the

upwards that would be negotiated between the parties.

Q.   So after reviewing everything and completing your

analysis, sir, what did you determine -- can you remind

the ladies and gentlemen of the jury what you determined

05:43PM   to be the appropriate amount of reasonable royalty

damages that Samsung would owe to Acorn for Samsung's

infringement of Acorn's patented technology?

A.   Yes, at this point we can now fill in the royalty

formula.   So we take the 3.5 percent royalty rate and we

05:43PM   apply that to the $9.3 billion in accused wafer revenue,

and multiplying those two together results in reasonable

royalty damages of $326,253,243.

Q.   And I see that we have the patent damages statute

back up, but this time, you highlighted the phrase, "But

05:43PM   in no event less than a reasonable royalty."   Why did

you do that?

A.   Well, I think we heard this at the very beginning of

the trial that a reasonable royalty is the damages

adequate to compensate and are no less than a reasonable

05:43PM   royalty.   So a royalty is the floor to which damages do

```
 1   not fall below.
 2   Q.   And that $326.2 million, is that for all the
 3   asserted patents?
 4   A.   Yes, it is.
 5   Q.   And is that your opinion, even if only one of the
 6   patents is found infringed?
 7   A.   Yes, it is.
 8   Q.   And why is that?
 9   A.   Well, because as you'll hear, I believe tomorrow
10   from Dr. Piner, all of the patents themselves are, in
11   fact, related and have a similar scope or specification
12   and, therefore, either individually or collectively
13   would provide the same benefit to the accused products.
14   Q.   And is that $326.2 million a one-time lump sum
15   royalty?
16   A.   No, it is not.  It is actually a calculation based
17   upon the extent of use of Samsung for the relevant
18   period.
19   Q.   And is that what we see here on this slide?
20   A.   Yes, it is.
21   Q.   And so would the form of the royalty be a running
22   royalty or a lump sum?
23   A.   It would be a running royalty.
24   Q.   Why is that?
25   A.   Well, because the Acorn patents do not expire until
```

1    2023, I believe, and so there would be royalties that

2    would be continued to be after, to the extent that they

3    are determined to be infringing, that they would be paid

4    after March of 2021, which is the most recent period we

05:45PM  5    have data for.

6    Q.    Thank you, Mr. Dell.

7            MR. DIXON:  Your Honor, I pass the witness.

8            THE COURT:  All right.  Ladies and gentlemen,

9    before we proceed with cross-examination, we're going to

05:45PM  10   recess for the day.  This is going to be a fairly

11   lengthy cross-examination and there will probably be

12   redirect, and I'm not about to keep you up here until

13   7:00 or so, which is probably what it would take to get

14   this witness off the stand today.

05:45PM  15           As you leave the courtroom in a few minutes, be

16   sure you take your notebooks with you.  Leave them

17   closed on the table in the jury room.  Please follow all

18   the instructions I've given you about your conduct,

19   including, of course, you would expect me to remind you

05:45PM  20   not to discuss the case with anyone.

21           Please plan your travel tomorrow so that you

22   can be at the courthouse and assembled in the jury room

23   and ready to go by 8:30.  We will do our best to start

24   at 8:30 tomorrow morning.

05:45PM  25           Travel safely to your homes.  Have a good

1    evening, and until tomorrow morning, you are excused.

2             (Whereupon, the jurors leave the courtroom.)

3             THE COURT:  All right.  Please be seated.

4             Counsel, we used a total of 4 hours and 56

05:46PM   5    minutes of trial time today.  Of that, Plaintiff has

6    used 3 hours and 32 minutes and Defendants used an hour

7    and 24 minutes.

8             We'll begin with Defendants' cross-examination

9    of Mr. Dell in the morning.

05:47PM   10            Mr. Horgan, this is not a big deal, but I would

11   prefer corporate counsel [sic] sit at the counsel table

12   throughout the trial.  If you'll make sure you're at

13   counsel table tomorrow and stay there during the

14   remainder of the trial, please, sir.

05:47PM   15            Are there any issues that either side needs to

16   raise with the Court before we recess for the day?

17            MR. McKEON:  Your Honor, may I raise one issue

18   regarding a MIL?

19            THE COURT:  That's why I asked, Mr. McKeon.

05:47PM   20            MR. McKEON:  Thank you, your Honor.  We had a

21   MIL, your Honor.  You may know, the MIL -- Samsung MIL 8

22   related to total sales.  And as you heard from the

23   witness, they have a 9.3 billion wafer sale theory in

24   this case.  And the MIL does permit Acorn to get into

05:47PM   25   convoyed sales beyond that, and they went into testimony

on slide -- one of their slides, Slide 20, where they

showed revenue from downstream devices up to

$32 billion, and there was no testimony of that being

convoyed sales or anything of that nature.  I am very

05:48PM  5   concerned that that is a violation of your Honor's MIL.

THE COURT:  All right.  Do you have a response

to that, Mr. Dixon?

MR. DIXON:  I do, your Honor.  The disclosure

of the chip revenue, as well as the revenue from the

05:48PM  10  accused products is relevant under Georgia-Pacific

Factors 6, as well as 8 and 11, and part of the convoyed

sales.  We disclosed these two exhibits, these two

slides, to Samsung.  They initially objected to them,

your Honor, and then dropped the objections; and,

05:48PM  15  therefore, they were on notice.  They were clearly aware

of them because they initially said, "We disagree with

them."  We said, "What's your basis?"

And by the time we pressed them, they

dropped it; and, therefore, we felt that they were

05:48PM  20  appropriate.  Not only were they relevant to

Georgia-Pacific Factors 6, 8 and 11 and part of the

convoyed sales, Samsung was on notice and dropped any

objections.

THE COURT:  Well, the Court's limiting order

05:49PM  25  did permit exploration into the area of convoyed sales.

1          As I recall, the primary thrust of Defendants'

2     MIL Number 8 was to preclude exploration into Samsung's

3     overall wealth and financial position, which I don't

4     necessarily believe that there's been a violation of.

05:49PM    5     Tell me how you think the MIL has been violated,

6     Mr. McKeon.

7          MR. McKEON:  Your Honor, they didn't violate

8     the MIL in that regard, and we do, of course, appreciate

9     that.  But the fact that they never linked the

05:49PM   10     downstream sales to any convoy issue, there's no

11     testimony regarding that at all from a witness.  So as

12     it stands now, this is revenue that has nothing to do

13     with the theory of their case that they put in front of

14     the jury.  It was a big number in front of the jury, and

05:49PM   15     I'm concerned by that.

16          THE COURT:  Well, I certainly have no problem

17     with you testing that testimony on cross-examination;

18     and if it is, in fact, convoyed sales, it's one thing.

19     If it can't be linked to convoyed sales, that's another.

05:50PM   20          I think the door's open to a vigorous

21     cross-examination of it, but I don't know that I'm

22     persuaded there's an actual violation of an order in

23     limine here.

24          MR. McKEON:  Thank you, your Honor.  Appreciate

05:50PM   25     it.

1       THE COURT:  Okay.  Anything further, Counsel?

2       MR. DIXON:  Nothing from Acorn, your Honor.

3       MR. CORDELL:  Nothing from Samsung, your Honor.

4 Thank you.

05:50PM  5       THE COURT:  Let me remind and urge both sides

6 to vigorously meet and confer overnight.  We have quite

7 a lengthy list of overnight objections to wade through

8 today that we were able to get through, but I would

9 certainly enjoy my morning a lot more tomorrow if there

05:50PM 10 were fewer of those that we have to take up.  So I'm

11 going to ask that both sides redouble their efforts to

12 work through those kind of issues; however, I will be in

13 chambers by 7:30.  We'll follow the same procedure

14 regarding reporting overnight disputes and dealing with

05:51PM 15 any unresolved disputes before I bring the jury in

16 tomorrow.

17       I've told them we're going to start at 8:30, so

18 we're going to find a way to start at 8:30 in the

19 morning.

05:51PM 20       Anything else before we recess for the evening?

21       MR. DIXON:  Nothing from Acorn, your Honor.

22       MR. CORDELL:  No, your Honor.  Thank you.

23       THE COURT:  All right.  We stand in recess

24 until tomorrow morning.

25   (Proceedings concluded for the day at 5:51 p.m.)

1           CERTIFICATE OF OFFICIAL REPORTER

2

3           I, Dana Hayden, Deputy Official Realtime Court

4   Reporter, in and for the United States District Court

5   for the Eastern District of Texas, do hereby certify

6   that pursuant to Section 753, Title 28, United States

7   Code that the foregoing is a true and correct transcript

8   of the stenographically reported proceedings held in the

9   above-entitled matter and that the transcript page

10  format is in conformance with the regulations of the

11  Judicial Conference of the United States.

12          Dated this 13th of May, 2021.

13

14

15

16  _____

17          Dana Hayden, CCR, RMR, CRR, CRC
            Federal Official Court Reporter

18

19

20

21

22

23

24

25